JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



09 CIV 6220

---------------------------------------x

ALASKA ELECTRICAL PENSION FUND,
on Behalf of Themselves and All Others
Similarly Situated,

                      Plaintiff,

       vs.

KERR-MCGEE CORPORATION,
ANADARKO PETROLEUM
CORPORATION, LUKE R. CORBETT,
GREGORY PILCHER, ROBERT M.
WOHLEBER, J. MICHAEL RAUH,
THOMAS W. ADAMS, MARY
MIKKELSON and MARTY J. ROWLAND,

                  Defendants.

---------------------------------------x

Civil Action No.

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Tronox Incorporated ("Tronox" or "the Company"), Kerr-McGee Corporation, Anadarko Petroleum Corporation ("Anadarko"), as well as regulatory filings and reports, securities analysts' reports and advisories about those entities, legal filings, press releases and other public statements issued by those entities, and media reports about those entities and the allegations made in the Adversary Proceeding styled *Tronox Incorporated, Tronox Worldwide LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and Tronox LLC f/k/a Kerr-McGee Chemical LLC v. Anardarko Petroleum Corporation and Kerr-McGee Corporation*, Case No. 09-10156 (ALG) (S.D.N.Y. Bankr.) (referred to as the "Adversary Proceeding"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all purchasers of Tronox common stock (Class A or Class B) between November 28, 2005 and January 12, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities and Exchange Act of 1934 (the "Exchange Act").

2.      Tronox is not named as a Defendant in this action as it filed for bankruptcy protection on January 12, 2009.  This case concerns a fraudulent scheme to conceal Tronox's massive environmental and other liabilities.

3.      Tronox was spun-off from Kerr-McGee Corporation ("Kerr-McGee") in a two-step transaction. In November 2005, Kerr-McGee sold 17.5 million shares of Tronox Class A shares in an initial public offering for $14.00 per share (the "IPO") generating proceeds for Kerr-McGee of $225 million.  After the IPO, Kerr-McGee continued to hold 56.7% of Tronox's outstanding

was delisted on September 30, 2008. Additionally, Tronox's bankruptcy proceeding is pending in this District and many of the facts and circumstances at issue in this case are similar to those in the Adversary Proceeding.

9.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.      Plaintiff Alaska Electrical Pension Fund purchased the common stock of Tronox during the Class Period, as set forth in the certification attached hereto and incorporated by reference herein, and has been damaged thereby.

11.      Tronox is a Delaware corporation engaged in the business of producing and marketing titanium dioxide – a white pigment used in a wide range of products to impart whiteness, brightness and opacity. The Company has operations and facilities in the United States, the Asia Pacific region, and Europe. On January 12, 2009, Tronox and 14 of its affiliated companies ("Tronox Entities") filed for Chapter 11 protection in this District. Due to the bankruptcy filing, the Tronox and the Tronox Entities are not named as Defendants in this action.

12.      Defendant Anadarko is a Delaware corporation headquartered in The Woodlands, Texas. On June 22, 2006, Anadarko offered to acquire Kerr-McGee for $18 billion, including $16.4 billion in cash. On August 10, 2006, the shareholders of Kerr-McGee approved the offer, and Kerr-McGee became a wholly owned subsidiary of Anadarko. Accordingly, Anadarko is a successor in interest to Kerr-McGee.

13.      Defendant Kerr-McGee Corporation is a wholly owned subsidiary of Anadarko. Kerr-McGee directed and oversaw the IPO and reaped the financial benefits from the IPO. Furthermore, Kerr-McGee controlled Tronox until the time of the Spin-Off.

14.     Defendant Luke R. Corbett ("Corbett") was the Chairman and Chief Executive Officer ("CEO") of Kerr-McGee at all times relevant hereto.  Through his positions and share ownership, Corbett was a control person of Kerr-McGee.

15.     Defendant Gregory F. Pilcher ("Pilcher") was a Vice President and the General Counsel of Kerr-McGee at all relevant times.  Pilcher was intimately involved in the IPO and the drafting of the Registration Statement.  Through his positions and share ownership, Pilcher was a control person of Kerr-McGee.

16.     Defendant Robert M. Wohleber ("Wohleber") was a Senior Vice President and the Chief Financial Officer ("CFO") of Kerr-McGee at all times relevant hereto.  Defendant Wohleber was also a director of Tronox during the Class Period and signed the Registration Statement.  Through his positions and share ownership, Wohleber was a control person of Kerr-McGee.

