UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- X

IN RE TRONOX, INC. SECURITIES
LITIGATION

-------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/13/09

**OPINION AND ORDER**

**09 Civ. 6220 (SAS)**
**09 Civ. 6490 (SAS)**
**09 Civ. 7116 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

In this federal securities class action suit brought on behalf of all purchasers of Tronox Incorporated ("Tronox"), three movants seek the consolidation of all related actions, to be appointed lead plaintiff, and to approve their respective selections of counsel. For the reasons discussed below, the related actions are consolidated, LaGrange Capital Partners, LP and LaGrange Capital Partners Offshore Fund, Ltd. (together, "LaGrange") are appointed lead plaintiff, and their selection of the law firm of Gold Bennett Cera & Sidener LLP ("Gold Bennett") as lead counsel and Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") as liaison counsel for the Class is approved.

## II.    BACKGROUND

### A.    Facts[1]

Tronox is a corporation engaged in producing and marketing titanium

dioxide – a white pigment used in a wide range of products to impart whiteness,

brightness and opacity.[2]  Tronox was spun-off from Kerr-McGee Corporation

("Kerr-McGee") in a two-step transaction.  On November 28, 2005, Kerr-McGee

sold 17.5 million shares of Tronox Class A common stock in an initial public

offering for fourteen dollars per share (the "IPO") generating proceeds for Kerr-

McGee of more than $225 million.[3]  After the IPO, Kerr-McGee continued to hold

56.7 percent of Tronox's outstanding common stock.[4]  On March 31, 2006, Kerr-

McGee distributed the remainder of the shares as Class B common stock to its

shareholders as a dividend.[5]  Unbeknownst to investors, Kerr-McGee discarded

---

[1]    The facts in this section are taken from the Complaints in the respective actions and are presumed true for purposes of this motion.

[2]    *See* Complaint ¶ 11, *Alaska Electrical Pension Fund v. Kerr-McGee Corp.*, No. 09 Civ. 6220 (S.D.N.Y. filed July 10, 2009) ("Alaska Compl."); Complaint ¶ 11, *Shi v. Kerr-McGee Corp.*, No. 09 Civ. 6490 (S.D.N.Y. filed July 21, 2009) ("Shi Compl."); Complaint ¶ 30, *Barnes v. Kerr-McGee Corp.*, No. 09 Civ. 7116 (S.D.N.Y. filed Aug. 12, 2009) ("Barnes Compl.").

[3]    *See* Alaska Compl. ¶ 29; Shi Compl. ¶ 29; Barnes Compl. ¶ 32.

[4]    *See id.*

[5]    *See id.*

substantial liabilities onto Tronox.[6]  On January 12, 2009, Tronox declared

bankruptcy due to its inability to cover these liabilities.[7]

From the period of November 28, 2005 through January 12, 2009 (the

"Class Period"), Tronox is alleged to have issued materially false and misleading

public statements regarding the extent of Tronox's environmental and tort

liabilities and the sufficiency of its reserves for those liabilities.[8]  Beginning with

the Registration Statement issued in connection with the IPO, Tronox represented,

among other things, that it "'reserved adequately for the reasonably estimable costs

of known environmental contingencies'" and tort liabilities.[9]  For approximately

the next two years, Tronox made similar statements regarding Tronox's

environmental and tort liabilities in investor presentations, press releases, and

financial reports.[10]  None of these public statements disclosed that Tronox's

reserves for environmental liabilities were inadequate and failed to include reserves

for identified, but undisclosed, sites requiring massive environmental

---

[6]    *See* Alaska Compl. ¶ 28; Shi Compl. ¶ 28; Barnes Compl. ¶ 55.

[7]    *See* Alaska Compl. ¶ 67; Shi Compl. ¶ 67; Barnes Compl. ¶ 53.

[8]    *See* Alaska Compl. ¶ 1; Shi Compl. ¶ 1; Barnes Compl. ¶ 1.

[9]    Alaska Compl. ¶¶ 31, 40 (quoting the Registration Statement). *Accord* Shi Compl. ¶¶ 31; 40; Barnes Compl. ¶¶ 33, 45.

[10]    *See* Alaska Compl. ¶¶ 29-68; Shi Compl. ¶¶ 28-68; Barnes Compl. ¶¶ 32-55.