17.     Defendant J. Michael Rauh ("Rauh") was the Vice President and Controller of Kerr-McGee at all times relevant hereto.  Defendant Rauh was also a director of Tronox during the Class Period and signed the Registration Statement.  Through his positions and share ownership, Rauh was a control person of Kerr-McGee.

18.     Defendant Thomas W. Adams ("Adams") was the CEO and a Director of Tronox during the Class Period.  Defendant Adams served as CEO from the beginning of the Class Period until August 15, 2008 when he was replaced as CEO by Dennis L. Wanlass.  Defendant Adams signed the Registration Statement.

19.     Defendant Mary Mikkelson ("Mikkelson") was the Senior Vice President and CFO of Tronox during the Class Period.  Defendant Mikkelson signed the Registration Statement.

20.     Defendant Marty J. Rowland ("Rowland") was the Chief Operating Officer and a Director of Tronox during the Class Period.  Defendant Rowland signed the Registration Statement.

21.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Tronox common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding the true nature and extent of the Company's environmental and tort Liabilities, Tronox's business, operations, management and the intrinsic value of Tronox common stock;  (ii) enabled Kerr-McGee to sell $225 million of Tronox stock to the unsuspecting public at artificially inflated prices; (iii) enabled Kerr-McGee to successfully rid itself of hundreds of millions of dollars of liabilities, thereby clearing the way for Kerr-McGee to sell itself to Anadarko; and (iv) caused Plaintiff and other members of the Class to purchase Tronox common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Tronox stock during the Class Period. Excluded from the Class are defendants, directors and officers of Tronox, Kerr-McGee, Anadarko and their families and affiliates.

23.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Tronox has more than 19 million shares of Class A common stock outstanding, owned by thousands of persons.

24.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the prices of Tronox stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

25.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

26.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

28.     Kerr-McGee, an oil and gas exploration and production company, created massive actual and contingent environmental, tort, retiree, and other liabilities during its more than 70-year history.  Kerr-McGee was able to rid itself of these liabilities by foisting them on its wholly owned subsidiary, Tronox.  After dumping these liabilities on Tronox, Defendants concealed the true extent of these liabilities when they sold Tronox stock in the IPO.

29.     On November 28, 2005, Kerr-McGee completed the IPO of Tronox Class A common stock. Kerr-McGee continued to exert control over Tronox through its majority ownership of Tronox and the Kerr-McGee officers who served on Tronox's Board of Directors. The Spin-Off was

completed on March 31, 2006, when Kerr-McGee distributed its shares of Class B common stock to Kerr-McGee shareholders.  On April 1, 2006, Tronox became an independent company.

30.    The Class Period begins on November 28, 2005.  On or about that date, Defendants consummated the IPO.  In the IPO, Kerr-McGee sold 17.5 million shares of Tronox Class A common stock for $14 per share, thereby generating proceeds of $228 million.  The Registration Statement issued in connection with the IPO was filed with the SEC and declared effective on November 21, 2005 (hereinafter known as the "Registration Statement").

31.    The Registration Statement represented that Tronox believed that it "reserved adequately for the reasonably estimable costs of known environmental contingencies."  The Registration Statement stated in pertinent part as follows:

> As of September 30, 2005, our financial reserves for all active and inactive sites totaled $239.4 million, $160.6 million of which are classified as noncurrent liabilities.  We believe we have reserved adequately for the reasonably estimable costs of known environmental contingencies.  However, additional reserves may be required in the future due to the previously noted uncertainties.

32.    The statement referenced above was materially false and misleading because Defendants knew that $239.4 million was grossly inadequate to cover the Company's environmental liabilities.  Defendants knew the methodology used to prepare the reserve was aggressive and not in accordance with Generally Accepted Accounting Principles ("GAAP") as Defendants ignored known information in setting reserves and applied a threshold for taking a reserve that was materially higher than what was appropriate under GAAP and industry practice.  Defendants also knew that the reserve did not include any reserves for the other sites that Kerr-McGee had identified in its investigation, as detailed further below.  Finally, Defendants knew, based on discussions with several third parties, that independent third parties that had reviewed the Company's internal non-public information concerning its environmental liabilities had concluded that the Company's exposure was at least $400 million and may be as high as $900 million.