3

remediation.[11]  Tronox also did not disclose that its financial statements and the

methodology used to calculate its environmental liabilities reserve were not

prepared in accordance with Generally Accepted Accounting Principles.[12]  Tronox

similarly withheld that it faced extraordinary exposure regarding its environmental

and tort liabilities, particularly for environmental contamination at certain wood

treatment sites.[13]

On July 11, 2007, Tronox issued a press release that it had identified

factors that would impact its second quarter 2007 earnings, which were to be

announced on August 1, 2007.[14]  One of these factors was the expected recording

of "'a pretax noncash environmental provision, net of expected insurance

reimbursements, of approximately $2 million in the second quarter for costs

associated with an ongoing environmental assessment at its Henderson, Nev.

site.'"[15]  In response to this announcement, Tronox stock price dropped 4.3

_____

[11]     *See* Alaska Compl. ¶ 32; Shi Compl. ¶ 32; Barnes Compl. ¶ 45.

[12]     *See id.*

[13]     *See id.*

[14]     *See* Alaska Compl. ¶ 61; Shi Compl. ¶ 61; Barnes Compl. ¶ 46.

[15]     Alaska Compl. ¶ 61 (quoting 7/11/07 Tronox Press Release).  *Accord* Shi Compl. ¶ 61; Barnes Compl. ¶ 46.

percent.[16]   As Tronox's stock price continued to fall as August 1, 2007

approached, Standard & Poor's Ratings Services ("S&P") announced that it had

placed Tronox's corporate credit rating on CreditWatch, explaining that "Tronox's

recent announcement of a higher-than-expected environmental provision of $2

million . . . reflect[s] the challenges Tronox faces in its efforts to improve credit

quality over the intermediate term'" and that S&P "'believe[]d that additional

reserves are likely to meet future environmental requirements.'"[17]   Upon the

release of its second quarter losses on August 1, 2007, Tronox noted that the losses

were caused, in part, by the costs associated with the environmental assessment at

the Henderson, Nevada site.[18]   After this release, Tronox's stock dropped again,

resulting in an 18.1 percent drop from Tronox's stock price as of July 10, 2007.[19]

       After August 1, 2007, Tronox continued to announce earnings losses

related to environmental charges, causing further reductions in Tronox's stock

price.  On February 13, 2008, Tronox announced during its fourth quarter of 2007

earnings call that its anticipated annual expenditure on environmental remediation

---

[16]     *See* Alaska Compl. ¶ 61 (quoting 7/11/07 Tronox Press Release)
(emphasis omitted); Shi Compl. ¶ 61; Barnes Compl. ¶ 47.

[17]     Alaska Compl. ¶ 62 (quoting S&P Announcement) (emphasis
omitted). *Accord* Shi Compl. ¶ 62.

[18]     *See* Alaska Compl. ¶ 63; Shi Compl. ¶ 63; Barnes Compl. ¶ 48.

[19]     *See* Alaska Compl. ¶ 63; Shi Compl. ¶ 63.

would rise from the thirty-three million dollars to between forty and forty-five million dollars.[20]  Tronox's share price dropped more than twenty-one percent in response.[21]  On July 30, 2008, in its earnings call for the second quarter of 2008, Tronox announced that its environmental expenses were continuing to mount.[22]  A J.P. Morgan analyst noted after the call that Tronox's losses for the second quarter of 2008 included $4.5 million in losses from discontinued operations, "'which are probably related to increased environmental provisions.'"[23]  Tronox's share price dropped another 10.5 percent as a result.[24]  S&P then lowered its rating on Tronox on September 17, 2008, resulting in a 17.1 percent drop in Tronox's share price and on September 30, 2008, Tronox was delisted from the New York Stock Exchange, but continued to trade over the counter.[25]  Finally, the "true extent of Tronox's environmental liabilities" came to light when it filed a bankruptcy

---

[20]     *See* Alaska Compl. ¶ 64; Shi Compl. ¶ 64; Barnes Compl. ¶ 49.

[21]     *See* Alaska Compl. ¶ 64; Shi Compl. ¶ 64; Barnes Compl. ¶ 50.

[22]     *See* Alaska Compl. ¶ 65; Shi Compl. ¶ 65; Barnes Compl. ¶ 51.

[23]     Alaska Compl. ¶ 65 (quoting J.P. Morgan Analyst Report) (emphasis omitted). *Accord* Shi Compl. ¶ 65.

[24]     *See* Alaska Compl. ¶ 66; Shi Compl. ¶ 66; Barnes Compl. ¶ 52.