- 7 -

33.    With respect to the Manville, New Jersey site and other sites, the Registration Statement stated in pertinent part as follows:

> There may be other sites where we have potential liability for environmental-related matters but for which we do not have sufficient information to determine that the liability is probable or reasonably estimable. We have not established reserves for such sites. One such site involves a former wood treatment plant in New Jersey.

34.    The statement that "[t]here may be other sites where we have potential liability for environmental-related matters" was materially false and misleading because it failed to disclose that Kerr-McGee had undertaken a "confidential" investigation of numerous wood treatment sites where a Kerr-McGee entity may face liability for substantial cleanup costs like those at the Manville, New Jersey site. Kerr-McGee internally referred to these sites as "secret sites." As part of its investigation, Kerr-McGee employees visited the "secret sites" and were instructed not to disclose the purpose of their visit. Through this investigation, Kerr-McGee identified at least ten other wood treatment sites where it could have liability akin to that asserted by the EPA at the Manville, New Jersey site.[1] These ten undisclosed sites represented potential liability of approximately $2 billion.

35.    The Registration Statement did not disclose the material fact that shortly before the Spin-Off, Kerr Mc-Gee considered conducting a similar investigation regarding approximately 260 undisclosed agricultural chemical sites, five undisclosed former chemical manufacturing sites, two undisclosed former fertilizer manufacturing sites, and several other undisclosed sites. That investigation never occurred. Kerr-McGee never disclosed to the public that they had identified

---

[1]    On August 28, 2008, the United States, in a lawsuit styled *United States of America v. Tronox, LLC*, sued Tronox LLC in the United States District Court for the District of New Jersey, No. 3:08-cv-04368, for reimbursement of the $280 million in costs incurred by the EPA at the Manville site.

these sites nor did they disclose their decision to forego investigating these sites. The Registration Statement made no mention of these material facts.

36.     The Registration Statement also materially misrepresented the Company's tort liabilities. With respect to former wood treatment sites the Registration Statement stated in pertinent part as follows:

> Between 1999 and 2001, Tronox LLC was named in 22 lawsuits in three states (Mississippi, Louisiana and Pennsylvania) in connection with former forest products operations located in those states (in Columbus, Mississippi; Bossier City, Louisiana; and Avoca, Pennsylvania). The lawsuits sought recovery under a variety of common law and statutory legal theories for personal injuries and property damages allegedly caused by exposure to and/or release of creosote and other substances used in the wood-treatment process. Tronox LLC has executed settlement agreements that are expected to resolve substantially all of the Louisiana, Pennsylvania and Mississippi lawsuits described above. Resolution of the remaining cases is not expected to have a material adverse effect on us.

37.     This statement was materially false and misleading because Kerr-McGee failed to disclose that it had settled these wood treatment claims for approximately $70 million in the years immediately preceding the Spin-Off. This omission was particularly significant in light of the nearly 11,000 additional claims related to wood treatment sites that had been filed at the time of the Spin-Off. Instead of disclosing that these claims were similar to the ones resolved for $70 million several years before the Spin-Off, the Registration Statement merely disclosed: "The company has not provided a reserve for these lawsuits because at this time it cannot reasonably determine the probability of a loss, and the amount of loss, if any, cannot be reasonably estimated. The company believes that the ultimate resolution of the forest products litigation will not have a material adverse effect on the company's financial condition or results of operations." This was not true given the prior settlements which indicated that the potential liability for the cases could be as high as $500 million.

38.     The financial statements contained in the Registration Statement were not prepared in accordance with GAAP and were therefore materially false and misleading. Specifically, Kerr-McGee's methodology for setting its environmental and tort reserves was deeply flawed, and inconsistent with GAAP and industry practice. Defendants ignored known information in setting reserves and applied a threshold for taking a reserve that was materially higher than what was appropriate under GAAP. As a result, the environmental and tort reserves set forth in the Registration Statement were materially understated.