[25]     *See* Alaska Compl. ¶ 66; Shi Compl. ¶ 66.

petition in the Southern District of New York on January 12, 2009.[26]   In the

petition and accompanying declarations, Tronox revealed that since at least March

2006, Tronox had spent more than $118 million to satisfy certain residual liabilities

and continues to face "hundreds of millions of dollars worth of additional

claims."[27]  The bankruptcy petition also revealed to the public for the first time the

hundreds of "secret sites" that Kerr-McGee had known about long before the IPO,

but did not disclose to investors.[28]

      The first complaint in this action – styled *Alaska Electrical Pension

Fund v. Kerr-McGee, et al.*, – was filed in the Southern District of New York on

July 10, 2009, asserting claims on behalf of all purchasers of Tronox Class A and

Class B common stock during the Class Period.  A public notice of the pendency of

that action was published the same day.[29]   Two subsequent complaints were filed

on July 21, 2009 and August 12, 2009, respectively, asserting claims on behalf of

---

      [26]      Alaska Compl. ¶ 67. *Accord* Shi Compl. ¶ 67; Barnes Compl. ¶ 53
("On January 12, 2009, Tronox shocked investors when it issued a press release
entitled Tronox's U.S. Operations File Chapter 11.") (quotation marks omitted).

      [27]      Alaska Compl. ¶ 67. *Accord* Shi Compl. ¶ 67; Barnes Compl. ¶ 55.

      [28]      Alaska Compl. ¶ 67. *Accord* Shi Compl. ¶ 67; Barnes Compl. ¶ 54.

      [29]      *See* Coughlin Stoia Geller Rudman & Robbins LLP Files Class Action
Suit on Behalf of Purchasers of Tronox, Inc., Business Wire, July 10, 2009, Ex. C
to the Declaration of Gerald H. Silk, counsel for Fire and Police Pension
Association of Colorado and the San Antonio Fire and Police Pension Fund ("Fire
and Police Pension Funds") ("Silk Decl.").

7

all purchasers of Tronox shares during the Class Period, and a public notice was published shortly thereafter.[30]

### B.    Procedure

In response to the July 11, 2009 notice, three plaintiffs moved for appointment as lead plaintiff.[31]   LaGrange, which purchased a total of 2,143,952 Class A and B Tronox common shares during the Class Period, suffered a loss of $7,640,434.56 on a last-in-first-out basis ("LIFO").[32]  Alaska, which purchased over 51,000 shares of Tronox stock, lost approximately one million dollars, depending on the method of calculation.[33]  The Fire and Police Pension Funds, which purchased approximately 945,000 units of Tronox 9 1/2 percent Senior

---

[30]      *See* Barroway Topaz Kessler Meltzer & Check, LLP Reminds All Tronox, Inc. investors of September 8, 2009 Lead Plaintiff Deadline, PR Newswire, August 31, 2009, Ex. D to Silk Decl.

[31]      A fourth movant, Oliver Shi, withdrew his application for lead plaintiff on September 18, 2009.

[32]      *See* LaGrange Memorandum of Law in Support of Its Motion for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Lead Counsel and Liaison Counsel for the Class ("LaGrange Mem.") at 5.

[33]      *See* Alaska Memorandum of Law in Support of Its Motion for Consolidation, Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel ("Alaska Mem.") at 5 (identifying its loss as "over $735,500"); LaGrange Memorandum of Law in Opposition to Motions Seeking Appointment as Lead Plaintiff and in Further Support of Their Motion for Appointment as Lead Plaintiff, Approval of Lead and Liaison Counsel and Consolidation of Related Actions at 1 (identifying Alaska's approximate losses as $1,165,906.35).

Notes due 2012 ("Notes") during the Class Period, suffered approximately

$514,797.96 in collective losses, whether calculated on a LIFO or a first-in-first-

out basis.[34] The movants do not dispute consolidation, the Class Period, or that

LaGrange possesses the largest financial interest among all movants.[35]

## III.   LEGAL STANDARD

In determining whom to appoint as lead plaintiff, the Private

Securities Litigation Reform Act ("PSLRA") sets forth a required procedure.[36]  The

lead plaintiff should be the plaintiff "most capable of adequately representing the

interests of class members."[37]  The PSLRA requires that the "most adequate

plaintiff" be determined by a two-step competitive process.[38]

---

[34]     *See* Fire and Police Pension Funds Memorandum of Law in Support
of Their Motion for Appointment as Lead Plaintiff, Approval of Their Selection of
Lead Counsel, and Consolidation of Related Cases ("Fire and Police Pension
Funds Mem.") at 5.