39.     The Registration Statement was also materially false and misleading because it created the misleading impression that Tronox was well positioned in its businesses and had a reasonable chance to compete and succeed. In truth and in fact, however, as Defendants knew, Tronox was doomed to fail for a variety of reasons: (a) Kerr-McGee had rushed the IPO in order to capitalize on the cyclical nature of the chemicals business which, at the time of the IPO, was at the top of its cycle. Accordingly, Tronox could never achieve the projections that Kerr-McGee had presented to the market; (b) Kerr-McGee concealed from potential investors the true extent of the liabilities that it had forced upon Tronox; (c) Kerr-McGee had stripped all of Tronox's cash except for $40 million (which was less than the amount Tronox would have to spend in its first year to service its Legacy Liabilities and debt) and told the Company to cover cash shortfalls by selling its assets which it knew was not likely to be sufficient; and (d) following extensive due diligence, a potential third-party buyer warned Kerr-McGee that Tronox could never survive on its own because of its extensive liabilities.

40.     The risk disclosures in the Registration Statement concerning the Company's environmental liabilities were not meaningful and were materially false and misleading in and of

themselves as they warned of contingencies and uncertainties when those very contingencies had already occurred, as detailed herein.

41.     Pursuant to the rules and regulations governing the preparation of the Registration Statement, the Registration Statement was required to disclose the adverse material facts detailed herein. The Registration Statement, however, failed to contain any such disclosure.

42.     On December 21, 2005, Defendant Adams made an "Investor Presentation." At the presentation, Defendant Adams used presentation slides which were subsequently attached as an Exhibit to a Form 8-K filed with the SEC on December 21, 2005. One of the slides concerned "Legacy Sites" and represented that the "Company actively manages environmental issues related to legacy businesses" and "financial reserves have been established for probable and estimable environmental costs," among other statements.

43.     On January 24, 2006, Tronox issued a press release announcing its preliminary fourth quarter earnings and fiscal year earnings for the periods ending December 31, 2005. Defendant Adams commented positively on the results. That same day, Defendants held a conference call to discuss the results. During that call, Defendants made numerous positive statements about the Company's business.

44.     On February 6, 2006, Defendant Adams made another "Investor Presentation." At the presentation, Defendant Adams used presentation slides which were subsequently attached as an Exhibit to a Form 8-K filed with the SEC on February 6, 2006. One of the slides concerned "Legacy Sites" and represented that the "Company actively manages environmental issues related to legacy businesses" and "financial reserves have been established for probable and estimable environmental costs," among other statements.

- 11 -

45.    Again, on February 22, 2006, Defendant Adams made another presentation to investors. This time it was at the Morgan Stanley Basic Materials Conference in New York City. At the presentation, Defendant Adams used presentation slides which were subsequently attached as an Exhibit to a Form 8-K filed with the SEC on February 21, 2006. One of the slides concerned "Legacy Sites" and represented that the "Company actively manages environmental issues related to legacy businesses" and "financial reserves have been established for probable and estimable environmental costs," among other statements.

46.    On March 29, 2006, Tronox filed its Form 10-K for fiscal year ended December 31, 2005 with the SEC which was signed by Defendant Adams, Rowland, Wohleber, Rauh and Mikkelson, among others. The Form 10-K contained financial statements for fiscal year ended December 31, 2005.

47.    On May 3, 2006, Tronox issued a press release announcing its preliminary first quarter earnings for the period ending March 31, 2006. Defendant Adams commented positively on the results stating that the Company generated "solid results." The press release further stated that as of March 31, 2006, environmental reserves were $216.5 million. That same day, Defendants held a conference call to discuss the results. During that call, Defendants made numerous positive statements about the Company's business.

48.    On May 15, 2006, Tronox filed its Form 10-Q for the period ending March 31, 2006, with the SEC which was signed by Defendants Adams and Mikkelson. The Form 10-Q contained interim financial statements which it represented were a "fair presentation" of the Company's financial position.

49.    On May 23, 2006, Defendant Adams made another presentation to investors and analysts. At the presentation, Defendant Adams used presentation slides which were subsequently

attached as an Exhibit to a Form 8-K filed with the SEC on May 23, 2006.  One of the slides concerned "Legacy Environmental" and represented that the gross reserves were $216.5, among other statements.

50.     On August 6, 2006, Tronox issued a press release announcing its preliminary second quarter earnings for the period ending June 30, 2006.  That same day, Defendants held a conference call to discuss the results.  During that call, Defendants made numerous positive statements about the Company's business.