[35]     *See* LaGrange Mem. at 1 (identifying class period as November 28,
2005 through January 12, 2009); Alaska Mem. at 1 (same); Fire and Police Pension
Funds Mem. at 1 (same); Alaska Memorandum in Further Support of Its Motion
for Consolidation, Appointment as Lead Plaintiff and Approval of Its Selection of
Counsel, and in Opposition to Competing Motions ("Alaska Opp.") at 1
("LaGrange [ ] claims the largest financial interest among the movants . . . .");
Response of Fire and Police Pension Funds to Motions for Appointment as Lead
Plaintiff ("Fire and Police Pension Funds Opp.") at 1 (same).

[36]     *See* 15 U.S.C. § 78u-4(a)(3)(B).

[37]     *Id.* § 78u-4(a)(3)(B)(i).

[38]     *See id.* § 78u-4(a)(3)(B)(iii).

9

The first step establishes as presumptive lead plaintiff the "person or group of persons" who meet(s) the following three criteria: (1) the candidate must have "filed the complaint or made a motion in response to a notice;"[39] (2) the candidate must have "the largest financial interest in the relief sought by the class,"[40] and (3) the candidate must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."[41]

"At the lead plaintiff stage of the litigation, in contrast to the class certification stage, a lead plaintiff movant need only make a 'preliminary showing that it satisfies the typicality and adequacy requirements of [Rule 23].'"[42] "Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"[43] "The adequacy requirement is satisfied where the

_____

[39]     *Id.* § 78u-4(a)(3)(B)(iii)(I)(aa).

[40]     *Id.* § 78u-4(a)(3)(B)(iii)(I)(bb).

[41]     *Id.* § 78u-4(a)(3)(B)(iii)(I)(cc).

[42]     *Ellenburg v. JA Solar Holdings Co. Ltd.*, No. 08 Civ. 10475, 2009 WL 1033362, at *4 (S.D.N.Y. Apr. 17, 2009) (quoting *In re SLM Corp. Sec. Litig.*, No. 08 Civ. 1029, 2009 WL 969934, at *3 (S.D.N.Y. Apr. 1, 2009)) (alteration in original).

[43]     *Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (quoting

proposed Lead Plaintiff does not have interests that are antagonistic to the class

that he seeks to represent and has retained counsel that is capable and qualified to

vigorously represent the interests of the class . . . ."[44]

Once the presumptive lead plaintiff has been designated, the court

conducts a second inquiry in which members of the class have the opportunity to

rebut the chosen lead plaintiff's presumptive status.  In order to rebut the

designation, class members must prove either that the presumptive lead plaintiff

"will not fairly and adequately protect the interests of the class" or "is subject to

unique defenses that render such plaintiff incapable of adequately representing the

class."[45]  If the presumptive lead plaintiff is disqualified on these grounds, the

candidate's position is forfeited and the court returns to the first phase to determine

a new presumptive lead plaintiff.  The process repeats itself until a candidate

succeeds in both the first and second phases of inquiry.  The lead plaintiff

determination does not depend on the court's judgment of which party would be

the best lead plaintiff for the class, but rather which candidate fulfills the

---

*Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)).

    [44]    *Glauser v. EVCI Ctr. Colleges Holding Corp.*, 236 F.R.D. 184, 189
(S.D.N.Y. 2006) (citing *Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000)).

    [45]    15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa), (bb).

11

requirements of the PSLRA.[46]

## IV.   DISCUSSION

### A.   Consolidation

Federal Rule of Civil Procedure Rule 42(a) grants the Court discretion to consolidate "actions involving a common question of law or fact."[47]  The *Alaska*, *Shi*, and *Barnes* actions all bring federal securities claims against identical groups of defendants relating to Tronox's alleged false and misleading statements. These actions also present common questions of fact based on a continuing course of conduct from November 28, 2005 through January 12, 2009.  Accordingly, litigation of these actions will require resolution of common questions of law and of fact, making consolidation appropriate.

### B.   Lead Plaintiff

The movants do not dispute that LaGrange properly moved for lead plaintiff appointment in response to the Class notice and possesses the largest financial interest in the litigation.  LaGrange also otherwise meets the requirements

---

[46]     *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) ("While the words 'most capable' seem to suggest that the district court will engage in a wide-ranging comparison to determine which plaintiff is best suited to represent the class, the statute defines the term much more narrowly.").

[47]     Fed. R. Civ. P. 42(a).  *See Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990).

of Rule 23. LaGrange purchased shares of Tronox during the Class Period and

claims that it suffered damage as a result of Tronox's artificially inflated stock

price caused by defendants' false and misleading statements and omissions.