51.     On August 14, 2006, Tronox filed its Form 10-Q for the period ending June 30, 2006, with the SEC which was signed by Defendants Adams and Mikkelson.  The Form 10-Q contained interim financial statements which it represented were a "fair presentation" of the Company's financial position.

52.     On August 16, 2006, Defendant Adams made another presentation to investors and analysts.  At the presentation, Defendant Adams used presentation slides which were subsequently attached as an Exhibit to a Form 8-K filed with the SEC on August 16, 2006.  During the presentation, Defendant Adams made numerous positive statements about Tronox and its business.

53.     On November 1, 2006, Tronox issued a press release announcing its preliminary third quarter earnings for the period ending September 30, 2006.  That same day, Defendants held a conference call to discuss the results.  During that call, Defendants made numerous positive statements about the Company's business.

54.     On November 14, 2006, Tronox filed its Form 10-Q for the period ending September 30, 2006, with the SEC which was signed by Defendants Adams and Mikkelson.  The Form 10-Q contained interim financial statements which it represented were a "fair presentation" of the Company's financial position.

- 13 -

55.     On February 22, 2007, Tronox issued a press release announcing its preliminary fourth quarter earnings and fiscal year earnings for the period ending December 31, 2006. Defendant Adams commented positively on the results.  That same day, Defendants held a conference call to discuss the results.  During that call, Defendants made numerous positive statements about the Company's business.

56.     On March 16, 2007, Tronox filed its Form 10-K for fiscal year ended December 31, 2006 with the SEC which was signed by Defendant Adams and Mikkelson, among others.  The Form 10-K contained financial statements for fiscal year ended December 31, 2006.

57.     On May 2, 2007, Tronox issued a press release announcing its preliminary first quarter earnings for the period ending March 31, 2007.  That same day, Defendants held a conference call to discuss the results.  During that call, Defendants made numerous positive statements about the Company's business.

58.     On May 8, 2007, Tronox filed its Form 10-Q for the period ending September 30, 2006, with the SEC which was signed by Defendants Adams and Mikkelson.  The Form 10-Q contained interim financial statements which it represented were a "fair presentation" of the Company's financial position.

59.     On May 9, 2007, Defendant Mikkelson made a presentation to investors and analysts at the UBS Leveraged Finance Conference in Las Vegas, Nevada.  At the presentation, Defendant Mikkelson used presentation slides which were subsequently attached as an Exhibit to a Form 8-K filed with the SEC on August 16, 2006.  During the presentation, Defendant Mikkelson made numerous positive statements about Tronox and its business.

- 14 -

60.    The statements referenced above in ¶¶42-59 were each materially false and misleading because they failed to disclose the full scope of the Company's environmental liabilities and presented financial results that were materially overstated, as detailed herein.

61.    On July 11, 2007, Tronox issued a press release announcing that it had identified factors that would impact its second quarter 2007 earnings, which were to be announced on August 1, 2007.  One of these factors was the expected recording of "a pretax noncash environmental provision, net of expected insurance reimbursements, of approximately **$2 million in the second quarter for costs associated with an ongoing environmental assessment at its Henderson, Nev. site.**"  In response to this announcement, the price of Tronox stock dropped 4.3%.

62.    In the days leading up to Tronox's August 1, 2007 earnings announcement, Tronox's stock price continued to fall as the market began to understand that the Company's environmental liability problems were mounting.  During that time Standard & Poor's Ratings Services (Standard & Poor's) announced that it had placed Tronox's corporate credit rating on CreditWatch with negative implications.  Standard & Poor's explained that "Tronox's recent announcement of a higher-than-expected environmental provision of $2 million ... reflect[s] the challenges Tronox faces in its efforts to improve credit quality over the intermediate term."  Standard & Poor's also noted that while Tronox, as of March 31, 2007, had environmental reserves of about $221 million to cover expected remediation costs ... Standard & Poor's believes that **additional reserves are likely to meet future environmental requirements.**" (emphasis added).  This announcement also caused Tronox's share price to significantly decrease.

63.    On August 1, 2007, Tronox issued a press release announcing its second quarter losses.  According to the press release, the Company's losses were caused, in part, due to the costs associated with environmental assessment at the Henderson, Nevada site.  That day, Tronox's stock

closed at $11.85 – representing an 18.1% drop from Tronox's price on July 10, 2007 (the day before Tronox began discussing second quarter 2007 earnings).