Therefore, LaGrange is typical of the class.[48]  LaGrange also satisfies the adequacy

requirement because LaGrange seeks identical relief on identical claims based on

identical legal theories making their interests not antagonistic with other class

members. LaGrange has also submitted a Certification affirming its understanding

of the duties owed to class members through its commitment to oversee the

prosecution of this class action.[49]  Finally, LaGrange retained Gold Bennett as lead

counsel and Cohen Milstein as liaison counsel to represent the Class.  Both are

highly competent plaintiffs' firms with substantial securities class action

experience.[50]  As a result, LaGrange satisfies the adequacy requirement for lead

plaintiff appointment, and is, therefore, the presumptive most adequate plaintiff.

---

[48]     *See Glauser*, 236 F.R.D. at 189 (finding typicality where proposed
lead plaintiff "like all class members" purchased the securities at issue during the
proposed class period at prices allegedly artificially inflated by the defendants'
false and misleading statements or omissions and suffered damage thereby).

[49]     *See* LaGrange Certificate of Plaintiff, signed by Grange Johnson,
managing member of LaGrange Capital Management LLC (general partner of
LaGrange Capital Partners, LP), Ex. B to the Declaration of Thomas Bright,
LaGrange's counsel ("Bright Decl.").

[50]     *See* Resume of Gold Bennett, Ex. C to Bright Decl.; Resume of Cohen
Milstein, Ex. D to Bright Decl.

13

Having identified LaGrange as the presumptive most adequate

plaintiff, the other movants have the opportunity to rebut this presumption.  Only

Alaska attempts to do so.[51]  Alaska first argues that LaGrange's trading pattern,

which included making its initial stock purchase after Tronox made its first partial

disclosure, would subject LaGrange to unique defenses.  LaGrange first purchased

Tronox shares on September 12, 2007, more than one month after Tronox's August

1, 2007 announced earnings losses related to environmental charges.[52]  LaGrange

continued to purchase Tronox shares through the remainder of the Class Period

and, in some instances, bought large amounts of shares within days of a negative

announcement or ratings downgrade.[53]  According to Alaska, LaGrange's late

---

[51]     The Fire and Police Pension Funds support LaGrange's bid for
appointment as lead plaintiff and state that the Funds' counsel "has conferred with
counsel for LaGrange and it has been agreed that, should the Court appoint
LaGrange, the [Funds] will serve as named plaintiffs and class representatives for
bond claimants in this action, and that the [Funds'] counsel will work in this action
under the authority of the Lead Plaintiff and Lead Counsel."  Fire and Police
Pension Funds Opp. at 1.

[52]     *See* Schedule to LaGrange Certificate of Plaintiff, Ex. B to Bright
Decl.

[53]     *See* Alaska Opp. at 6 (citing LaGrange's purchase of over 300,000
Tronox shares on the three consecutive days after Tronox's February 13, 2008
announcement that it had a wider-than-expected quarterly loss for the fourth-
quarter and Moody's had placed Tronox under review for a possible ratings cut,
downgrading it the following day); *id.* at 7 (citing LaGrange's purchase of over
355,000 Tronox Class B shares in the two weeks following S&P's August 14, 2008
announcement that it had eliminated Tronox from its S&P SmallCap 600 index).

14

initial purchase and continued purchase of Tronox stock after partial corrective

disclosures subjects LaGrange to unique defenses involving reliance and causation

rendering LaGrange atypical and inadequate as lead plaintiff.[54]

The cases cited by Alaska in support of its argument are unavailing

due to the strength and extent of correction in the partial disclosures in those

cases.[55] By comparison, the Tronox partial disclosures that Alaska emphasizes

---

[54]     *See* Alaska Opp. at 10.

[55]     *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990) (holding that it was not an abuse of discretion for the district court to find the proposed class representative inappropriate because its claim would be subject to the unique defenses of having purchased the securities despite having notice of, and investigated, the alleged fraud); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 310 (S.D. Ohio 2005) (finding movant subject to a unique defense because it purchased its shares after the company's public disclosures of investigations by the Securities and Exchange Commission and the United States Attorney's Office for the Southern District of New York into the company's accounting methods); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455 (S.D. Tex. 2002) (denying proposed lead plaintiff's motion to appoint where plaintiff relied in part upon an advisory firm with connections to the company and was possibly in possession of nonpublic information prior to purchasing the company's shares). *Cf. In re Comverse Tech., Inc. Sec. Litig.*, No. 06 Civ. 1925, 2008 WL 820015, at *2, *3 n.2 (E.D.N.Y. Mar. 25, 2008) (distinguishing *Gary Plastic, In re Enron,* and *In re Cardinal Health*). On October 7, 2009, Alaska submitted a notice of supplemental authority to bring this Court's attention to the recent Eastern District of New York class certification decision, *Blank v. Jacobs* – a case which Alaska claims strengthens its argument because the court denied class certification "finding that lead plaintiff REG Partners LLP was atypical and subject to unique defenses because, among other things, REG *may have had access to non-public information* and had purchased the majority (73%) of its shares after the first corrective disclosure. . . ." Alaska's Notice of Supplemental Authority in Support of Its Motion for Consolidation,