64.    After the August 1, 2007 announcement, Tronox continued to announce earnings losses related to environmental charges, thereby causing further reductions in the price of Tronox stock. For instance, on February 13, 2008, Tronox had an earnings call for the fourth quarter of 2007. During the call, Tronox announced that its anticipated net spend on environmental remediation in 2008 would jump from the $33 million it spent in 2007 to between $40 and $45 million. Tronox's shares plummeted more than 21% on this news.

65.    On July 30, 2008, Tronox had its last earnings call – this time to discuss earnings for the second quarter of 2008. During this call, Tronox announced that its environmental expenses continued to mount. That same day, a JP Morgan analyst noted that Tronox's losses for the second quarter of 2008 included $4.5 million in losses from discontinued operations, "which are probably **related to increased environmental provisions**." On this news, Tronox's share priced dropped 10.5% to close at $1.35 per share.

66.    On September 17, 2008, S&P again lowered its rating on Tronox. This announcement sent Tronox's share price plummeting 17.1%. On September 30, 2008 Tronox was delisted from the NYSE but continued to trade over the counter.

67.    The true extent of Tronox's environmental liabilities finally came to light when it filed its bankruptcy petition. In the petition and accompanying declarations, it was revealed that since the Spin-Off, Tronox had spent more than $118 million to satisfy the residual Legacy Liability obligations and still faces hundreds of millions of dollars worth of additional claims related to the Legacy Liabilities. The bankruptcy petition also revealed to the public for the first time the hundreds of "secret sites" that Kerr-McGee had known about long before the IPO.

- 16 -

68.     The transfer of the liabilities and the concealment of their true extent is the subject of an adversary proceeding, currently pending in United States Bankruptcy Court for the Southern District of New York, Case No. 09-10156 (ALG), brought by Tronox, Tronox Worldwide LLC, and Tronox LLC against Anadarko and Kerr-McGee.  The United States of America, acting at the request of the Administrator of the United States Environmental Protection Agency sought and was granted permission to intervene in the Adversary Proceeding and is seeking hundreds of millions of dollars for various remediation and clean-up sites.

## ADDITIONAL SCIENTER ALLEGATIONS

69.     During the Class Period, Defendants had both the motive and opportunity to conduct fraud.  As explained above, via the Spin-Off, Kerr-McGee was able to pass its liabilities onto Tronox and generate $225 million in cash from the IPO.  Additionally, the Spin-Off enabled Kerr-McGee to sell itself, within three months, to Anadarko for $18 billion and in the process richly rewarded the architects of the Spin-Off scheme.  Specifically, Kerr-McGee Chairman and CEO Luke R. Corbett personally profited by more than $200 million from the Anadarko deal. Kerr-McGee Senior Vice President and CFO Robert M. Wohleber, who also served as Chairman of the Board of Tronox until the completion of the Spin-Off, pocketed more than $20 million. Kerr-McGee Senior Vice President and General Counsel Gregory F. Pilcher, another architect of the Spin-Off, walked away with more than $9 million. Other Kerr-McGee senior executives also enjoyed windfalls.

70.     Defendants also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  As detailed above, this actual knowledge came from a variety of sources, including the pre-IPO discussions that Kerr-McGee had regarding the extent of its liabilities with prospective purchasers, their financial advisers and accountants.

- 17 -

71.     As Defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Tronox stock during the Class Period.

### LOSS CAUSATION/ECONOMIC LOSS

72.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated Tronox's stock price and operated as a fraud or deceit on Class Period purchasers of Tronox stock by misrepresenting the Company's business. Later, as detailed above, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Tronox's stock price fell precipitously, as the prior artificial inflation came out of the prices over time. As a result of their purchases of Tronox stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

### NO SAFE HARBOR

73.     Tronox's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

74.     The defendants are also liable for any false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Tronox who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made,

nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE:  FRAUD ON THE MARKET

75.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff and other members of the Class purchased Tronox stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)    At all relevant times, the markets for Tronox stock were efficient for the following reasons, among others:

(i)    As a regulated issuer, Tronox filed periodic public reports with the Securities and Exchange Commission;

(ii)    Tronox regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(iii)        Tronox stock was actively traded in an efficient market, namely the NYSE, under the symbol TRX, until September 30, 2008 – well into the Class Period.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