prior to LaGrange's purchases were merely *partial* corrective disclosures. They neither make mention of fraud or government investigations; nor do they sufficiently correct Tronox's prior false and misleading statements or make LaGrange, or any other class member, actually aware of the fraud. As even Alaska's own Complaint recognizes, it was only once Tronox filed for bankruptcy in January 2009 that "[t]he true extent of Tronox's environmental liabilities finally came to light."[56] Without more, LaGrange's purchase of these shares after the partial disclosures does not render LaGrange atypical or subject it to unique defenses.[57]

---

Appointment as Lead Plaintiff and Its Selection of Lead Counsel at 1 (citing *Blank v. Jacobs*, No. 03 Civ. 2111, 2009 WL 3233037, at *5 (E.D.N.Y. Sept. 30, 2009)) (emphasis added). But this case too is distinguishable in that the lead plaintiff may have had access to nonpublic information creating a legitimate question of typicality where the remainder of the class relied solely on public statements. *See Blank*, 2009 WL 3233037, at *5. Here, there are no allegations that LaGrange had any nonpublic information.

[56]    Alaska Compl. ¶ 67. *Accord* Shi Compl. ¶ 67; Barnes Compl. ¶ 53 ("On January 12, 2009, Tronox shocked investors when it issued a press release entitled Tronox's U.S. Operations File Chapter 11.").

[57]    *See, e.g.*, *In re Comverse Tech., Inc. Sec. Litig.*, 2008 WL 820015, at *3 (rejecting opposing movant's argument that purchases after alleged partial disclosures created a unique defense where the partial disclosures were too "weak" to "counter-balance effectively" the company's previous false and misleading statements and "[t]here are undoubtedly many members of the class of plaintiffs who, like [the lead plaintiff], purchased shares of [the company] only after the [partial disclosures]"); *In re BearingPoint, Inc., Sec. Litig.*, 232 F.R.D. 534, 540 (E.D. Va. 2006) (holding plaintiff who purchased after an adverse disclosure was

16

Alaska also argues that LaGrange should not be appointed lead

plaintiff because LaGrange lacks Article III standing. For support, Alaska cites

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche, LLP.*[58] In *W.R. Huff*,

a plaintiff brought an action as "'the investment advisor and attorney-in-fact on

behalf of certain purchasers'" and "explicitly disclaim[ed] that it suffered an injury

individually that is separate from its agency function."[59] The Second Circuit held

that the investment advisor did not have Article III standing because it could not

---

not atypical and certified plaintiff as class representative); *In re Loewen Group, Inc. Sec. Litig.*, 233 F.R.D. 154, 163 (E.D. Pa. 2005) (rejecting the argument that class representatives who purchased all of their shares after a partial curative disclosure were subject to unique defenses); *Dietrich v. Bauer*, 192 F.R.D. 119, 125 n.1 (S.D.N.Y. 2000) (finding proposed class representative satisfied typicality despite purchasing stock after partial curative disclosures where the disclosures did not concede the existence of the fraudulent schemes at issue in the litigation); *In re Arakis Energy Corp. Sec. Litig.*, No. 95 Civ. 3431, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999) (approving proposed class representative despite having purchased options in the last two days of the class period and after the issuer had disseminated to the public certain curative disclosures, noting that "a difference in the amount of damage, date, size, or manner of purchase, the type of purchaser, and even the specific document influencing the purchase will not render the claim atypical in most securities actions"); *Lawrence v. Philip Morris Co.*, No. 94 Civ. 1494, 1999 WL 51845, at *5-*6 (E.D.N.Y. Jan. 9, 1999) (finding representative plaintiff's claim was not atypical even though plaintiff, unlike other class members, purchased securities after partial disclosure and drop in stock price).

    58      *See* Alaska Opp. at 8-9 (citing 549 F.3d 100 (2d Cir. 2008)).

    59      *W.R. Huff*, 549 F.3d at 103, 104 (quoting plaintiff's second amended complaint at 1) (alteration in original).