76.        Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.        During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.        Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

79.        Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tronox common stock. Plaintiff and the Class would not have purchased Tronox common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

80.        As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Tronox common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

81.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    Defendants acted as controlling persons of Tronox within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By reason of their positions as officers and/or directors of Tronox and/or Kerr-McGee, and their ownership of Tronox stock, the Defendants had the power and authority to cause Tronox to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

83.    Defendant Kerr-McGee controlled Tronox at the time of the IPO and thereafter and had the power and authority to cause Tronox to engage in the wrongful conduct complained of.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 10, 2009

COUGHLIN STOIA GELLER RUDMAN &
   ROBBINS LLP
SAMUEL H. RUDMAN
JARRETT S. CHARO

_____
            SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ALASKA ELECTRICAL PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Rines v. Heelys, Inc., et al.*, No. 3:07-cv-01468-K (N.D. Tex.)
*In re Cadence Design Systems, Inc. Sec. Litig.*, No. C-08-4966 SC (N.D. Cal.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Indiana State District Council v. Omnicare, Inc., et al.*, No. 2:06-cv-0026-WOB (E.D. Ky.)
*HCL Partners Limited v. Leap Wireless International, Inc., et al.*, No. 3:07-cv-02245-BTM(NLS) (S.D. Cal.)
*In re Smith & Wesson Holding Corp. Sec. Litig.*, No. 07-30238 (D. Mass.)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10th_ day of ___JULY___, 2009.

ALASKA ELECTRICAL PENSION FUND

By: _Gregory R. Stakes_

Its: _ADMINISTRATOR_

TRONOX

## SCHEDULE A

## SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Amount of Securities Acquired | Price | Type |
|---|---|---|---|
| 12/15/2005 | 2,200 | $12.10 | Class A |
| 12/15/2005 | 2,700 | $12.02 | Class A |
| 12/16/2005 | 1,800 | $11.93 | Class A |
| 12/19/2005 | 5,700 | $11.83 | Class A |
| 12/20/2005 | 1,800 | $11.92 | Class A |
| 08/02/2006 | 5,400 | $11.47 | Class A |
| 08/03/2006 | 500 | $11.41 | Class A |
| 08/03/2006 | 2,000 | $11.50 | Class A |
| 08/04/2006 | 2,700 | $11.19 | Class A |
| 08/04/2006 | 8,200 | $11.22 | Class A |
| 08/22/2006 | 600 | $11.50 | Class A |
| 01/22/2007 | 2,100 | $15.09 | Class A |
| 01/23/2007 | 700 | $15.14 | Class A |
| 11/27/2006 | 1,000 | $14.67 | Class B |
| 11/28/2006 | 2,100 | $14.58 | Class B |
| 11/30/2006 | 700 | $14.79 | Class B |
| 12/01/2006 | 100 | $14.80 | Class B |
| 12/19/2006 | 900 | $14.84 | Class B |
| 12/21/2006 | 100 | $14.85 | Class B |
| 01/06/2007 | 800 | $14.72 | Class B |
| 01/08/2007 | 5,500 | $14.64 | Class B |
| 01/09/2007 | 4,200 | $14.48 | Class B |
| 01/10/2007 | 5,100 | $14.85 | Class B |
| 01/11/2007 | 1,100 | $14.76 | Class B |
| 01/16/2007 | 5,300 | $14.75 | Class B |
| 01/17/2007 | 10,700 | $14.75 | Class B |
| 01/22/2007 | 700 | $14.75 | Class B |
| 01/22/2007 | 5,500 | $14.75 | Class B |
| 01/23/2007 | 300 | $14.71 | Class B |
| 01/25/2007 | 1,500 | $14.86 | Class B |
| 01/26/2007 | 2,400 | $14.61 | Class B |
| 01/29/2007 | 1,300 | $14.69 | Class B |
| 01/30/2007 | 900 | $14.54 | Class B |

Sales

| Date Sold | Amount of Securities Sold | Price | Type |
|---|---|---|---|
| 01/12/2009 | 36,400 | $0.03 | Class A |
| 04/24/2006 | 1,502 | $17.91 | Class B |
| 04/26/2006 | 0.016 | $18.13 | Class B |
| 01/12/2009 | 60,200 | $0.03 | Class B |

*Opening position of 1,502 Class B shares.