17

establish injury-in-fact.[60]  Alaska argues that, based on a "google search" of the

term "lagrange capital partners [sic]," LaGrange is an "asset manager that

'manage[es] private investment funds exclusively for qualified investors'" and asks

this Court to therefore infer that LaGrange is an investment advisor lacking

standing under *W.R. Huff*.[61]  As set forth in the PSLRA, it is Alaska's burden to

submit proof that LaGrange is an atypical investor – google search results are

insufficient.  Alaska also submits in support of *its* opposition a Securities and

Exchange Commission filing which states that LaGrange "directly beneficially

owns" Tronox stock[62] – establishing that LaGrange was a direct investor in Tronox

and can sufficiently establish injury-in-fact.

     Alaska's contention that LaGrange should not be appointed because it

_____

[60]    *See id.* at 104.

[61]    Alaska Opp. at 2 (quoting LaGrange Capital Partners, L.P. google search description, Ex. 3 to the Declaration of David A. Rosenfeld, Alaska's counsel, in Support of the Alaska Opp. ("Rosenfeld Opp. Decl")).

[62]    Tronox Inc., Report of Beneficial Ownership by LaGrange Capital Partners, L.P., (Schedule 13G/A) (Dec. 31, 2008), Ex. 2 to Rosenfeld Opp. Decl., at Item 4 n.1-3. *See also* 9/09 Declaration of Frank LaGrange Johnson, managing member of LaGrange Capital Management LLC (general partner of LaGrange Capital Partners, LP), in Support of LaGrange's Motion for Appointment as Lead Plaintiff, Approval of Selection of Lead Counsel and Liaison Counsel, and Consolidation of Related Cases ¶ 2 (LaGrange "can and will allege that they directly incurred the foregoing losses and have suffered injury-in-fact. The losses were sustained by [LaGrange], and not by an investment advisor or any other entity.").

18

allegedly "lies at the center of a group of shadowy entities whose operations,

existence and investment activities are hidden from public view and this Court's

review" is similarly unfounded.[63]  Alaska's allegations lack foundation or

explanation.  Alaska also notes that one of the two LaGrange entities is a non-U.S.

entity, presumably to imply that its status as a foreign entity renders it incapable of

representing the class.[64]  Yet, courts routinely appoint hedge funds, foreign

investors, and even foreign hedge funds, as lead plaintiffs.[65]  As a result, Alaska

has not rebutted the presumption that LaGrange is the most adequate plaintiff.

Alaska also seeks, in the event that this Court considered appointing

LaGrange lead plaintiff, limited discovery to ascertain the adequacy of LaGrange

in light of Alaska's claims regarding LaGrange's trading patterns and corporate

structure.[66]  Alaska specifically seeks to depose Frank LaGrange Johnson to

---

[63]     Alaska Opp. at 2. *See also id.* at 15-17.

[64]     *See id.* at 2.

[65]     *See, e.g., Corwin v. Seizinger*, No. 07 Civ. 6728, 2008 WL 123846, at
*3 n.1, *5 (S.D.N.Y. Jan. 8, 2008) (appointing as lead plaintiff an investment firm
established under Luxemburg law); *Steinberg v. Ericsson LM Tel.* Co., No. 07 Civ.
9615, 2008 WL 1721484, at *2-*3 (S.D.N.Y. Apr. 11, 2008) (denying motion for
reconsideration of court's appointment of a citizen of Belgium as lead plaintiff);
*Jolly Roger Offshore Fund Ltd. v. BKF Capital Group, Inc.*, No. 07 Civ. 3923,
2007 WL 2363610, at *5 (S.D.N.Y. Aug. 16, 2007) (appointing a hedge fund and
its offshore partnership lead plaintiff).

[66]     *See* Alaska Opp. at 18-19.

19

address these questions.[67] The PSLRA provides for discovery in connection with

the appointment of lead plaintiff and counsel in limited circumstances, requiring

"the plaintiff first demonstrate[]a reasonable basis for a finding that the

presumptively most adequate plaintiff is incapable of adequately representing the

class."[68] However, Alaska has not presented sufficient evidence to give rise to a

reasonable basis on which to authorize discovery of LaGrange[69] and the cases on

which Alaska relies – including two slip opinions not electronically available – are

inapposite.[70] Moreover, such discovery will only cause unnecessary delay and

---

[67]   *See id.*

[68]   15 U.S.C. § 77z-1 (a)(3)(B)(iv).

[69]   *See, e.g.*, *Ferrari v. Impath, Inc.*, No. 03 Civ. 1940, 2004 WL
1637053, at *7 (S.D.N.Y. July 20, 2004) (rejecting request for limited discovery of
presumptive most adequate plaintiff where "not one iota of evidence" had been
produced "to give the Court even a reasonable basis to authorize discovery").

[70]   *See In re The Reserve Fund Sec. and Derivative Litig.*, No. 09 MD
2011 (S.D.N.Y. Aug. 5, 2009), Ex. 15 to Rosenfeld Opp. Decl., slip op. at 1
(ordering limited discovery, without explanation, into whether the proposed lead
plaintiff investor group "was formed in bad faith, was lawyer-instigated, or is
likely to be lawyer-dominated"); *In re Michaels Stores, Inc. Sec. Litig.*, No. 03 Civ.
0236 (N.D. Tex. Oct. 24, 2003), Ex. 16 to Rosenfeld Opp. Decl., slip op. at 2
(granting limited discovery where proposed lead plaintiff was an assistant manager
of the issuer corporation and therefore may have been in possession of nonpublic
information); *In re Network Assoc.*, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999)
(granting limited discovery where plaintiff-side attorneys had unsuccessfully
attempted to aggregate a large number of class members together to achieve a large
financial loss to qualify for the statute's presumption and discovery subsequently
became necessary to determine the movant with the largest financial loss);
*Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 854 (S.D. Ind. 1999)

expense, likely to provide results that are neither helpful nor likely to change the outcome. As a result, Alaska's request to conduct limited discovery is denied and LaGrange's motion for appointment as lead plaintiff is granted.

### C.    Appointment of Lead Counsel

The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z-1(a)(3)(B)(v). LaGrange has selected the law firm of Gold Bennett as lead counsel and Cohen Milstein as liaison counsel. As ascertained from each firm's resume, and as stated earlier, both firms are qualified to litigate this action. Accordingly, the Court approves the selection of Gold Bennett as Lead Counsel and Cohen Milstein as liaison counsel.

## V.    CONCLUSION

The actions are hereby consolidated under the caption In re Tronox, Inc. Securities Litigation under docket number 09 Civ. 6220 (SAS). LaGrange is appointed lead plaintiff in these actions. Gold Bennett is appointed lead counsel and Cohen Milstein is appointed liaison counsel. The Clerk of the Court is directed to close these motions (Docket Nos. 17, 20, and 23 in 09 Civ. 6220). A conference is scheduled for October 21, 2009 at 4:30 p.m.

---

(authorizing a deposition of one party where lawyers sought to aggregate large numbers of investors, but noting "the result has been a debacle").

21

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            October 13, 2009

22

## -Appearances-

## For Movant LaGrange:

Solomon B. Cera, Esq.
Thomas C. Bright, Esq.
Gold Bennett Cera & Sidener LLP
595 Market Street, Suite 2300
San Francisco, California 94105
(415) 777-2230

Christopher Lometti, Esq.
Daniel B. Rehns, Esq.
Cohen Milstein Sellers & Toll PLLC
150 East 52nd Street, 30th Floor
New York, New York 10022
(212) 838-7797

Steven J. Toll, Esq.
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, Suite 500 West
Washington, D.C. 20005
(202) 408-4600

**For Movant Alaska:**

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mario Alba, Jr., Esq.
Jarrett S. Charo, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100

Darren J. Robbins, Esq.
Brian O. O'Mara, Esq.
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, California 92101
(619) 231-1058

**For Movant Fire and Police Pension Funds:**

Gerald H. Silk, Esq.
Noam Mandel, Esq.
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
(212) 554-1400

**For Movant Shi:**

Gregory M. Nespole, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10017
(212) 545-4657

**For Defendant Kerr-McGee Corporation:**

Jay B. Kasner, Esq.
Susan L. Saltzstein, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square, 42nd Floor
New York, New York 10036
(212) 735-3000

**For Defendants Luke R. Corbett, Gregory Pilcher, Robert M. Wohleber, J. Michael Rauh:**

Gandolfo V. DiBlasi, Esq.
Jessica M. Klein, Esq.
Penny Shane, Esq.
Sullivan and Cromwell, LLP
125 Broad Street
New York, New York 10004
(212) 558-3836

**For Defendants Thomas W. Adams, Mary Mikkelson, Marty J. Rowland:**

David H. Kistenbroker, Esq.
Joni S. Jacobsen, Esq.
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661
(312) 902-5452

Matthew D. Parrott, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
(212) 940-8842