**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------

|  | x |  |
| IN RE TRONOX, INC., | : | Civil Action No. 09-cv-06220-SAS |
| SECURITIES LITIGATION | : |  |
|  | : | **ECF CASE** |
|  | : |  |
|  | : |  |
|  | : | **Electronically Filed** |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | x |  |

---------------------------------------------------------------

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF DEFENDANTS KERR-MCGEE CORPORATION; ANADARKO PETROLEUM CORPORATION; AND THE INDIVIDUALLY NAMED DEFENDANTS

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
Gwendolyn R. Giblin
Thomas C. Bright
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Attorneys for Lead Plaintiffs

#122113

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

     A.     Background Of KMG's Business ........................................................... 3

     B.     The Tronox IPO .................................................................................... 4

     C.     The Role Of The Tronox Officers And Directors.................................. 5

     D.     The Role Of KMG Officers ................................................................. 6

     E.     False And Misleading Statements During The Class Period ................. 6

     F.     Anadarko's Involvement....................................................................... 7

     G.     Tronox Goes Bankrupt.......................................................................... 8

ARGUMENT ........................................................................................................ 8

I.     PLAINTIFFS HAVE ADEQUATELY ALLEGED DEFENDANTS' LIABILITY UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934............. 8

     A.     KMG Is Liable As A Primary Violator Of Section 10(b)...................... 8

          1.     Kerr-McGee Substantially Participated In Making The False And Misleading Statements Of Tronox And The Investing Public Understood Its Key Role ....................................................................... 9

          2.     KMG's Control Of Tronox Supports The Conclusion That KMG Made False And Misleading Statements........................................... 12

     B.     KMG's Scienter Is Adequately Alleged ............................................. 15

          1.     The Manville Site................................................................. 16

          2.     The Secret Wood-Treatment Sites ........................................ 18

          3.     The Ag-Chem Sites............................................................... 20

          4.     Forest Products Lawsuits ...................................................... 22

          5.     The Information Learned By KMG From Third Parties........................... 23

# TABLE OF CONTENTS

**Page**

C.    Anadarko Has Successor-In-Interest Liability ...................................................... 26

D.    Scienter Allegations Against The Individually Named Defendants .................... 28

    1.    Tronox Officer Defendants ........................................................................ 28

        a)    Motive ............................................................................................ 28

        b)    Conscious Disregard ..................................................................... 32

    2.    KMG Officer Defendants .......................................................................... 37

E.    The Reliance Allegations As To The IPO And Bond Purchasers Are Sufficient. 41

F.    The Control Person Claims Have Been Properly Alleged .................................... 46

    1.    Rule 9(b) Does Not Apply To Control Person Claims ............................. 47

    2.    Defendants KMG And Anadarko Were Control Persons Of Tronox ....... 47

    3.    Defendants KMG And Anadarko Were Culpable Participants In The
        Fraud ......................................................................................................... 50

G.    Use Of Allegations Made By Tronox In Its Bankruptcy Court Adversary
    Complaint Is Proper ............................................................................................. 51

II.    CONCLUSION ................................................................................................................. 55

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*AAL High Yield Bond Fund v. Ruttenberg*
  229 F.R.D. 676 (N.D. Ala. 2005)...................................................................................... 45

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*
  651 F.Supp.2d 155 (S.D.N.Y. 2009)........................................................................... 36, 39

*Am. Buying Ins. Serv. v. S. Kornreich & Sons, Inc.*
  944 F.Supp. 240 (S.D.N.Y. 1996)...................................................................................... 27

*Basic, Inc. v. Levinson*
  485 U.S. 224 (1988)................................................................................................... 41, 42

*Black v. Finantra Capital, Inc.*
  418 F.3d 203 (2d Cir. 2005)............................................................................................... 41

*Bourjaily v. United States*
  483 U.S. 171 (1987)........................................................................................................... 54

*CALPERS v. Chubb Corp.*
  394 F.3d 126 (3d Cir. 2004).............................................................................................. 22

*Camden Asset Mgmt, L.P. v. Sunbeam Corp.*
  2001 WL 34556527 (S.D. Fla. July 3, 2001)..................................................................... 45

*Cammer v. Bloom*
  711 F.Supp. 1264 (D.N.J. 1989) ................................................................................. 42, 46

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*
  511 U.S. 164 (1994)............................................................................................................. 8

*City of Monroe Employers Retirement System v. Bridgestone Corp.*
  399 F.3d 651 (6th Cir. 2005) ............................................................................................. 23

*Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*
  2001 WL 300733 at *8 (S.D.N.Y. 2001)............................................................................ 26

*Davidoff v. Farina*
  2005 WL 2030501, *17 (S.D.N.Y. Aug. 22, 2005).............................................................. 35

*Demarco v. Lehman Bros. Inc.*
  309 F.Supp.2d 631 (S.D.N.Y. 2004)................................................................................... 42

# <u>TABLE OF AUTHORITIES</u>

**Page**

*Duncan v. Pencer*
  1996 U.S. Dist. LEXIS 401, *48 (S.D.N.Y. 1996) ................................................... 41

*ECA, Local 134 IBEW Joint v. JP Morgan Chase*
  553 F.3d 187 (2d Cir. 2009) ........................................................................... 31

*Ellison v. Am. Image Motor Co., Inc.*
  36 F.Supp.2d 628 (S.D.N.Y. 1999) ................................................................. 42

*Endo v. Albertine*
  863 F.Supp.708 (N.D. Ill. 1994) ..................................................................... 45

*Feitshans v. Kahn*
  2007 U.S. Dist. LEXIS 24693, at *3 (S.D.N.Y. Apr. 2, 2007) ............................. 52

*Fleet Nat'l Bank v. Boyle*
  2005 WL 2455673, at *2 (E.D. Pa. Sept. 12, 2005) ......................................... 53

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*
  270 F.3d 645 (8th Cir. 2001) ..................................................................... 31, 32

*Fogarazzo v. Lehman Bros., Inc.*
  341 F.Supp.2d 274 (S.D.N.Y. May 21, 2004) ................................................. 39

*Gabriel Capital, L.P. v. NatWest Fin., Inc.*
  122 F.Supp.2d 407 (S.D.N.Y. 2000) .............................................................. 51

*Good v. Zenith Elecs. Corp.*
  751 F.Supp. 1320 (N.D. Ill. 1990) ................................................................. 42

*Hall v. The Children's Place Retail Stores, Inc.*
  580 F.Supp.2d 212 (S.D.N.Y. 2008) ....................................................... *passim*

*Holmes v. Baker*
  166 F.Supp.2d 1362 (S.D. Fla. 2001) ............................................................ 25

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*
  580 F.3d 755 (8th Cir. 2009) ........................................................................ 26

*In re Able Lab. Sec. Litig.*
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) ..................................................... 14

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*In re Aegon N.V. Sec. Litig.*
  2004 WL 1415973, at *10, *11 (S.D.N.Y. June 23, 2004)..................................... 37

*In re American Int'l. Group, Inc. Sec. Litig.*
  2010 U.S. Dist. LEXIS 15453 (S.D.N.Y. Feb. 22, 2010)                                      46

*In re Blech Sec. Litig.*
  2002 U.S. Dist. LEXIS 19835, at *59 (S.D.N.Y. Oct. 22, 2002) ............................ 51

*In re Bristol-Myers Squibb Co. Securities Litigation*
  586 F.Supp.2d 148 (S.D.N.Y. 2008)..................................................................... 14

*In re Bristol-Myers Squibb Sec. Litig.*
  312 F.Supp.2d 549 (S.D.N.Y. 2004)..................................................................... 36

*In re Cabletron Systems, Inc.*
  311 F.3d 11 (1st Cir. 2002).................................................................................. 31

*In re Centerline Holdings Co. Sec. Litig.*
  613 F.Supp.2d 394 (S.D.N.Y. 2009)..................................................................... 26

*In re Connectics Corp. Sec. Litig.*
  2008 WL 3842938, at *4 (N.D. Cal. 2008) ........................................................... 54

*In re Connetics Corp. Sec. Litig.*
  542 F.Supp.2d 996 (N.D. Cal. 2008) .................................................................... 54

*In re Converium Holding AG Sec. Litig.*
  2006 WL 3804619, at *11 (S.D.N.Y. Dec. 28, 2006) ................................. 14, 15, 43

*In re Converium Holding AG Sec. Litig.*
  2007 U.S. Dist. LEXIS 25849, at *6 (S.D.N.Y. Apr. 9, 2007).......................... 43, 44

*In re Corning Sec. Litig.*
  349 F.Supp.2d 698 (S.D.N.Y. 2004)..................................................................... 23

*In re DaimlerChrysler AG Sec. Litig.*
  197 F.Supp.2d 42 (D. Del. 2002)......................................................................... 55

*In re Daou Sys.*
  411 F.3d 1006 (9th Cir. 2005) .............................................................................. 33

**TABLE OF AUTHORITIES**

**Page**

*In re Dynex Capital, Inc. Sec. Litig.*
   2009 WL 3380621 at *14 (S.D.N.Y. Oct. 19, 2009) ................................. 34

*In re Enron Corp. Secs. Litig.*
   2005 U.S. Dist. LEXIS 41240, at *23 n.11 (S.D. Tex. 2005) ............................ 53, 54

*In re eSpeed, Inc. Sec. Litig.*
   2006 WL 880045, at *16 (S.D.N.Y. Apr. 3, 2006) .................................... 20

*In re EVCI Colleges Holding Corp. Secs. Litig.*
   469 F.Supp.2d 88 (S.D.N.Y. 2006) ................................................. 30

*In re Federated Dep't Stores, Inc. Sec. Litig.*
   2005 WL 696894, at *5 (S.D.N.Y. Mar. 25, 2005) .................................. 19

*In re Global Crossing, Ltd., Sec. Litig.*
   322 F.Supp.2d 319 (S.D.N.Y. 2004) ............................................. 13, 15

*In re Initial Public Offering Sec. Litig.*
   241 F.Supp.2d 281 (S.D.N.Y. 2003) ................................................ 42

*In re Initial Public Offering Sec. Litig.*
   471 F.3d 24 (2d Cir. 2006) ...................................................... 42, 44

*In re Initial Public Offering Sec. Litig.*
   544 F.Supp.2d 277 (S.D.N.Y. 2008) ............................................... 28

*In re LaBranche Sec. Litig.*
   405 F.Supp.2d 333 (S.D.N.Y. 2005) ................................................. 9

*In re Marsh & McLennan Cos. Inc. Sec. Litig.*
   501 F.Supp.2d 452 (S.D.N.Y. 2006) ............................................. 21, 26

*In re New Century*
   588 F.Supp.2d 1206 (C.D. Cal. 2008) ........................................... 53, 54

*In re Openwave Sys. Sec. Litig.*
   528 F.Supp.2d 235 (S.D.N.Y. 2007) ............................................... 39

*In re Oxford Health Plans, Inc. Sec. Litig.*
   187 F.R.D. 133 (S.D.N.Y. 1999) ............................................... 26, 51

## <u>TABLE OF AUTHORITIES</u>

**Page**

*In re Parmalat Sec. Litig.*
   376 F.Supp.2d 472 (S.D.N.Y. 2005).................................................................. 42

*In re Parmalat Sec. Litig.*
   493 F. Supp. 2d 723 (S.D.N.Y. 2007)............................................................... 27

*In re Parmalat Sec. Litig.*
   598 F.Supp.2d 569 (S.D.N.Y. Feb. 25, 2009)................................................. 48

*In re Prudential Sec. Inc. Limited Partnerships Litig.*
   930 F.Supp. 68 (S.D.N.Y. 1996)..................................................................... 26

*In re Ramada Inns Sec. Litig.*
   550 F.Supp. 1127 (D. Del. 1982)..................................................................... 55

*In re Raytheon Sec. Litig.*
   157 F.Supp.2d 131 (D.Mass. 2001) ........................................................... 18, 33

*In re Refco, Inc. Sec. Litig.*
   503 F.Supp.2d 611 (S.D.N.Y. Apr. 30, 2007) ................................................ 38

*In re Res. Am. Sec. Litig.*
   2000 WL 1053861, at *7 (E.D. Pa. July 26, 2000)......................................... 41

*In re Sadia, S.A. Sec. Litig.*
   643 F.Supp.2d 521 (S.D.N.Y. 2009)............................................................... 30

*In re Scholastic Corp. Sec. Litig.*
   252 F.3d 63 (2d Cir. 2001)................................................................................. 9

*In re Scor Holdings (Switz) AG Litig.*
   537 F.Supp.2d 556 (S.D.N.Y. 2008)............................................................... 44

*In re Scottish Re Group Sec. Litig.*
   524 F.Supp.2d 370 (S.D.N.Y. 2007)..................................................... 46, 47, 53

*In re Spiegel, Inc. Sec. Litig.*
   382 F.Supp.2d 989 (N.D. Ill. 2004) ................................................................ 53

*In re Time Warner, Sec. Litig. Inc.*
   9 F.3d 259 (2d Cir. 1993) ................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*In re Twinlab Corp. Sec. Litig.*
103 F.Supp.2d 193 (E.D.N.Y. 2000) ................................................................. 41

*In re Van Der Moolen Holding N.V. Sec. Litig.*
405 F.Supp.2d 388 (S.D.N.Y. 2005)........................................................... 9, 10

*In re Williams Sec. Litig.*
339 F.Supp.2d 1206 (N.D. Okla. 2003) ....................................................... 14, 32

*In re Winstar Commc'n.*
2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006) .................................... 34

*Kalnit v. Eichler*
264 F.3d 131 (2d Cir. 2001)............................................................................ 31

*Kalnit v. Eichler*
99 F.Supp.2d 327, 339 (S.D.N.Y. 2000)............................................. 38, 39, 40

*Karagianis v. Karagianis*
2009 WL 4738188 (Bankr. D.N.H. Dec. 4, 2009) ................................... 54

*Lattanzio v. Deloitte & Touche LLP*
476 F.3d 147 (2d Cir. 2007)............................................................................ 9

*Lehocky v. Tidel Techs., Inc.*
220 F.R.D. 491 (S.D. Tex. 2004)................................................................... 45

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*
513 F.3d 702 (7th Cir. 2008) .................................................................. 21, 34

*Menkes v. Stolt-Nielsen, S.A.*
2006 WL 1699603 at * 7 (D. Conn. June 19, 2006) ................................. 9

*Morse v. Abbott Labs.*
1991 WL 83148, at *1 (N.D. Ill. May 7, 1991) ........................................ 55

*Norfolk County Ret. Sys. v. Ustian*
2009 WL 2386156 at *10 (N.D. Ill. July 28, 2009)................................... 30

*Pavelic & LeFlore v. Marvel Entm't Group*
493 U.S. 120 (1989).......................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*PR Diamonds, Inc. v. Chandler*
  364 F.3d 671 (6th Cir. 2004) ................................................ 19

*Rothman v. Gregor*
  220 F.3d 81 (2d Cir. 2000) ............................................... 39, 40

*San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*
  75 F.3d 801 (2d Cir. 1996) .......................................... 38, 39, 40

*SEC v. Buntrock*
  2004 WL 1179423 at *6 (N.D. Ill. May 25, 2004) .................... 23

*SEC v. First Jersey Sec., Inc.*
  101 F.3d 1450 (2d Cir. 1996) ............................................... 49

*SEC v. Softpoint, Inc.*
  958 F.Supp. 846 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998) ................. 34

*Securities Investor Protection Corp. v. BDO Seidman, LLP*
  222 F.3d 63 (2d. Cir. 2000) ............................................... 41

*Shields v. Citytrust Bancorp, Inc.*
  25 F.3d 1124 (2d Cir. 1994) ............................................... 37

*Simpson v. Specialty Retail Concepts*
  823 F.Supp. 353 (M.D.N.C. 1993) ..................................... 42

*South Cherry Street, LLC v. Hennessee Group LLC*
  573 F.3d 98 (2d Cir. 2009) ............................................... 22

*South Ferry LP, No. 2 v. Killinger*
  542 F.3d 776 (9th Cir. 2008) .......................................... 21, 33

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*
  128 S.Ct. 761 (2008) ...................................................... 14

*Swack v. Credit Suisse First Boston*
  383 F.Supp.2d 223 (D. Mass. 2004) ................................... 42

*Tatz v. Nanophase Techs. Corp.*
  2003 U.S. Dist. LEXIS 9982, at *21 (N.D. Ill. June 13, 2003) ................. 46

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Teachers' Ret. Sys. of LA v. Hunter*
 477 F.3d 162 (4th Cir. 2007) ................................................................................ 30

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*
 2005 WL 2148919 at *13 (S.D.N.Y. Sept. 6, 2005) ............................................... 35

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*
 531 F.3d 190 (2d Cir. 2008) .................................................................................. 48

*Telephia, Inc. v. Cuppy*
 411 F.Supp.2d 1178 (N.D. Cal. 2006) .................................................................... 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
 551 U.S. 308 (2007) .......................................................................................... 8, 33

*The Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*
 592 F.Supp.2d 608 (S.D.N.Y. 2009) ................................................................ 8, 9, 13

*The Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*
 446 F.Supp.2d 163 (S.D.N.Y. 2006) ................................................................. 10, 11

*Varghese v. China Shenghuo Pharm. Holdings*
 2009 U.S. Dist. LEXIS 114819, at *32 (S.D.N.Y. Dec. 9, 2009) ........................... 47

*Wight v. BankAmerica Corp.*
 219 F.3d 79 (2d Cir. 2000) .................................................................................... 31

*Wright v. Ernst & Young LLP*
 152 F.3d 169 (2d Cir. 1998) ............................................................................... 8, 10

*In re WRT Energy Sec. Litig.*
 1999 WL 178749, at *13 (S.D.N.Y. Mar. 29, 1999) .............................................. 53

## Statutes, Rules and Regulations

15 U.S.C. §78t(a) ....................................................................................................... 46

Section 10(b) ....................................................................................................... *passim*

Section 20(a) .................................................................................................. 46, 50, 51

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

Federal Rules of Civil Procedure

    Rule 9(b) ......................................................................................................................... 47

## PRELIMINARY STATEMENT

The Consolidated Class Action Complaint ("Complaint")[1] alleges in great detail the existence of a carefully orchestrated securities fraud which had the purpose and effect of relieving defendant Kerr-McGee Corporation ("KMG") of massive known environmental remediation and related tort liabilities so that it could be acquired by defendant Anadarko Petroleum Corporation ("Anadarko") at an enormous premium free and clear of these crippling obligations.  The transactions described in the Complaint foisted these enormous liabilities onto KMG's controlled subsidiary, Tronox Incorporated ("Tronox"), whose securities were then offered to the public in an IPO and traded in the secondary market, with no disclosure as to the true magnitude of the burdens that had been shifted onto Tronox's books.  Ultimately, these obligations drove Tronox into bankruptcy.

Contrary to Defendants' suggestion, the demise of Tronox had nothing to do with the Great Recession, and everything to do with the fraud alleged in the Complaint.[2]  This included the admitted failure to apply proper reserving methodologies and the consequent material understatement of the environmental remediation reserve throughout the Class Period.[3]  Upon completion of the transactions which form the basis of the Complaint, KMG was, as intended,

---

[1]   All references hereinafter to "¶__" are to paragraphs of the Complaint, filed November 24, 2009.  (Docket No. 56).

[2]   Post-IPO, Tronox was primarily engaged in the business of producing and selling titanium dioxide, a white pigment with a wide array of uses.  Tronox's competitors have flourished in this business, easily weathering the storm of the recent financial contagion.  In fact, Huntsman Corporation, a Tronox competitor, sought to buy Tronox's titanium dioxide business out of bankruptcy.  *See* Ex. A to the Declaration of Solomon B. Cera (the "Cera Decl."), filed herewith.

[3]   The Class Period runs from November 21, 2005, the date Tronox went public, through January 12, 2009, the date of its bankruptcy filing.  ¶¶1, 27, 48.

able to present itself for sale as a pure oil and gas exploration and production company, free of the toxic financial by-products of its seventy (70) year history.  Proceeding directly on plan, on August 10, 2006, Anadarko brought KMG for $18 billion in cash and assumption of debt, acquiring a valuable oil and gas company without any material obligation for the vast majority of the environmental remediation obligations accumulated by KMG over several decades.  To assist in effectuating the fraud, KMG put in place as officers and directors of Tronox individuals who had served as KMG officers and who themselves knew of, or recklessly disregarded, the extent of the environmental remediation and tort liabilities facing Tronox, and who were willing to sign off on the inappropriate accounting treatment and lack of disclosure regarding these liabilities to serve the interests of KMG and assume leading executive positions in a public company with a billion dollars in sales.

Significantly, much of the factual support for the allegations of wrongdoing set forth in the Complaint derive from a uniquely reliable source: the Tronox bankruptcy estate.  Based on access to corporate records and percipient witnesses, Tronox revealed in its bankruptcy filings for the first time the existence of "secret sites" requiring material and previously undisclosed environmental remediation estimated to cost Tronox hundreds of millions of dollars and that Defendants are alleged to have known of, or recklessly disregarded, during the Class Period. The dramatic dichotomy between these additional hundreds of millions of dollars in newly revealed obligations stands in stark contrast to the approximately $200 million KMG and Tronox consistently reported as an appropriate environmental remediation reserve throughout the Class Period.

Tronox has now admitted that it published materially false financial statements throughout the Class Period based on KMG's improper reserving methodology, which KMG

required Tronox to employ.  The Complaint lays out a compelling and plausible case that all Defendants played important roles in this complex and carefully crafted fraud.  Accordingly, because the allegations of the Complaint are at least as plausible as Defendants' alternative explanations for this financial debacle, the motions to dismiss should be denied.

## FACTUAL BACKGROUND

### A.    Background Of KMG's Business

KMG was founded in 1929 as an oil and gas company.  ¶55.[4]  Over the years, it expanded into businesses including gas service stations, forestry, coal mining, uranium, fertilizers, and ammonium perchlorate chemicals.  ¶¶56-58.  In the 1970s, it also became involved in various aspects of the nuclear industry.  ¶59.  By 2000, KMG, a public company, had exited many of these businesses to focus on: (a) oil and gas exploration; and (b) chemicals.  ¶60.[5]

KMG nonetheless remained legally responsible under applicable laws for remediation of pollution caused by its former businesses (the "Legacy Liabilities").  ¶¶60-66.  The potential financial exposure represented by the Legacy Liabilities was massive.  Setting appropriate remediation reserves would dramatically affect KMG's financial results.  Under Generally Accepted Accounting Principles ("GAAP"), additions to remediation reserves are treated as a current business expense, meaning that KMG's current net income and earnings per share would be reduced every time a remediation provision was made, a potentially devastating blow in light the magnitude of the Legacy Liabilities.

---

[4]    The Complaint spells out in detail the various entities involved in the fraudulent scheme.  For ease of reference, in this brief the acronym "KMG" will be used to refer to all relevant Kerr-McGee entities.

[5]    Tronox was essentially the KMG chemicals business.

The U.S. Environmental Protection Agency's ("EPA") remediation efforts at certain KMG sites made the situation worse.  In 1999, the EPA identified KMG as a "potentially responsible party" for hazardous substances in a residential community in Manville, New Jersey. ¶62.  Given the nature of its former operations in Manville, KMG knew that similar liabilities likely existed at many other locations.  This was but one in a long string of problem sites.  ¶¶9, 66, 95-96, 100, 131-132, 134-135, 139, 177.  As long as KMG remained a legally responsible party for these sites, its financial obligations would easily total hundreds of millions of dollars, if not more.  The Legacy Liabilities also limited KMG's business opportunities because potential merger and acquisition partners understandably did not want to take on those obligations. ¶¶61, 67.

### B.   The Tronox IPO

As a result of these concerns, KMG developed a strategy to offload the Legacy Liabilities, known internally as "Project Focus."  ¶¶11, 69.  In 2005, KMG hired investment bankers to assist with the "separation" of the chemical business, including the Legacy Liabilities. ¶74.  These efforts ran into a serious stumbling block, however, as potential purchasers balked at taking on the Legacy Liabilities in the absence of a massive indemnification from KMG or a dramatic price reduction.  ¶¶12, 31, 78.  Thus, a spin-off of the Legacy Liabilities (and the chemical business) was settled on as the preferred structure, resulting in Tronox going public on November 21, 2005.  ¶¶13, 84-86, 103.  The agreements entered into between KMG and Tronox in connection with the transaction effectively gave KMG total control over Tronox.  ¶¶13, 15,

28, 45-47, 90, 103. Thereafter, on March 31, 2006, KMG issued a dividend of the remaining shares of Tronox that it had not offered in the IPO to its stockholders.[6]  ¶103.

### C.     The Role Of The Tronox Officers And Directors

In November 2005, Defendants Adams and Mikkelson, and other future members of the Tronox management team, made road show presentations to market the IPO.  ¶¶91-92.  Prior to making those presentations, they were aware that potential buyers had articulated serious concerns about the hundreds of millions of dollars in Legacy Liabilities and declined to enter into any agreements to acquire the chemical assets together with these liabilities, many of which were unrelated to the chemicals business.  ¶93.  Thus, they had to ensure that potential IPO investors would not reach that same conclusion in order to make the IPO successful.  ¶93.

The IPO Registration Statement, which was signed by Defendants Adams, Mikkelson, Rowland, Wohleber, and Rauh, significantly understated the reserves necessary for the Legacy Liabilities.  ¶¶31-35, 94.  It also omitted material information regarding the extent of the probable environmental liabilities, information about "secret sites," that had been identified, and the confidential investigations conducted prior to the IPO, among other things.  ¶¶94-95.  Each of the signing Defendants held high-ranking positions within KMG prior to the IPO.  ¶¶31-35.  They were not outsiders who can legitimately claim ignorance of the Legacy Liabilities and related issues.  At a minimum, they were reckless in not knowing information that was critical to the representations they made to investors.  The Complaint details each of the false statements

---

[6]    In moving to dismiss the claims of KMG stockholders who received shares of Tronox as a dividend on March 31, 2006, Defendants have misread the Complaint.  Brief of Anadarko Petroleum Corporation and Kerr-McGee Corporation ("KMG Br.") at 22.  The class definition includes all those who purchased Tronox securities and were damaged by the misconduct alleged.  ¶48.  Plaintiffs do not allege that existing KMG stockholders who received a dividend of Tronox Class B shares for no consideration were damaged.

made by Defendants Adams, Mikkelson, and Rowland throughout the Class Period and the fact that the truth regarding the Legacy Liabilities was never disclosed.  ¶¶31-33, 165-295.

### D.    The Role Of KMG Officers

The Complaint alleges in detail the role of KMG senior management in the fraud. Specifically, defendants Corbett (Chairman and CEO of KMG), Pilcher (Senior VP, Secretary, and General Counsel of KMG), Wohleber (Senior VP and CFO of KMG and the first Chairman of Tronox), and Rauh (Vice President and Controller of KMG and a director of Tronox) are alleged to have been instrumental in crafting the strategy and agreements that led to the IPO and the jettisoning of the massive Legacy Liabilities from KMG's books onto Tronxo.  ¶¶4, 67. Defendants Wohleber and Rauh held contemporaneous positions at KMG and Tronox through March 31, 2006. [7]  ¶¶34-35.

### E.    False And Misleading Statements During The Class Period

The Complaint alleges that throughout the Class Period, the Defendants engaged in a fraudulent scheme to mislead investors.  This included making false or misleading statements about Tronox's true financial condition in light of the Legacy Liabilities.  ¶¶166-295.  The Complaint alleges that, at the time statements were made to investors, the Defendants knew, or were reckless in not knowing, that:

> - **Improper reserve methodology:** KMG, and later Tronox, at KMG's instruction, did not apply the appropriate methodology for calculating environmental liabilities.  In a May 2009 SEC filing, Tronox **admitted** that the methodology was inappropriate.  ¶¶6, 167, 295.

---

[7]    Wohleber and Rauh, together with defendants Adams, Rowland, and Mikkelson, signed the IPO disclosure documents as well as the 2005 Tronox Annual Report on Form 10-K which contained the materially misstated numbers regarding Tronox's environmental remediation reserve.  ¶¶31-35, 188.

- **Inadequate reserves:** By employing an inappropriate methodology, KMG, and later Tronox, at KMG's instruction, under-reserved for known environmental liabilities. This allowed the Defendants to artificially inflate and misrepresent the companies' net income and earnings per share to investors. ¶112. It also allowed the Defendants to mislead investors regarding the true extent of Tronox's exposure for liabilities and related tort claims. ¶13.

- **Reason for spinning-off Tronox:** The Defendants represented to investors that Tronox was spun-off from KMG so the companies could focus on their respective core competencies, *i.e.*, oil and gas exploration by KMG, and titanium dioxide in the case of Tronox. ¶72. Investors were **not** told that Tronox was used as a dumping ground for the Legacy Liabilities, including many related to the oil and gas business which Tronox was not engaged in. *Id.*

The Defendants have not and cannot challenge the existence of materially false and misleading statements throughout the Class Period. ¶¶165-295.

### F.   Anadarko's Involvement

The Complaint, as well as the Adversary Complaint,[8] alleges that the sale of KMG to Anadarko was in the planning stages prior to the March 31, 2006 spin-off, and was dependent on KMG ridding itself of the Legacy Liabilities. ¶125. Less than three months after the spin-off, Anadarko offered to acquire KMG for $18 billion. ¶104. This resulted in personal profits to three key KMG insiders (defendants Corbett, Pilcher, and Wohleber) of more than $270 million. ¶147. In connection with the acquisition, Anadarko has acknowledged its responsibility for the liability of KMG arising from any of its acts or omissions in connection with the transactions challenged in the Complaint. ¶¶107-108. KMG is now a wholly-owned subsidiary of Anadarko.

---

[8]   *See* Ex. B to the Cera Decl. (attaching relevant excerpts of the Adversary Complaint).

### G.    Tronox Goes Bankrupt

Unable to sustain itself under the weight of the undisclosed Legacy Liabilities, and having serially misrepresented its financial status over the course of more than three years based on false financial reporting regarding its environmental remediation reserve, Tronox filed for bankruptcy on January 12, 2009.  ¶¶5, 27, 110-111.  Its securities are now worthless.[9]

### ARGUMENT

## I.    PLAINTIFFS HAVE ADEQUATELY ALLEGED DEFENDANTS' LIABILITY UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934

### A.    KMG Is Liable As A Primary Violator Of Section 10(b)

KMG argues that Plaintiffs' Section 10(b) claims should be dismissed because there is no allegation of a misstatement or omission attributable to it.  KMG Br. at 10.  Relying on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, *N.A.*, 511 U.S. 164, 177 (1994) and *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998), KMG asserts that it cannot be subject to Section 10(b) liability for statements made by Tronox, which was KMG's wholly owned subsidiary at the time of the IPO, and, following the IPO, a company admittedly controlled by KMG.  KMG is wrong.  The facts alleged establish KMG's substantial participation in the preparation of the false statements and that the investing public clearly understood that the Tronox IPO was a KMG-engineered offering.

In appropriate circumstances, such as those extant here, a "non-speaking" defendant can face primary Section 10(b) liability.  *See The Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F.Supp.2d 608, 622 (S.D.N.Y. 2009) (Scheindlin, J.)

---

[9]    The pleading standard applicable to this motion is set forth in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) and this Court's opinion in *Hall v. The Children's Place Retail Stores, Inc.*, 580 F.Supp.2d 212, 223-228 (S.D.N.Y. 2008) (Scheindlin, J.).

(reconsideration denied in part 617 F.Supp.2d 216 S.D.N.Y. 2009); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F.Supp.2d 388, 401-402 (S.D.N.Y. 2005) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001)).  As explained by this Court:

> The prevailing rule in this Circuit is that a statement need not be publicly attributed to the defendant, if the defendant's participation is substantial enough that s/he may be deemed to have made the statement, and if investors are sufficiently aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant.

*Pension Comm.*, 592 F.Supp.2d at 622 (alterations omitted); *see also In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 351-352 (S.D.N.Y. 2005); *Menkes v. Stolt-Nielsen, S.A.*, No. 3-cv-409 (DJS), 2006 WL 1699603 at * 7 (D. Conn. June 19, 2006).[10]

As demonstrated below, the Complaint clearly pleads that KMG substantially participated in the preparation of Tronox's false and misleading statements and that Tronox investors were aware of and relied on KMG's involvement.

### 1. Kerr-McGee Substantially Participated In Making The False And Misleading Statements Of Tronox And The Investing Public Understood Its Key Role

Plaintiffs specifically allege in the Complaint that certain of Tronox's SEC filings during the Class Period **identified KMG as the source of the information concerning the environmental remediation reserve balances that are directly at issue here**.  ¶¶113, 185, 297. In fact, Tronox was a wholly-owned subsidiary of KMG immediately prior to the IPO.  ¶¶11, 27,

---

[10]   The Second Circuit's decision in *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) does not detract from this analysis.  There, the court of appeals affirmed dismissal of securities fraud claims against a public company's outside auditor. This conclusion was based on the fact that one of the allegedly false statements was made outside the class period (*id.* at 153), there is no accountant liability for interim reviews associated with quarterly financial statements (*id.* at 154-156), and as to the one potentially actionable class period statement, loss causation could not be shown (*id.* at 157-58).  None of these circumstances is present here.

70.  Accordingly, all relevant financial data regarding Tronox that was set forth in the IPO Registration Statement and Prospectus[11] was in fact KMG data reflecting the results of its subsidiary's operations.  The information set forth in the IPO and in Tronox's Annual Report on Form 10-K for the year ended December 31, 2005, filed March 26, 2006, contained the environmental remediation reserve balances for the years ended December 31, 2001, 2002, 2003, 2004, and 2005 **for the KMG chemical business**.  ¶¶113, 185, 297.

In light of these facts, "[t]he public was made aware that the misstatements were attributable to [Kerr-McGee], and [Kerr-McGee] knew or should have known that the investing public would rely on them.  Therefore, under *Wright*, to the extent plaintiff's claims allege that the misrepresentations were publicly attributable to [Kerr-McGee], they have adequately stated a 10b-5 claim against [Kerr-McGee]."  *Van Der Moolen*, 405 F.Supp.2d at 402.  This Court's motion to dismiss decision in *The Pension Committee of the University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F.Supp.2d 163 (S.D.N.Y. 2006) (Scheindlin, J.) is instructive.  There, the following allegations were found sufficient to state a primary Section 10(b) claim:

> [P]aragraph 7 of the Complaint states that "*Citco NV* used Lauer's fraudulent valuations in *preparing* the NAV statements."  Paragraph 9 pleads that *Citco NV* "*creat[ed]* and/or confirm[ed] false valuations of the Funds' assets," paragraph 112 provides that plaintiffs relied on "the NAV statements, audit reports, PPMs, performance reports and other communications from Lauer *and the Funds' service providers*.

---

[11]    All further references to "IPO" are deemed to include the Registration Statement and Prospectus.

*Id*. at 182 (italics in original).  The allegations of KMG's involvement in the IPO are even stronger here than in *Pension Comm*.[12]  The IPO was engineered and effectuated by KMG.  ¶¶4, 67, 94, 98.  Thus, not only were all of Tronox's financial results as presented in the IPO in fact the financial results of a wholly-owned subsidiary of KMG, but these results were repeated in the soon-to-be filed Tronox Form 10-K for 2005.[13]  No one can seriously dispute that KMG prepared these numbers (which have since been acknowledged to be materially misleading (¶¶6, 118, 191)), and that the investing public understood these financial results, including the reserve balances, were those of KMG.  Accordingly, under *Pension Committee*., a Section 10(b) claim properly lies against KMG for the IPO and 2005 Form 10-K.

Furthermore, based on the publicly filed Master Separation Agreement, the market was aware that Tronox was effectively precluded from changing the reserve methodologies employed by KMG, or was in danger of placing at risk KMG's limited indemnity if it did so.  ¶¶15, 113-114.  Thus, the publicly reported reserve balances – which remained essentially consistent throughout the Class Period – can therefore be understood as statements which KMG

---

[12]   ¶113 (The Registration Statement incorporated the financial results for the chemicals segment of KMG for the years ended December 31, 2001, 2002, 2003, and 2004); ¶185 (the 2005 Form 10-K "included financial statements for periods prior to November 2005 that were 'derived from the accounting records of KMG, principally representing the Chemical – Pigment and Chemical – Other segments of KMG, using the historical results of operations, and historical basis of assets and liabilities of the subsidiaries that the Company did not own but currently owns and the chemical business the company operates.'"

[13]   The Tronox IPO went effective on November 21, 2005 and the 2005 Form 10-K was filed on March 29, 2006.  ¶¶166, 185.  Furthermore, the results of KMG's chemicals business (*i.e.* Tronox) for years 2003 and 2004 continued to be reflected in Tronox's Annual Reports on Form 10-K filed for the years 2006 and 2007 issued during the Class Period.  Ex. C to the Cera Decl. These financial results and related environmental remediation reserves were attributable to the KMG Officers, including Defendants Corbett, Pilcher, Wohleber, and Rauh, and they are therefore properly alleged to be liable for misstatements made throughout the entirety of the Class Period.

participated in preparing and that investors understood were attributable to the bogus KMG reserving practices.  ¶¶15, 113-114.

### 2.    KMG's Control Of Tronox Supports The Conclusion That KMG Made False And Misleading Statements

While the facts alleged in the Complaint unquestionably show KMG's status as a "controlling person" of Tronox,[14] these same facts are also instructive as to KMG's substantial participation in Tronox's SEC Filings, further supporting KMG's primary Section 10(b) liability.

The IPO acknowledged the complete control exercised by KMG over Tronox by virtue of KMG owning all of Tronox's shares immediately prior to the IPO and a majority of the voting power of Tronox common stock after the IPO.  ¶¶46, 103.  KMG's domination of Tronox was described in the IPO as resulting in:(1) KMG being entitled to nominate a majority of [Tronox's] board of directors and having the ability **to control the vote** in any election of directors; (2) having **control over Tronox's decisions** to enter into significant corporate transactions and, (3) having **the ability to prevent any transactions** that it does not believe are in KMG's best interest.  ¶46.  It was further disclosed that, as a result, KMG was able to **control all matters affecting Tronox**, including the following: (1) any determination with respect to Tronox's business direction and policies, including the appointment and removal of officers; (2) any determinations with respect to mergers, business combinations or dispositions of assets; (3) Tronox's capital structure; (4) compensation, option programs and other human resources policy decisions; (5) changes to other agreements that may adversely affect Tronox; and (6) the payment of dividends on our common stock.  *Id.*

Furthermore KMG put in place as officers and directors of Tronox individuals who served as KMG and/or its subsidiaries' officers, including Defendants Adams, Rowland,

---

[14]    *See* Section I.1.,F., *infra* at 46.

Mikkelson, Wohleber, and Rauh.  ¶¶4, 31-35, 45, 103.  In November 2005, the future Tronox

management team (which included senior KMG personnel, Defendants Adams, Mikkelson and

Wohleber) made a series of road show presentations to potential investors in connection with the

IPO.  ¶91.  These presentations were prepared with the involvement of KMG and its investment

banker, Lehman Brothers.  Accordingly, the market clearly was being told and understood that

the IPO was a KMG offering.  *Id.*

In addition, all proceeds of the IPO, the bond offerings, the term loan facility, and cash on

hand at Tronox, less $40 million – a total of $804 million – were distributed to KMG upon the

closing of these transactions.  ¶¶14, 28.  The Master Separation Agreement between Tronox and

KMG, provided (1) KMG's potential responsibility for environmental remediation costs would

be capped at $100 million for a period of seven years; and (2) that to be reimbursed pursuant to

this indemnity, Tronox had to obtain KMG's approval in advance for any deviation from the

environmental remediation reserving policies that were in place at KMG prior to the IPO.  ¶¶15,

114.[15]

These allegations are sufficient to demonstrate KMG's substantial participation in the

false and misleading statements.  *See Pension Comm.*, 592 F.Supp.2d at 622; *In re Global

Crossing, Ltd., Sec. Litig.*, 322 F.Supp.2d 319, 334 (S.D.N.Y. 2004) ("Allegations that Andersen

'prepared, directed, or controlled,' 'help create' or 'materially assisted in' preparing false

statements issued by Global Crossing [not including year-end audited financial statements] place

its involvement well beyond the realm of 'aiding and abetting' liability precluded by Central

Bank.").

---

[15]   Viewed collectively, there can be no question that the statements in the IPO and 2005 Form
10-K were effectively those of KMG, the beneficiary of these transactions.

In *In re Williams Sec. Litig.*, 339 F.Supp.2d 1206, 1233-34 (N.D. Okla. 2003), there the Court noted that allegations of a scheme to spin-off an underperforming subsidiary with a large debt load which the parent would otherwise be responsible for were sufficient to state a Section 10(b) claim. *See also In re Able Lab. Sec. Litig.*, No. 2:05-cv-02681-JAG-MCA, 2008 WL 1967509 (D.N.J. Mar. 24, 2008), where in denying a motion to dismiss 10b-5(a) and (c) claims against the CEO and a Vice President of a pharmaceutical company the court noted that "the Supreme Court recently observed that the suggestion that 'there must be a specific oral or written statement before there could be liability under §10(b) or Rule 10b-5, . . . would be erroneous [since c]onduct itself can be deceptive.'" *Id.* at *18 (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S.Ct. 761, 769 (2008) (alterations in *Able*)); *In re Bristol-Myers Squibb Co. Securities Litigation*, 586 F.Supp.2d 148, 169-70 (S.D.N.Y. 2008) (upholding claims against non-speaking officers).

Defendants' heavy reliance on *In re Converium Holding AG Sec. Litig.*, *No.*, No. 04-civ-7897 (DLC) 2006 WL 3804619, at *11 (S.D.N.Y. Dec. 28, 2006) is unavailing. The facts showing participation and the market's understanding of KMG's role are alleged in much greater detail and are more complete than the allegations in *Converium*. It is true that both the instant case and *Converium* deal with the spin-off of a wholly owned subsidiary and both allege the parent controlled the content of the subsidiary's IPO. However, present in the Complaint, but not in *Converium*, are the following critical allegations: (1) the IPO and 2005 Form 10-K contained material misstatements involving the environmental remediation reserve directly attributable to KMG at the time the statements were disseminated (¶¶113, 185, 297)[16]; (2) KMG

---

[16] While the IPO and 2005 Form 10-K incorporated KMG's Chemical Segment Environmental Remediation Reserve Balances, it was only KMG that had the ability to specifically identify the environmental liabilities that were transferred to Tronox. The Assumption and Assignment

controlled and dictated the reserve methodologies employed by Tronox; (3) nearly all proceeds

of the IPO were distributed to KMG; (4) KMG put in place as officers and directors of Tronox

individuals who had served as KMG or its subsidiaries' officers; (5) KMG's majority voting

share allowed it to dictate all of Tronox's major business decisions.  No comparable allegations

of participation are found in *Converium*.  Accordingly, *Converium* does not support KMG's

motion to dismiss.

The overwhelming domination of Tronox by KMG confirms that KMG can properly be

deemed a maker of false statements in the IPO as well as the 2005 Form 10-K, and that investors

understood and relied on this fact.  *See Global Crossing*, 322 F.Supp.2d at 334.  KMG is

therefore properly alleged to be primarily liable under Section 10(b).[17]

### B.  KMG's Scienter Is Adequately Alleged

Multiple confidential witnesses have confirmed that it was widely known within both

KMG and Tronox at the time of the IPO and thereafter that the Company was severely under-

reserved for the massive Legacy Liabilities that had been dumped on Tronox.  CW1, a seven

year employee, related that Defendant Corbett insisted on offloading the liabilities as a part of

---

Agreement, signed in 2005, but made effective as of December 31, 2002, listed the few
environmental and tort liabilities for which KMG remained responsible, and provided a list of
those for which Tronox assumed responsibility.  ¶73.  This degree of participation and
domination is of a much greater magnitude than anything alleged in *Converium*.

[17]   Defendants Corbett and Pilcher argue that they cannot be primarily liable under Section
10(b) for the same reasons as KMG, *i.e.*, they made no statements.  However, the Complaint
similarly alleges Corbett and Pilcher's substantial involvement with all of the transactions
leading up to the IPO and subsequent March 31, 2006 Spin-Off, including their roles in
structuring the transactions.  ¶¶4, 37-38, 67.  Furthermore, Corbett had signed previous KMG
statements incorporating the financial results for the chemical business of KMG which were in
turn included in the IPO and 2005 Form 10-K, as well as the environmental remediation reserve
amounts.  Cera Decl., Ex. C.  As such, these individuals substantially participated in making the
challenged statements, and as senior officers of KMG the market readily understood their pivotal
roles in the transactions.  Defendants Wohleber and Rauh actually signed the IPO Registration
Statement and Tronox 2005 Form 10-K.  ¶¶34-35, 118.

the IPO process.  ¶125.  CW2, a twenty-four year employee, identified Defendants Corbett and

Wohleber as having deep involvement in the transfer of the liabilities.  ¶126.  CW6, a twenty

year employee, confirmed that the legacy liability fraud was "common knowledge within the

Company" and caused Tronox to fail.  ¶128.  A thirty year employee, Director of Financial

Services at KMG, stated that Tronox was severely under-reserved and that this was a result of

pressure to meet earnings. ¶133.  CW10, a Controller and Manager of Accounting at Tronox

stated that the debts and liabilities of Tronox were more than a billion dollars and were

associated with environmental remediation costs which the directors would have been aware of.

¶134.  Several confidential witnesses, including CW12 from the Safety and Environmental

Group, stated that it was known that the Legacy Liabilities were placed in Tronox to allow the

merger with Anadarko to occur.  ¶¶129, 139.[18]  The consistency and detail in the information

provided by the confidential witnesses strongly supports a finding of scienter.

### 1.     The Manville Site

KMG asserts that Plaintiffs have failed to allege scienter in that there are no allegations

that KMG had information contradicting the disclosures that were made regarding the adequacy

of reserves.  KMG Br. at 7-8.  In so arguing, KMG appears to be analyzing a complaint other

than the one at issue on these motions.

The Complaint specifically alleges that the relevant reserve numbers were inconsistent

with information possessed by KMG at the time of the IPO.  For example, it is undisputed that

Tronox recorded no reserve for the Manville, New Jersey site until the third quarter of 2006.

¶¶115, 117, 160.  Even then, the reserve is alleged to have understated the probable and

---

[18]    The legal sufficiency of the confidential witness allegations is discussed in Section I.D.1.(a),
*infra*, at 30 n.32.

reasonably estimable exposure.  ¶¶115, 160.  On July 6, 1999, the EPA sent a letter to KMG

identifying it as a potentially responsible party, and that the site was in a residential area.  ¶62.

Three months later, on October 18, 1999, the EPA informed KMG that the remedy for Manville

included permanent relocation of residents at an estimated cost of $59,100,000.  ¶63.  KMG

proceeded to investigate the site to determine the extent of its exposure (¶64) and as a result of its

investigation, KMG management informed the Board that KMG would probably be responsible

for the clean up.  *Id.*  Thereafter, on April 15, 2005, the EPA demanded $178,800,000 in clean up

costs incurred through 2004, plus interest.  ¶¶13, 76, 80.  During negotiations conducted in the

summer of 2005 regarding the potential purchase of KMG's Chemical Business (*i.e.*, Tronox),

Apollo sought to exclude all liabilities related to wood-treatment facilities, including Manville,

from the purchase price.  ¶81.  Despite Apollo's concerns about and refusal to assume the costs

associated with Manville and other wood-treatment liabilities, the increasing demands of the

EPA, and KMG management's determination that they would be responsible, no reserve

whatsoever was recorded until the $35 million reflected in the 3Q 2006 10-Q, and this minimal

reserve was never increased during the Class Period.  ¶¶115, 117, 160.  According to a lawsuit

filed in August 2008, the EPA and the State of New Jersey had spent approximately $280 million

to clean up Manville.  ¶65.  Despite these facts, neither KMG, nor later Tronox, ever

appropriately increased the minimal reserve that had been belatedly recorded.  ¶115.

      Based on the foregoing, KMG and its officers knew or recklessly disregarded that a

significant reserve was required to have been recorded for Manville throughout the Class

Period.[19]  In addition, although after receiving the $179 million demand from the EPA, KMG

---

[19]    Tronox's announcement that its Class Period financials could not be relied upon specifically
references "improper reserve methodologies" it had employed.  ¶¶6, 17.  As noted, these were in
fact KMG's accounting treatments that were required to be applied by Tronox.  One can

failed to record a reserve, it did quickly move to ensure its isolation from any liability related to Manville by transferring this obligation to Tronox. ¶80. Specifically, after receiving the April 15, 2005 letter from the EPA put KMG on notice that it could be responsible for the Manville liabilities even after a sale or spin-off (*id.*), KMG put in place an indemnity in the form of the Assignment, Assumption and Indemnity Agreement, made retroactive to December 31, 2002, to ensure that the $179 million Manville demand would be included. *Id.* These actions are a clear reflection of KMG's understanding that Manville represented a significant liability, which is probative of scienter.

These allegations, when considered collectively, plainly give rise to a reasonable inference of scienter on the part of KMG and its officers that is at least as plausible as any opposing inference. *See Children's Place*, 580 F.Supp.2d at 233. [20]

### 2.   The Secret Wood-Treatment Sites

Faced with ballooning claims by the EPA and the State of New Jersey related to Manville, KMG also knew or recklessly disregarded that similar wood-treatment sites for which it was responsible would entail enormous clean up costs, especially when considered in the aggregate. ¶¶66, 95.[21] After the EPA's October 1999 reimbursement demand, a confidential investigation was undertaken by 2002 at the latest. ¶95. KMG employees who performed the

---

reasonably infer from the announcement that the failure to record any reserve for Manville, even in the face of a hundred million dollar EPA demand, is one such improper reserving practice.

[20]   KMG's scienter is also supported by the fact that that **all** of KMG's reserve numbers published during the Class Period, as adopted by Tronox were materially deficient and were the product of **KMG's** improper reserving methodologies and GAAP violations. ¶¶6, 118, 191. *In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 148 (D.Mass. 2001).

[21]   Confidential witnesses confirm the existence of the secret sites. ¶¶135, 139. CW2, an Environmental Manager who had provided expert testimony for KMG and Tronox and was with the Company for more than 20 years, confirmed that an internal review of the wood treatment sites was done after Manville erupted. ¶135. CW10 reported that sites similar to Manville "absolutely" raised concern and that the Board was aware of them. *Id.*

investigation were told not to disclose the purpose of their visits to the sites.  *Id.*  Through this investigation, KMG identified the additional wood-treatment sites where it may have liability akin to that at Manville, yet it made no disclosures of any of these sites.  *Id.*  Based on these visits, information was circulated within KMG regarding the "secret sites."  *Id.*  Coupled with their knowledge of the Manville demand, KMG and its officers knew or recklessly disregarded that several of these sites were under investigation for potential remediation.  These "secret sites" were never disclosed and no reserve was taken.  *Id.*

Defendants argue that their investigation of additional wood-treatment sites undercuts any inference of scienter (KMG Br. at 16), but this argument misses the point.  The investigation itself demonstrates that the liabilities associated with these sites were in fact known to KMG and its officers.  Confidential witnesses have confirmed this.  ¶¶132, 135, 139.  It was the failure to specifically disclose these sites and to establish a proper reserve for them that gives rise to the Section 10(b) claim.

Defendants reliance on *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) to exonerate their failure to properly reserve is misplaced.  As opposed to the numerous, highly detailed allegations of **knowledge** presented here, the plaintiffs in *PR Diamonds* alleged only three red flags, two of which were simply repetitions of the alleged GAAP violation.  Likewise, *In re Federated Dep't Stores, Inc. Sec. Litig.*, Case No. 00 cv 6362 (RCC), 2005 WL 696894, at *5 (S.D.N.Y. Mar. 25, 2005), the allegations "suffered from similar defects" as those found in *PR Diamonds*.  In stark contrast, the Complaint here alleges actual **knowledge** of the facts that constitute the fraud.  Specifically, it is clearly alleged that the "confidential" investigation revealed specific sites with similar liability as Manville, yet KMG and its officers failed to disclose the existence of these "secret sites" or to record a reserve for these liabilities.

###    3.    <u>The Ag-Chem Sites</u>

Defendants also claim that KMG's failure to investigate other agricultural chemical and chemical manufacturing remediation sites, identified in Appendix A to the Complaint, is insufficient to plead scienter.  KMG Br. at 16.  However, the facts alleged show otherwise.  The Complaint specifically alleges that, prior to the IPO, KMG refused to conduct a detailed investigation of these sites which were known to exist as potential remediation sites.  ¶96.  As a result, no investigation was performed, and the sites were not disclosed in the IPO or thereafter.  *Id.*  Defendants argue that KMG senior managers were not aware of these "purported" sites and fail to address Appendix "A" which identify the specific locations.  KMG Br. at 17 n.21.

These sites were transferred to Tronox as a part of the transactions leading to the IPO, and given the sheer number involved, were significant enough to have the attention of the KMG and Tronox officers.  Indeed, a memo discussing these sites was created in August 2005, just prior to September 12, 2005, the date KMG incorporated the entity that would become Tronox.  ¶¶85, 96.  On October 6, 2005, KMG's Board of Directors approved the separation of the chemical business through the IPO and subsequent spin-off.  ¶86.  At that time, it is reasonable to presume that the Boards of both KMG and Tronox were presented with a valuation of the assets to be transferred, which undoubtedly included information regarding the millions in environmental remediation costs.  The Defendants were also dutibound to be fully informed regarding these sites and the cost to remediate them, or were reckless in not knowing.  ¶96.  The potential cost of liabilities to be spun off to Tronox was a critical fact which both the KMG and Tronox officers were in a position to know, particularly given the obligation to ascertain whether the representations made were accurate or not.  *See, e.g., In re eSpeed, Inc. Sec. Litig.*, No. 05-cv-2091 (SAS), 2006 WL 880045, at *16 (S.D.N.Y. Apr. 3, 2006) (where "the subject-matter of

the alleged misstatements is sufficiently 'significant' to a defendant company, it may be possible for knowledge of contradictory information (and thus, scienter) to be imputed to individual defendants even in the absence of specific information contradicting their public statements"). Here, the Defendants were exposed to information at odds with their public statements. *E.g.*, *In re Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F.Supp.2d 452, 483 (S.D.N.Y. 2006).[22]

Given the history of the Manville site, it was reckless to have transferred these additional liabilities without any investigation into possible reserve requirements. Clearly, the existence of the unique indemnification of KMG (¶¶15, 90) and its control over Tronox's operations, including reserve balances, allowed it to transfer the liability for Ag-Chem sites identified on Appendix A without any disclosure or meaningful investigation as to this liability. In addition, any disclosure of huge potential reserve requirements associated with the Ag-Chem sites would obviously have jeopardized a successful IPO. These facts must be considered collectively in

---

[22]   *See also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*"), where on remand from the Supreme Court, the Seventh Circuit agreed with plaintiffs that it was "exceedingly unlikely" that the false statements about key parts of the company's business were the result of "merely careless mistakes at the management level … rather than of an intent to deceive or a reckless indifference to whether the statements were misleading," and further held "[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's key products] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity." *Id.* at 709. Instead, the Seventh Circuit held that the more plausible inference was that facts critical to a company's core operations are known to the company's most senior officers. *Id.* at 711. If anything, the inference of scienter is equally compelling here where, unlike *Tellabs*, the Legacy Liabilities had the ability to bankrupt Tronox. Similarly, in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008), the Ninth Circuit held that a plaintiff may adequately allege the scienter of key officers based on the "core operations." As in *Tellabs II* and *South Ferry*, the core operations doctrine supports a strong inference that the Company's senior officers were aware of the facts concerning the Legacy Liabilities and environmental reserves, and the manipulations undertaken to conceal these obligations.

assessing the scienter allegations, and they plainly give rise to a strong inference of the requisite mental state.[23]

### 4.    <u>Forest Products Lawsuits</u>

While the IPO disclosed the settlement of twenty-two lawsuits related to "exposure to and/or release of creosote and other substances used in the wood-treatment process" (¶99) and that an additional 11,000 additional claims related to wood-treatment sites had been filed as of the time of the IPO (¶100), there was **no** disclosure that the additional wood-treatment lawsuits were settled for approximately $70 million, or as to the potential size of the 11,000 additional claims (*id.*), for which no reserve was taken until the fourth quarter of 2005.[24]  Plaintiffs allege that Defendants' assurances that the ultimate resolution of 11,000 claims related to damages resulting from wood-treatment plants "would not have a material adverse effect" on the Company's financials, in the wake of settling 22 lawsuits for the same type of damages **for $70 million**, was materially misleading.  ¶171.[25]

---

[23]   Defendants' reliance on *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 122 (2d Cir. 2009) is misplaced.  In that case, investors sued their investment advisors for not disclosing that a recommended investment was part of a Ponzi scheme.  *Id.* at 99-100.  The relationship between the investor and its advisor in no way parallels the facts alleged here regarding known environmental remediation risks.  *See id.*, at 114.  Indeed, in *South Cherry*, "[t]he closest the Complaint came to identifying any fact that supposedly should have put HG on fraud alert" was the inaccurate name of the purported auditor.  *Id.* at 113.  The detailed facts alleged here are far more compelling.

[24]   Even then, the reserve never exceeded $11 million, in context a paltry sum.  *Id.*.

[25]   Apollo's due diligence team from Morgan Lewis & Bockius believed the prior settlements indicated the potential exposure to be up to $500 million for these claims.  ¶¶101, 171.  This conclusion was based on what they learned during their due diligence process.  Defendants dismiss this conclusion, likening it to a "barebones sketch of an internal memo" citing *CALPERS v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004).  *Chubb* involved a vaguely described memorandum where plaintiffs failed to identify who was involved in its preparation or what information its conclusions were based on.  *Id.*  Here, it is the existence of the facts that were available to the KMG and Tronox officers that renders this a material disclosure item.  That

In spite of these facts, Defendants remarkably argue that the Complaint provides no basis for the assertion that the settlement of past claims had a bearing on Tronox's future exposures. KMG Br. at 17.  This is nonsensical, especially where the claims are all related to the same type of environmental exposures.  Past litigation is clearly a relevant consideration.  *See City of Monroe Employers Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 678 (6th Cir. 2005); *cf. In re Corning Sec. Litig.*, 349 F.Supp.2d 698, 721 (S.D.N.Y. 2004) (finding that since during the class period there were "no existing lawsuits or claims even beginning to approach something of this magnitude," and "there was no trend toward such a thing," "there was no basis for postulating in any form potential exposure to thousands of lawsuits and liability exposures sufficient to result in losses to Dow Corning and Corning.").  Here, abundant information was available to KMG and to officers of both KMG and Tronox, indicating a severe understatement of claim liability reserves.

### 5.   The Information Learned By KMG From Third Parties

Defendants argue that Plaintiffs have failed to allege any facts "supporting an inference that any KMG employee did not believe at any relevant time that Tronox's reserves were adequate."  KMG Br. at 18.  This argument is specious as it discounts the information learned by KMG during the due diligence performed by potential private equity buyers.  To the extent this information is damaging to KMG's position, it is dismissed as different business judgments

---

Apollo thought the exposure for these claims was up to $500 million more than was disclosed by KMG is not such an insignificant sum that it may be dismissed as "a different business judgment," or that KMG was not aware of Apollo's opinion.  Even if unaware of the opinion, KMG knew the same facts as did Apollo.  In any event, disregarding the advice of an expert is probative of scienter.  *E.g., SEC v. Buntrock*, No. 02-C-2180, 2004 WL 1179423 at *6 (N.D. Ill. May 25, 2004).

influenced by self-interested negotiations.  *Id.*  However, the Complaint's allegations as to the substance of what was learned goes well beyond differing business valuations.

After performing their due diligence on the KMG chemicals business (*i.e.*, Tronox), four (4) potential purchasers all shared their concerns with KMG about the Legacy Liabilities, which caused them to discount the value of KMG's chemicals business by 25% to 75%.  ¶¶12, 78.[26] The Complaint alleges in great detail the following facts, learned by KMG during the due diligence period from potential purchasers, that put KMG and its officers, including those who assumed positions on the Tronox Board, on notice of the true extent of the Legacy Liabilities and that the recorded reserves for these liabilities were materially deficient:

- One prospective purchaser conveyed a $1.2 billion bid if the Legacy Liabilities were not included, but otherwise only a $300 million bid if they were.  ¶78.

- After extensive negotiations in the summer of 2005, Apollo made an initial bid of $1.6 billion for the Chemical Business excluding all liabilities related to wood-treatment facilities, including Manville.  ¶81.

- Apollo determined the Legacy Liabilities would be $400 to $900 million dollars.  ¶¶81, 83.

- To complete the transaction with Apollo, KMG had considered offering Apollo a $400 million indemnity to purchase the Legacy Liabilities, including the wood-treatment facilities.  ¶81. Ultimately, KMG decided against the sale to Apollo because of the cost of the indemnity obligation.  *Id.*

- On July 8, 2005, Lehman made a presentation to KMG comparing the Apollo bid to a potential spin-off.  ¶82.  Based on Lehman's analysis, the Apollo bid would provide more than $500 million in additional after-tax cash proceeds to KMG (without the Legacy Liabilities) as compared to a spin-off.  *Id.*  In effect, by choosing to

---

[26]   One confidential witness, VP for Human Resources at Tronox, who responsibilities included scheduling meetings and facility visits, relayed that there were fourteen initial expressions of interest in Tronox, but all of these potential buyers were spooked by the Legacy Liabilities and no deals arose.  ¶131.

proceed with the Spin-Off, KMG was foregoing $500 million in cash so long as the Legacy Liabilities were eliminated as a KMG obligation. *Id.* Tellingly, it did so while at the same time it was only reserving approximately $200 million for these same obligations. *Id.*

- KMG and its financial advisor, Lehman Brothers, warned that one of the risks of the proposed transaction was that the "[s]eparation from legacy liabilities" would be "[c]omplicated under [a] bankruptcy scenario." ¶83.

- Apollo had asserted that Tronox should not go public because it could not survive as a stand-alone company in the face of the Legacy Liabilities. Apollo's due diligence teams had concluded that KMG was attempting to offload hundreds of millions of dollars of legacy environmental and tort claims through the sale process. ¶93.

- Based on the information provided to it during its due diligence process, Apollo's due diligence team from the law firm of Morgan Lewis & Bockius concluded that KMG "may be significantly under-reserved for these cases [forest products litigation]" and the "total potential exposure could be well over $500 million." ¶101.

These facts show that KMG and its officers who were KMG representatives on the Tronox Board, knew or were reckless in not knowing that had there been full and truthful disclosure of the material exposures for environmental remediation and tort claims based on the Legacy Liabilities, the IPO would not have succeeded and Tronox could not ultimately survive as an independent company. ¶102.[27]

Differences in valuations of the magnitudes discussed with the potential buyers cannot be explained as negotiating tactics or conflicting business judgments, especially when no deal was ever consummated. *See Holmes v. Baker*, 166 F.Supp.2d 1362, 1377 (S.D. Fla. 2001) (court finding "compelling Plaintiff's allegations that [the defendant] was confronted directly with the

---

[27]   A plethora of additional related factual allegations which are essentially ignored by Defendants further contribute to a strong inference of scienter. ¶¶11, 15, 91-92, 98.

ongoing accounting fraud in connection with" due diligence allegations and the deal was not

consummated because of the fraud); *see also Telephia, Inc. v. Cuppy*, 411 F.Supp.2d 1178, 1185

(N.D. Cal. 2006) (in a fraud case, finding that defendants' knowledge that another customer had

raised specific concerns about the technology that the plaintiff was contemplating buying, and

defendants' "attempts to assuage those concerns during the due diligence period, and their failure

to disclose those concerns to [the plaintiff] are sufficient circumstantial evidence of scienter to

survive summary judgment"). [28]

## C.    Anadarko Has Successor-In-Interest Liability

Successor liability will lie when: "(1) there is an express or implied agreement to assume

the other company's debts and obligations, (2) the transaction [conveying the assets of one

---

[28]   Defendants argue that Plaintiffs have ignored what Defendants refer to as Tronox's "ample warnings, and risk disclosures" related to their environmental liabilities and "a complete description of Tronox's current and legacy businesses."  KMG Br. at 2, 7-8; Brief of Defendants Adams, Mikkelson, and Rowland ("Tronox Def. Br.") at 2, 12.  Yet the complaint makes clear that Tronox failed to provide sufficient disclosure to investors to permit a meaningful evaluation of the true scope and extent of these environmental remediation and related tort liabilities, which were associated with decades of environmental pollution.  ¶2.  "When a corporation makes a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."  *In re Centerline Holdings Co. Sec. Litig.*, 613 F.Supp.2d 394, 398 (S.D.N.Y. 2009) (Scheindlin, J.) (internal quotation marks and citations omitted); *In re Marsh & McLennan*, 501 F.Supp.2d at 469; *Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.*, No. 99-CIV-12046, 2001 WL 300733 at *8 (S.D.N.Y. 2001) ("warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described.").  *Accord In re Prudential Sec. Inc. Limited Partnerships Litig.*, 930 F.Supp. 68, 74 (S.D.N.Y. 1996) ("warnings of possible detriment are insufficient if they are simply a smoke screen to cover a company's internal reasonably informed certainty of detriment"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999).  *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 764 (8th Cir. 2009) relied on repeated disclosure of control problems, and not the withholding of hard information such as the need for additional reserves.  The systematic under-reserving that began with KMG and carried over to Tronox is a classic example of a failure to provide complete and accurate disclosure.  And Tronox's recent announcement that it reported materially misstated financial results throughout the Class Period related to reserves utterly debunks any suggestion of adequate risk disclosures.

company to the other] was fraudulent, (3) there was a de facto merger or consolidation of the companies, or (4) the purchasing company was a mere continuation of the selling company." *In re Parmalat Sec. Litig.*, 493 F.Supp.2d 723, 729 (S.D.N.Y. 2007); *see also Am. Buying Ins. Serv. v. S. Kornreich & Sons, Inc.*, 944 F.Supp. 240, 249 (S.D.N.Y. 1996). These conditions have been met here and, as a result, Anadarko has successor-in-interest liability. Nevertheless, Defendant Anadarko contends that since KMG was technically the surviving corporation in the merger transaction, it cannot be liable for KMG's actions before the merger. KMG Br. at 9. This argument improperly elevates form over substance.

Plaintiffs have alleged that Anadarko assumed KMG's liability (¶¶108-09) and $1.6 billion of debt (¶104), and that KMG is now a subsidiary of Anadarko by way of sale (¶104). Specifically, the Complaint alleges that Anadarko purported to immunize KMG's officers and directors from liability for acts and omissions occurring before the acquisition date. ¶¶15, 107. The Complaint further alleges that, since acquiring KMG, Anadarko has admitted in its 2006 and 2007 Forms 10-K its potential responsibility for the Legacy Liabilities in the event Tronox should fail. ¶¶108-09. In fact, in those Form 10-Ks, Anadarko refers to itself "as the **successor** to KMG, if Tronox is unable to perform certain remedial obligations." ¶108. Plainly, Anadarko's admissions and assumption of KMG's liabilities and debt confirm that, to the extent KMG is found liable for Section 10(b) violations, liability will attach against Anadarko as KMG's successor-in-interest. *See, e.g.*, *Parmalat*, 493 F.Supp.2d at 729-30 (allegations that New Parmalat assumed liability for the debts of Old Parmalat enough to plead successor liability); *American Buying*, 944 F.Supp. at 249 (allegations that formation of company was through a merger and successor assumed the liabilities of the acquired companies enough to

plead successor liability).[29]   Accordingly, for these reasons, successor liability attaches to

Anadarko.

#### D.    Scienter Allegations Against The Individually Named Defendants

As discussed in Section I.B., *supra*, all of the individually named defendants were privy

to the material, undisclosed adverse information about environmental remediation and related

tort liabilities that are at the heart of this case.  Certain additional allegations set forth in the

Complaint leave little doubt that it sufficiently alleges scienter as to all of the individually named

defendants.

#### 1.    Tronox Officer Defendants

##### a)    Motive

The Complaint alleges in detail that Defendants Adams, Mikkelson, and Rowland

(collectively, the "Tronox Officers") had a strong motive to keep the extent of the known

environmental liabilities secret. [30]   Indeed, from the time of the IPO, the Tronox Officers knew

that Tronox's very existence depended on keeping the liabilities hidden.  ¶125.  The Company

was thinly capitalized and could not reveal the extent of the liabilities without raising an

insolvency concern.  ¶3.  Thus, the Tronox Officers had two options: (1) to "come clean" and

reveal the truth, which certainly would have devastated their careers and the Company; or (2)

attempt to maintain the facade, hoping that they could keep it secret indefinitely, or at least until

the Company might be able to handle the financial consequences resulting from the inadequacy

---

[29]   Plaintiffs do not allege that Anadarko made or participated in making the false statements. Rather, to the extent KMG is liable for doing so, so too is Anadarko as its successor-in-interest, since KMG has been absorbed into Anadarko's corporate structure.

[30]   The law does not require motive to establish scienter.  *See, e.g., In re Initial Public Offering Sec. Litig.*, 544 F.Supp.2d 277, 286 (S.D.N.Y. 2008)  (Scheindlin, J.).

of the reserves balances.  The Tronox Officers chose the latter and as a result repeatedly

misrepresented to the market the true extent of the Legacy Liabilities. [31]

The Complaint specifically alleges how defendants Adams, Mikkelson, and Rowland

benefited, in a concrete way, from participating in and perpetuating the scheme.  Each of them,

residents of Oklahoma City, received substantial salary increases, special bonuses, and generous

grants of stock options in connection with the IPO.  Serious efforts to sell or spin-off Tronox

began and were consummated in 2005.  ¶74.  At that same time, the compensation paid to

Defendants Adams, Mikkelson, and Rowland tripled and quadrupled.  Defendant Adams

received $2,424,909 in total compensation in 2005, up from $560,518 in 2004.  ¶142.  Defendant

Mikkelson's compensation increased to $932,957 in 2005 from $224,747 in 2004.  *Id.*  Similarly,

Defendant Rowland benefited from receiving total compensation of $1,078,477 in 2005, up from

$340,248 in 2004.  *Id.*  Thus, contrary to Defendants' contentions, the existence of bonuses,

stock options, and other compensation is not alleged as a generalized motive for Adams,

Mikkelson, and Rowland to engage in the misconduct.  Rather, the magnitude and timing of the

bonuses support a finding of motive.  Recently, one court found that bonuses of $828,655 and $2

million were indicative of scienter:

> [T]his court does not regard such bonuses and awards to be
> common among corporate executives in general, or these particular
> sums to be insignificant.  Simple greed is a powerful motivator, as
> proven by recent events in the marketplace.  Personal profit,
> coupled with professional motives to hide internal weaknesses and

---

[31]   The Tronox Officers claim that the inference of scienter is rebutted by the fact that they "did
not change the reserve methodology at the beginning of the Class Period, but instead employed a
reserve methodology that had been used by [Kerr-McGee] . . . prior to the IPO."  Tronox Def.
Br. at 7.  This misses the point.  Suddenly changing the reserve methodology after the IPO would
have exposed the scheme because it would have required an immediate and enormous increase in
reserves.  Not only would this have potentially caused the collapse of Tronox, but it also would
have eliminated the indemnity obligation running from KMG in favor of Tronox.  ¶¶15, 90.

> paint a rosy picture of the restructuring lend weight to not only a
> cogent inference of scienter, but a compelling one . . .

*Norfolk County Ret. Sys. v. Ustian*, No. 07-cv-7014, 2009 WL 2386156 at *10 (N.D. Ill. July 28,

2009).  Here, too, the timing and extreme departure from past practice makes the large increases

in compensation indicative of scienter.

The Complaint also explains, in detail, how the payments received by the Tronox

Officers were not ordinary retention bonuses.  It was "common knowledge" within the Company

that Defendant Adams was "offered a bonus if he could keep the company alive for one year

after the IPO."  ¶144.  An employee in the Safety and Environmental Affairs group, who had

substantial knowledge of the Company's remediation efforts, said she received a bonus equal to

25% of her annual salary to join Tronox in light of its fragile, albeit undisclosed, condition.

¶145.  However, she "was sworn to secrecy" and "asked to sign a document to keep the bonus

money confidential."  *Id.*  Other "selective executives and employees" reportedly received

similar payments.  *Id.*  As one confidential witness noted, the compensation received by the

Tronox Officers was "higher . . . comparable to others in the chemical industry and especially for

executives living in Oklahoma City."  ¶141.[32]

---

[32]   The Tronox Officers challenge the use of information received from twelve confidential witnesses in the Complaint.  All are former employees of KMG and/or Tronox.  The Complaint identifies each person's role within the Company and other details establishing that the witness was in a position to know the information that was provided.  *See* ¶¶125-128, 131-137, 139-140, 144-145.  Each witness's testimony is consistent with that of the other witnesses and the Complaint's other allegations, which further indicates their reliability.  *See In re EVCI Colleges Holding Corp. Secs. Litig.*, 469 F.Supp.2d 88, 97 (S.D.N.Y. 2006).  Thus, the Complaint sufficiently states allegations based on information received from confidential witnesses.  *See, e.g., In re Sadia, S.A. Sec. Litig.*, 643 F.Supp.2d 521, 534 (S.D.N.Y. 2009) (Scheindlin, J.); *Children's Place*, 580 F.Supp.2d at 220-221.  The Tronox Officers' reliance on *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 181 (4th Cir. 2007) is misplaced.  In that case, the witness produced "conclusory and hardly probative statements" that were contradicted elsewhere in the complaint.

The Complaint thus supports a compelling inference that Defendants Adams, Mikkelson, and Rowland had a clear motive to engage in the wrongdoing.  *See, e.g., Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) (inference of scienter supported by allegations of a "strong financial motive to aid the . . . fraud"); *In re Cabletron Systems, Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (inference of scienter existed where complaint alleged "more than the usual concern by executives to improve financial results"); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) ("the magnitude of Coss's compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit Coss, provides an unusual, heightened showing of motive to commit fraud" and is "therefore an important part of a circumstantial case against him").

Significantly, the Tronox Officers incorrectly assert that "[t]he Second Circuit has *rejected* incentive compensation as evidence of motive[.]"  Tronox Def. Br. at 6 (emphasis added).  However, the cases cited by the Tronox Officers create no such bright line rule.  In fact, *ECA, Local 134 IBEW Joint v. JP Morgan Chase*, 553 F.3d 187, 201 (2d Cir. 2009) actually suggests that a "direct link between the compensation package and the fraudulent statements," along with "the defendants' motive to sweep problems under the rug," might be indicative of motive.  Similarly, in *Kalnit v. Eichler*, 264 F.3d 131, 141-42 (2d Cir. 2001), the Second Circuit recognized that identifying specific benefits received by the defendants may sufficiently allege motive.  As discussed above, the Complaint goes far beyond generic assertions and specifically connects the financial rewards with the Tronox Officers' motives.

In addition, the Tronox Officers minimize the significance of the bonuses because the large payments did not continue after the IPO.  Tronox Def. Br. at 6.  To the contrary, the timing of the unusually large financial rewards highlights how they were in fact tied to the Tronox

Officers' ability to successfully effectuate the misleading IPO.  *See, e.g., In re Williams*,

339 F.Supp.2d at 1234 ("significant bonuses . . . as a reward for completing the spin-off"

contributed to inference of scienter).

The Tronox Officers also claim that it "makes no sense" for them to have "hitched their

future" to a troubled company.  Tronox Def. Br. at 7.  An equally plausible conclusion is that

these individuals were willing to take the risk of running Tronox because it was their first (and

perhaps only) opportunity to lead a public Company and a big one at that, with annual sales of

more than one billion dollars, the world's third largest producer and marketer of titanium dioxide

products.  This, coupled with the intention that Tronox would continue to disguise the reserving

issues, are plausible rationales for their misconduct.  *See, e.g.*, *Green Tree*, 270 F.3d at 662

(inference of scienter existed where CEO may have "acted recklessly to pile up earnings . . .

gambling he could get away with it").  *Accord Tellabs II*, 513 F.3d at 710. Moreover, the

scheme's ultimate failure does not negate the fact that these Defendants participated in it.  *See,*

*e.g.*, *Green Tree*, 270 F.3d at 662 ("Just as we cannot countenance pleading fraud by hindsight,

neither can we infer innocence by hindsight because the alleged misdeeds did not pay off"); *In re*

*Williams*, 339 F.Supp.2d at 1233 ("allegations that the Defendants could (and would) have

reaped material benefits as a result of their fraud are probative of scienter, even if their alleged

scheme was aborted prior to its ultimate fulfillment").

### b)      <u>Conscious Disregard</u>

In seeking dismissal on scienter grounds, the Tronox Officers' motion fails to address the

big picture.  They focus on whether each had specific knowledge of particular aspects of the

misrepresentations.  This allegation-by-allegation approach runs afoul of the requirement that a

complaint's scienter allegations be considered holistically.  *Tellabs*, 551 U.S. 308, 322 (2007).[33]

The Tronox Officers attempt to divert attention from the real issue: did they know of, or recklessly disregard, the extent of the anticipated financial obligation resulting from the Legacy Liabilities and that Tronox failed to record adequate reserves for that exposure rendering its financial statements materially misleading.

The Tronox Officers' claimed ignorance of the extent of the Legacy Liabilities is refuted by the factual allegations of the Complaint.  As the Tronox Officers themselves recognize, reserves must be based on contingent liabilities that are "probable" and "reasonably estimable." Tronox Def. Br. at 10.  The Form 8-K filed by Tronox on May 4, 2009 states that "the Company failed to establish adequate reserves **as required by applicable accounting pronouncements**." ¶6 (emphasis added).  In other words, the Company failed to establish reserves for known liabilities that **were** "probable" and "reasonably estimable."  If the contingent liabilities had not been "probable" or "reasonably estimable" when the financial statements were prepared, there would have been no need for the admission in the Form 8-K.[34]

---

[33]   For example, there is no requirement that the Plaintiffs allege in excruciating detail how liability was "probable" and costs were "reasonably estimable" as to "*each*" of the secret sites, as the Tronox Officers claim.  Tronox Def. Br. at 13 (emphasis in original).  The issue is whether improper reserve methodologies were knowingly and/or recklessly applied to determine environmental liabilities and whether these defendants knew or recklessly disregarded that the recorded reserve was materially understated in the aggregate.  As noted, there is no question that an improper methodology was used because that fact has been admitted by Tronox.  ¶6.

[34]   The scienter of the Tronox Officers is not based solely on "GAAP violations," as they incorrectly assert.  GAAP violations are nonetheless probative of scienter.  *In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. 2005); *Raytheon*, 157 F.Supp.2d at 148 (pervasiveness and magnitude of GAAP violations supports inference of scienter).  Here, each of the individually named Tronox officer defendants occupied senior positions within KMG's chemical business and thereafter became officers and/or directors of Tronox. They were in positions to have knowledge about a clearly material line item in the Company's balance sheet, the environmental remediation reserve. *E.g.*, *South Ferry*, 542 F.3d at 784 (facts critical to a business's "core operations" or an important transaction are presumed to be known to a company's key officers thereby supporting an inference of scienter).  Any suggestion that the reserve issue – especially given its magnitude

The Tronox Officers' claim that they were unaware of the extent of the Legacy Liabilities also defies logic and common sense and is contradicted by confidential witnesses. ¶¶131-132, 135. The environmental reserves and potential future liabilities were a material item in the Company's financial statements for which they were responsible.[35] For the year ended December 2005, Tronox stated that it had made a provision for environmental remediation of $223.7 million. ¶¶114, 186. This dwarfs the Company's reported net income of $18.8 million in that year. ¶186. Because it was such a large item in the financial statements, it was unquestionably a matter given intense attention. It is simply not plausible that Tronox's most senior officers did not know of the scope of the Legacy Liabilities, which were critical to the Company's financial condition. *Tellabs II*, 513 F.3d at 709.[36]

---

– did not have the attention of these defendants lacks any credibility. Indeed, they were asked about it at roadshows and on quarterly conference calls and gave no indication of a problem. Defendants Adams and Mikkelson argue that their statements made to securities analysts were just "a series of general and optimistic statements of opinion." Tronox Def. Br. at 23. These allegations do not relate to "undue optimism." At the time Defendants Adams and Mikkelson told analysts that they were "being diligent" in limiting the consequences of the Legacy Liabilities, they did not state that their "diligence" took the form of improper accounting methodologies. Accordingly, their misstatements cannot be minimized as mere puffery. *See, e.g., Children's Place*, 580 F.Supp.2d at 229.

[35] The Tronox Officers had an obligation to ensure the accuracy of financial statement information, notwithstanding that an outside auditor rendered unqualified opinions. *See In re Winstar Commc'n.*, No. 01-cv-3014 (GBD), 2006 WL 473885, at *8 (S.D.N.Y. Feb. 27, 2006) ("However, as directors of a corporation, the Winstar defendants have "a well-defined obligation to ensure the accuracy of the information filed with the SEC," and their claim of reliance upon [Grant Thornton] may not absolve them of responsibility. *See, SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 865 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998)"). Here too, Plaintiffs have sued Ernst & Young, LLP, KMG and Tronox's auditor, for securities fraud.

[36] Alternatively, if Defendants Adams, Mikkelson, and Rowland insist on claiming ignorance of the facts respecting the Legacy Liabilities, this lack of attention rises to the level of, at least, recklessness. *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2009 WL 3380621 at *14 (S.D.N.Y. Oct. 19, 2009).

The Tronox Officers also argue that the Complaint fails to "adequately allege that the Tronox Officers were even involved with the reserve process prior to the IPO" as if this might absolve them from liability.  Tronox Def. Br. at 11.  It defies logic for the Tronox Officers to suggest that they lacked meaningful involvement in, and knowledge regarding, a key element of the IPO of their own company.  The Registration Statement was signed by Defendant Adams (as CEO and a Director), Defendant Mikkelson (as Senior Vice President, Chief Financial Officer, and Principal Financial and Accounting Officer), and Defendant Rowland (as Chief Operating Officer and a Director).  The Tronox officers were legally obligated to know of and confirm the accuracy of the Registration Statement's contents and important information regarding the Company's operations.  *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-cv-1898 (SAS), 2005 WL 2148919 at *13 (S.D.N.Y. Sept. 6, 2005) (Scheindlin, J.).  The Plaintiffs are not seeking to impute knowledge to the Tronox Officers based solely on their executive positions, as they incorrectly assert.[37]  These Defendants each signed multiple SEC filings in which they made specific representations regarding Tronox's environmental reserves.  ¶¶31, 32, 33.  Furthermore, the Class Period begins on November 21, 2005, the date on which the IPO became effective.  Even if the Tronox Officers were not directly involved in reserve calculations prior to the IPO, by the beginning of the Class Period they had an obligation to understand how those calculations had been made and to ensure their accuracy.  *Bombardier*, 2005 WL 2148919 at *13.

---

[37]   In *Davidoff v. Farina*, No. 04-cv-761 (NRB), 2005 WL 2030501, *17 (S.D.N.Y. Aug. 22, 2005), a case on which the Tronox Officers rely, the allegations were insufficient because "Other than general allegations that it would be 'logical' for the Individual Defendants to have been aware of certain things, the Complaint gives us no factual basis to conclude that actual knowledge on the part of any Individual Defendant existed."  The Complaint goes far beyond such boilerplate allegations.

Moreover, there is a clear basis on which to plausibly infer scienter.  Prior to the IPO, each of the Tronox Officers was an executive at the KMG subsidiary which became Tronox and were therefore in a senior position with access to information regarding the Legacy Liabilities. At various times, Defendant Adams served as President of Tronox LLC, V.P. and General Manager of the Pigment Division, V.P. of Strategic Planning and Business Development of KMG Shared Services, V.P. of Acquisitions, and V.P. of Information Management and Technology.  ¶31.  Defendant Mikkelson also held positions in which she was privy to information about the extent and anticipated liabilities for environmental remediation, including V.P. and Controller of Tronox LLC and Assistant Controller of KMG Shared Services.  ¶33.  In addition, Mikkelson has 20 years of experience as a certified public accountant, so she cannot legitimately claim ignorance of accounting treatments for environmental reserves.  Similarly, Defendant Rowland held positions at KMG that necessarily made him aware of the nature and extent of the environmental liabilities, including Director of North America Operations and V.P. of Global Pigment Operations for Tronox LLC.  ¶32.[38]

The cases on which the Tronox Officers rely involved bare allegations of inadequate reserves or otherwise lacked detail regarding the defendants' knowledge.  Thus, there can be no serious argument that Plaintiffs' precise and detailed Complaint, which includes consistent information received from multiple sources, including Tronox itself, is akin to the complaints in the cases they cite.  Tronox Def. Br. at 10-11, citing *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 569 (S.D.N.Y. 2004) ("Again in textbook pleading by hindsight style, Plaintiffs

---

[38]   In a footnote, the Tronox Officers argue that "Plaintiffs cannot rely on group pleading to establish the Tronox Defendants' scienter."  Tronox Def. Br. at 11 n.15.  However, that is not the basis for Plaintiffs' scienter allegations.  Group pleading is, however, applicable for purposes of attributing false or misleading statements to the Tronox Officers.  *E.g., Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F.Supp.2d 155, 177 (S.D.N.Y. 2009) (Scheindlin, J.).

then assert the conclusion that 'the inappropriate reserves also demonstrates [sic] the defendants'

scienter.'"); *In re Aegon N.V. Sec. Litig.*, No. 03-cv-603 (RWS), 2004 WL 1415973, at *10, *11

(S.D.N.Y. June 23, 2004) ("The Plaintiffs' characterization of what occurred in the stock market

cannot withstand scrutiny, as the chart they supply contradicts that assertion" and "it is only with

the benefit of hindsight that the Plaintiffs contend that the estimates were unreasonable"); *Shields*

*v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("Shields' frequent conclusory

allegations – that the Defendants 'knew but concealed' some things, or 'knew or were reckless in

not knowing' other things – do not satisfy the requirements").

## 2.   **KMG Officer Defendants**[39]

The Complaint alleges that, together, Defendants Corbett, Wohleber and Pilcher

personally reaped *more than $270,019,216.40* through the sale of KMG to Anadarko ¶¶16, 106,

147.[40]  The Complaint also alleges that KMG garnered *more than $18 billion* through the sale of

KMG to Anadarko; received in excess of *$500 million* in cash from the Tronox IPO; and

obtained more than *$450 million* in securities credit facility money from the IPO (*id.*).  In

addition, the Complaint alleges that neither the sale of KMG to Anadarko nor the IPO could have

occurred **but for** the Defendants' fraud.  The sale of KMG to Anadarko is alleged to have been

in the planning stages **prior** to the IPO, and could not occur unless and until KMG unloaded the

Legacy Liabilities.  ¶¶16, 104, 125.[41]  In fact, Anadarko went so far as to purport to immunize

---

[39]   The conscious disregard and reckless conduct of the KMG Officers is discussed in
connection with KMG's scienter at Section I.A. and B., *supra*, at 8-25.

[40]   Defendant Corbett profited by *more than $237,739,053.50*, Defendant Wohleber profited by
*more than $26,018,423.30* and Defendant Pilcher profited by *more than $32,184,589.60*.  ¶147.

[41]   Contrary to Defendants' assertion, the Complaint does allege that the Defendants knew of the
potential merger with Anadarko prior to the Tronox IPO.  *See e.g.*, ¶¶125, 129, 139.  *See also* Ex.
B to the Cera Decl.  Brief of Defendants Corbett, Pilcher, Wohleber, and Rauh (the "KMG Off.
Br.") at 12.

KMG's officers and directors for acts and omissions occurring prior to the acquisition date. ¶¶15, 107.  As discussed more fully below, allegations similar to these have routinely been found sufficient to support a finding of motive.

In response, these Defendants ignore the Complaint's detailed motive allegations and make boilerplate arguments in an attempt to diminish their significance.  Such efforts should be rejected.  Specifically, relying on *San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) and *Kalnit v. Eichler*, 99 F.Supp.2d 327, 339 (S.D.N.Y. 2000), the Defendants characterize the multiple "concrete and personal" benefits described above as being common to all executives and companies and argue that "motive to profit from a future merger" does not constitute a sufficient motive for fraud.  KMG Off. Br. at 12.  As set forth below, this argument is without merit.

First, "any officer of any company in the United States" is not entitled to a windfall of *$270 million* in the event of a merger.  KMG Off. Br. at 11.  These exorbitant payouts only occurred by virtue of the unique – and fraudulent – circumstances surrounding the IPO and Anadarko's purchase of KMG.  Accordingly, these allegations demonstrate a unique concrete and personal benefit to Defendants Corbett, Wohleber and Pilcher and are sufficient to allege motive.  *See, e.g., In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 646 (S.D.N.Y. Apr. 30, 2007) ("[T]he officers had a direct financial interest in the IPO.  By fraudulently concealing the uncollectible receivables, they could drive up demand for Refco shares, which would result in purchases of shares from which defendants would be directly compensated. This is a concrete benefit directly flowing from the alleged fraud, and is accordingly sufficient to give rise to a

strong inference of motive.").[42]

Second, the Complaint does not generically allege that these Defendants were motivated to commit fraud in order to potentially profit at some date in the distant future from a potential merger. To the contrary the Complaint alleges that: (i) the Defendants were planning the sale of KMG to Anadarko prior to the IPO (¶¶125, 129, 139); and (ii) the sole purpose of the IPO was to foist KMG's Legacy Liabilities onto unsuspecting investors in order to then sell KMG to Anadarko for $18 billion. ¶¶61-107. Such allegations are also sufficient to allege motive.[43]

Finally, neither *San Leandro* nor *Kalnit* "support the argument that the desire to consummate any corporate transaction cannot ever be a motive for securities fraud." *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000). Indeed, *San Leandro* did not even involve a merger. Instead, the plaintiffs in *San Leandro* only alleged that the defendant company was motivated to commit fraud in order to maintain its bond or credit ratings at the highest possible level so as to generally maximize their marketability and minimize the interest rate on those

---

[42]   *Accord Children's Place*, 580 F.Supp.2d at 233 (finding pledged shares of common stock as collateral for margin loans a "concrete and personal" benefit because they provided the defendant "with a financial incentive to conceal the problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit in his personal brokerage account."); *In re Openwave Sys. Sec. Litig.*, 528 F.Supp.2d 235, 250 (S.D.N.Y. 2007) (holding that defendants' stock options "are 'concrete and personal' because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors.").

[43]   *See Fogarazzo v. Lehman Bros., Inc.*, 341 F.Supp.2d 274, 296 (S.D.N.Y. May 21, 2004) (Scheindlin, J.) (motive prong satisfied by allegations that banks gave a defendant company favorable research coverage in exchange for investment banking business); *Abu Dhabi*, 651 F.Supp.2d at 179 (motive prong satisfied by allegations that rating agencies' remuneration was dependent upon the successful sale of the securities they were rating and "obtaining [] high ratings was a condition precedent to the offering of the Rated Notes."); *In re Initial Public Offering Sec. Litig.*, 544 F.Supp.2d 277, 293-94 (S.D.N.Y. 2008) (Scheindlin, J.) (motive prong satisfied by allegations that defendants used their securities as currency to acquire other corporations with lower expenditures of cash and securities than would otherwise be required).

securities.  75 F.3d at 813.[44]  In stark contrast, Plaintiffs here allege that the sole purpose in

orchestrating the fraud was to position KMG for a sale which would otherwise be impossible.

¶¶61-107, 125, 129, 139.  Accordingly, "[a]lthough virtually every company may have the desire

to maintain a high bond or credit rating," as *San Leandro* reasoned, not every company has the

desire to offload millions of dollars in liabilities in order to consummate a merger, as was the

case here.  *See Rothman,* 220 F.3d at 92.

  *Kalnit* is similarly inapposite.  The "possible" merger profits at issue in *Kalnit* – "a

corporate defendant's desire to retain his position with its attendant salary or realize gains on

company stock" – are quite different from the $270 million Defendants Corbett, Wohleber and

Pilcher personally received, the more than $18 billion KMG received through its sale to

Anadarko and the more than $950 million in cash and credit facilities KMG received through the

IPO.  *Kalnit*, 99 F.Supp.2d at 340 (citation omitted).  For example, the $270 million Defendants

Corbett, Wohleber and Pilcher personally received included the vesting of stock options,

severance, retirement benefits, and millions in straight payouts.  ¶¶16, 106, 147.  Similarly, the

$450 million in secured credit facilities received by KMG could not have been obtained but for

the fraudulent spin-off.  ¶14.

  Defendants additionally argue that the motive to make Tronox "appear profitable and to

maintain and/or inflate the prices of Tronox securities" is insufficient.  KMG Off. Br. at 12-13.

Defendants are wrong again.  While the desire to maintain a high stock price, generally, is

insufficient to allege motive, numerous cases within the Second Circuit have held that acting to

maintain a high stock price **in connection with an offering** – as is the case here – is sufficient.

*See, e.g., In re Time Warner, Sec. Litig. Inc.*, 9 F.3d 259, 270 (2d Cir. 1993) (finding sufficient

---

[44]   Prior to reaching motive, the *San Leandro* court found that plaintiffs had failed to allege any
actionable misstatements or omissions.  *Id.* at 812-23.

motive to maintain a high stock price prior to announcement of an offering); *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 206 (E.D.N.Y. 2000) (same); *In re Res. Am. Sec. Litig.*, No. 98-5446, 2000 WL 1053861, at *7 (E.D. Pa. July 26, 2000) (same); *Duncan v. Pencer*, 1996 U.S. Dist. LEXIS 401, *48 (S.D.N.Y. 1996) (same).[45]

Accordingly, plaintiffs have adequately alleged that Defendants Corbett, Wohleber, and Pilcher were highly motivated to commit the fraud alleged herein.

**E.     The Reliance Allegations As To The IPO And Bond Purchasers Are Sufficient**

It is well settled that, where there has been a material misrepresentation pertaining to shares that trade in a developed market, "the plaintiff may meet its burden of proof through a 'fraud on the market' presumption of reliance on market price." *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988)). Plaintiffs have properly alleged reliance under the "fraud on the market" presumption and KMG's suggestion to the contrary is wrong.  KMG Br. at 13.

Under the "fraud on the market" theory, a plaintiff "is entitled to a rebuttable presumption of reliance based on the notion that 'in an open and developed securities market, the price of a company's stock is determined by the available material information.'" *Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 72 n.5 (2d. Cir. 2000) (quoting *Basic Inc.*, 485 U.S. at 241 (internal quotation marks omitted)). As a result, "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."  *Black*, 418 F.3d at 209 (quoting *Basic*).

---

[45]   None of the cases cites by the KMG Officers in support of their position (KMG Off. Br. at 13) are in the context of an offering – let alone a fraudulent offering, as is the case here – and are therefore inapplicable.

Here, Plaintiffs specifically allege that they are entitled to rely on "the presumption of reliance established by the fraud-on-the-market doctrine" because the markets for Tronox's securities were, at all relevant times, efficient, and the Complaint describes in detail specific factors that demonstrate the efficiency of Tronox's stock and bond markets.  ¶372.  Nonetheless, KMG asserts that Plaintiffs cannot rely on the fraud on the market theory for common stockholders "to the extent [plaintiffs' claims] relate to the IPO," and for bondholders who purchased Tronox bonds through PORTAL.  KMG Br. at 13-14.

Defendants' arguments are, at best, premature, because they do not raise pure questions of law.  *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 377 (S.D.N.Y. 2003) (Scheindlin, J.) (first motion to dismiss decision).  At the motion to dismiss stage, the "determination turns on whether the relevant market has the *traits* of an 'efficient market' as described in *Basic [v. Levinson.]*."  *Id.* (emphasis added) ("Ultimately, whether the relevant markets were efficient is a question of fact to be resolved at trial").[46]  *In re Initial Public Offering Sec. Litig.*, 544 F.Supp.2d 277, 296 (S.D.N.Y. Mar. 26, 2008) (Scheindlin, J.) (second motion to dismiss decision).  The issue of reliance is simply not ripe for consideration at this time.[47]

The case at bar differs from *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) in an important respect.  In this case, a significant amount of information was

---

[46]   *See also In re Parmalat Sec. Litig.*, 376 F.Supp.2d 472, 508 (S.D.N.Y. 2005); *Ellison v. Am. Image Motor Co., Inc.*, 36 F.Supp.2d 628, 643-44 (S.D.N.Y. 1999).

[47]   *See also Demarco v. Lehman Bros. Inc.*, 309 F.Supp.2d 631, 636 (S.D.N.Y. 2004) (fact-based arguments not cognizable in context of Rule 12(b)(6) motion); *Swack v. Credit Suisse First Boston*, 383 F.Supp.2d 223, 241-242 (D. Mass. 2004); *Simpson v. Specialty Retail Concepts*, 823 F.Supp. 353, 355 (M.D.N.C. 1993) (denying summary judgment on fraud on the market theory because of existence of material factual dispute); *Good v. Zenith Elecs. Corp.*, 751 F.Supp. 1320, 1323 (N.D. Ill. 1990) (same); *Cammer v. Bloom*, 711 F.Supp. 1264, 1287 (D.N.J. 1989) (same).

available to the investing public because Tronox was the chemicals segment of KMG, which had publicly reported results for many years prior to the IPO. There was abundant information about Tronox's operating history and financial results, and analysts had followed KMG, including its chemical subsidiaries, for years and had published research reports on KMG.[48]

It is unclear from Defendants KMG and Anadarko's motions to dismiss whether they are arguing that allegations pertaining to an IPO will never be sufficient to withstand a motion to dismiss – including allegations pertaining to aftermarket purchasers – or whether they are only arguing that individuals who purchase in an IPO can never withstand a motion to dismiss. KMG Br. at 13. In either event, KMG and Anadarko are wrong. Indeed, neither *IPO* nor *Converium* held that "all claims must be dismissed to the extent they relate to [an] IPO." KMG Br. at 13. To the contrary, the *Converium* court held that the market for Converium securities was efficient immediately following the 25 day "quiet period" and that Converium's statements in its IPO were actionable for those class members who purchased their shares after the end of the 25 day quiet period. *In re Converium Holding AG Sec. Litig.,* 2007 U.S. Dist. LEXIS 25849, at *6 (S.D.N.Y. Apr. 9, 2007); *see also In re IPO*, 544 F.Supp.2d at 296 (second motion to dismiss decision) ("Clearly the [Second Circuit] panel did not believe that *Miles I* foreclosed the possibility of efficiency in the aftermarket"). Moreover, in its later class certification decision – which was only decided after substantial expert reports and testimony, documentary evidence, analyst coverage and statistical evidence had been submitted to the court – the *Converium* court

---

[48]   The efficiency of Tronox's common stock is supported by the fact that, among other things, throughout the entire Class Period, it: (1) traded on the New York Stock Exchange; (2) Tronox filed periodic public reports with the SEC; and (3) numerous securities analyst firms  followed Tronox. *In re IPO*, 544 F.Supp.2d at 296  (finding allegations that the stocks at issue traded on NASDAQ and were the subject of numerous analyst reports and extensive media coverage sufficient "under any reasonable test for market efficiency" to indicate that the market in which the stocks traded was efficient at the motion to dismiss stage).

held that it was **not** deciding "whether, after *In re IPO*, it would be possible to plead facts sufficient to allege the existence of an efficient market for an initial public offering and to support a presumption of reliance." *In re Scor Holdings (Switz) AG Litig.*, 537 F.Supp.2d 556, 573 (S.D.N.Y. 2008).[49]

Defendants additionally argue that Plaintiffs fail to adequately allege that the market for Tronox's bonds was efficient. KMG Br. at 14. Defendants are again incorrect. As alleged in the Complaint, throughout the Class Period, Tronox bonds actively traded in the PORTAL Market (¶372), a highly developed and liquid securities market, which "facilitates the quoting and trading of unregistered [equity and debt] securities eligible to be resold pursuant to SEC Rule 144A." *See* Cera Decl., Ex. D.[50]

Plaintiffs also allege that the Tronox bond market was efficient due to the fact that Tronox filed periodic public reports with the SEC, that Tronox bonds were followed by numerous securities analyst firms, including fixed income analysts and brokerage firms, and that all of Tronox securities, including its debt securities, were rated by Moody's, Standard & Poor's and Fitch Ratings. ¶372. Clearly, these allegations are sufficient to entitle Plaintiffs to the fraud on the market presumption of reliance for the Tronox bonds at the motion to dismiss stage.

---

[49]    Similarly, *In re IPO*, 471 F.3d 24, was a class certification decision that occurred only after considerable fact discovery into the efficiency of the market for each company's securities had been conducted. *Id*. at 31 (discussing the competing expert reports in the record). No such discovery has been conducted here.

[50]    "The dollar value of [equity] securities using a 144A tranche on PORTAL in 2006 was over $221 billion, ***exceeding the amount raised collectively on NASDAQ®, the NYSE and Amex***," and the overall "growth in capital formation [consisting of both equity and debt securities] with a 144A component [on PORTAL] has been dramatic, ***increasing more than three-fold since 2002 to $1.5 trillion globally***" in 2007. *See* Cera Decl., Ex. D (emphasis added). With the advent of more sophisticated electronic databases and reporting systems, the PORTAL Market has also become extremely liquid.

Defendants argue that PORTAL purportedly does not make "public disclosure of trade information" because it is only open to sophisticated institutional investors.  KMG Br. at 14. Defendants are wrong again.  Trade information for the Tronox bonds was, and still is, available through public sources such as *Bloomberg*.  In addition, pricing and transaction data is available to PORTAL subscribers, which includes members of the Class.[51]

Moreover, the fact that PORTAL is only open to sophisticated institutional investors does not indicate market **inefficiency**, but rather market **efficiency**.  With resources to evaluate all available public data concerning an issuer, including SEC filings and complex financial statements and reports, as well as databases to store historical data and monitor new market information, institutional investors are best suited to accurately value, transact and price corporate securities.  Courts thus routinely find that a high level of institutional ownership of a given security is an indicia of market efficiency.  *See Endo v. Albertine*, 863 F.Supp.708, 726-27 (N.D. Ill. 1994) (citation omitted) (market is more likely to be efficient where security is "eagerly followed by astute investors with the capital to turn their views into movements in price"); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004) ("a high level of institutional interest in a security serves to increase the efficiency of the market"); *Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982, at *21 (N.D. Ill. June 13, 2003) (finding efficient market where "11% to 13% of the total outstanding common stock of [company] was held by numerous large institutional investors").  Accordingly, that Tronox bond

---

[51]   *Camden Asset Mgmt, L.P. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527 (S.D. Fla. July 3, 2001), involved a motion for class certification following extensive class discovery. Nowhere did the court make any finding respecting the efficiency of the PORTAL Market or the inefficiency of the pricing of the Sunbeam debt at issue.  *Id.  See alternatively AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 685 (N.D. Ala. 2005) (finding efficiency of market for notes issued on private placement where price of notes "reacted immediately" to company's corrective disclosures).

purchasers are comprised of qualified institutional buyers is a fact which strongly supports, rather than negates, the efficiency of the Tronox bond market.[52]

### F.     The Control Person Claims Have Been Properly Alleged

Defendants have completely failed to come to grips with Plaintiffs' "control person" claims under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).[53]  Three separate "control person" counts are alleged.  In Count IV of the Complaint, it is alleged that during their respective tenures as directors of Tronox, Defendants Adams, Wohleber, Mikkelson, Rowland and Rauh exercised control over the Company.  Count V alleges that KMG, Anadarko (as successor-in-interest to KMG), Corbett, Wohleber, and Pilcher are liable as controlling persons of both Tronox and the officers of Tronox (defendants Adams, Rowland, Mikkelson, and Rauh) who formerly held positions at KMG.  Count VI alleges that Defendants Corbett, Wohleber, and Pilcher were controlling persons of KMG at all relevant times.

---

[52]   The recent decision in *In re American Int'l. Group, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 15453 (S.D.N.Y. Feb. 22, 2010) ("*AIG*"), further supports this position.  First, *AIG* makes clear that a determination of whether the fraud-on-the-market presumption applies to bonds is appropriate at the class certification stage, not at the motion to dismiss stage.  Indeed, in AIG, the court only reached its decision at the class certification stage after the parties had conducted discovery, the court received competing expert reports and held a hearing during which the competing experts testified.  *See id*. at *77-78.  Second, the *AIG* court held that during the period in which AIG's bonds were reported on TRACE, there was increased transparency in the markets, and that the fact that the bonds were reported on TRACE was "one factor that may be considered in concert with the *Cammer* factors and other evidence of a market's efficiency." *Id*. Finally, unlike here, in AIG, there was a "complete absence of price decreases . . . of statistical significance due to AIG-related news" (*id.* at 77) and "generally . . . there were no statistically significant price movements on any of the disclosure dates on which [plaintiffs' expert] focused with respect to AIG stock."  *Id*. at 72.  In contrast, here, Plaintiffs allege in detail that the bonds statistically significantly dropped in response to Tronox disclosures of the fraud.  ¶¶327, 342, 356, 358, 362, 365.

[53]   The elements of a section 20(a) claim are set out in *Children's Place*, 580 F.Supp.2d at 228 (Scheindlin, J.).  *See also In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 401 (S.D.N.Y. 2007) (Scheindlin, J.) (same).

---

"Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *Id.* at 235. For the reasons set forth below, Plaintiffs have properly pled the "control person" claims.[54]

### 1.    Rule 9(b) Does Not Apply To Control Person Claims

KMG argues that the element of culpable participation must be pleaded with particularity pursuant to Rule 9(b). KMG Br. at 23-24. This is wrong. As this Court recently held in *Children's Place*, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity. Thus, '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard' and '[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.'" 580 F.Supp.2d at 228.[55] Plaintiffs have met this standard.

### 2.    Defendants KMG And Anadarko Were Control Persons Of Tronox

As discussed in Section I.A, B, and C above, Plaintiffs have pled facts showing a primary violation of the securities laws under Section 10(b) of the Exchange Act and Rule 10b-5.[56]

---

[54]    The Tronox Officers and the KMG Officers simply rely on the purported failure of Plaintiffs to allege a primary violation which, as shown in this memorandum, is not the case. Only KMG substantively addresses the "control person" claims. KMG Br. at 23.

[55]    *See also In re Scottish Re*, 524 F.Supp.2d at 386 (Scheindlin, J.) (same); *Varghese v. China Shenghuo Pharm. Holdings*, 2009 U.S. Dist. LEXIS 114819, at *32 (S.D.N.Y. Dec. 9, 2009).

[56]    This includes a Section 10(b) claim against Tronox itself, which would have been asserted in the absence of a bankruptcy filing. Any suggestion that there are insufficient allegations of a primary violation by Tronox are baseless. As shown, the allegations supporting the Section 10(b) claims against officers and directors of Tronox, including defendants Adams, Mikkelson, Rowland, Wohleber, and Rauh are more than sufficient to establish Tronox's scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (allegations against single officer sufficient to impute scienter to corporation).

Likewise, no one can reasonably dispute that the Complaint adequately pleads all defendants' "control" over Tronox.

Plaintiffs have also adequately alleged that Defendants KMG and Anadarko (as successor-in-interest to Tronox) controlled Tronox after March 31, 2006,[57] the date of the spin-off.  By virtue of the fact that Defendants Corbett, Pilcher, and Wohleber do not refute their control over Tronox during any portion of the Class Period, Defendant KMG is necessarily properly deemed a control person of Tronox after March 31, 2006.  *See e.g.*, *In re Parmalat Sec. Litig.*, 598 F.Supp.2d 569 (S.D.N.Y. Feb. 25, 2009) (denying defendants' motion for summary judgment on the basis that a principal could be held liable vicariously for acts committed by its agents in the course of the principal's business even if the principal did not itself participate in those acts).

Moreover, even assuming, *arguendo*, that these Defendants did refute their control over Tronox, the Complaint adequately alleges that even after the spin-off was completed on March 31, 2006, KMG and its senior executives, Defendants Corbett, Wohleber and Pilcher, and thereafter Anadarko, controlled Tronox through the Master Separation Agreement.  Specifically, the Complaint alleges that as a result of the terms of the Master Separation Agreement, these Defendants were able to, and in fact, did dictate Tronox's misleading environmental remediation reserves, which is key to the allegations of wrongdoing alleged in the Complaint.  ¶¶15, 90.

---

[57]   KMG's control over Tronox prior to March 31, 2006, is evidenced by the fact that, among other things, KMG: (1) planned and effectuated the fraudulent IPO scheme alleged in the Complaint; (2) owned 88.7% of the total voting power of all classes of Tronox stock, including 56.7% of the outstanding Tronox Class B shares (¶15); (2) received $804 million of the $844 million in proceeds and secured credit facility monies raised through the IPO (¶14); (3) assigned two of its executives, Defendants Rauh and Wohleber, to Tronox's Board of Directors (¶¶34-35, 409); and (4) had complete control over the Master Separation Agreement (¶15).  In fact, in the Registration Statement and Prospectus for the IPO, Tronox admitted KMG's complete control. ¶46.

Pursuant to the Master Separation Agreement, in order for Tronox to receive even the $100

million indemnity owed to it from KMG, **Tronox was required to obtain KMG's (and later**

**Anadarko's) approval in advance for any deviation from the environmental remediation**

**reserving policies that were in place prior to the IPO**.  *Id.*  The Master Separation Agreement

also provided that to be reimbursed pursuant to this indemnity, "Tronox had to obtain KMG's

approval in advance for any deviation from the environmental remediation reserving policies that

were in place prior to the IPO."[58]  *Id.*  Given the devastating impact on Tronox if KMG and

Anadarko were to refuse to pay the $100 million indemnity, Tronox was forced to continue to

reserve for its environmental remediation costs in the improper and misleading manner **KMG**

**initially established** to effectuate the fraudulent IPO and spin-off.  *SEC v. First Jersey Sec., Inc.*,

101 F.3d 1450**,** 1473 (2d Cir. 1996) ("Control over a primary violator may be established by

showing that the defendant possessed the power to direct or cause the direction of the

management and policies of a person, whether through the ownership of voting securities, **by**

**contract**, or otherwise.")  (Emphasis added).

Defendants KMG and Anadarko argue that the Master Separation Agreement does not

demonstrate their control over Tronox because: (1) Plaintiffs purportedly do not allege that KMG

had the ability to dictate reserves to Tronox; (2) Plaintiffs allege elsewhere that the indemnity in

---

[58]   *See also*, Cera Decl. at Ex. E (Master Separation Agreement) at Section 2.5 (e)
("Notwithstanding the foregoing, **Parent shall not be required to reimburse any member of**
**the Tronox Group** with respect to an individual site associated with any Former Operation if
any member of the Tronox Group, **without the prior written consent of Parent** [Kerr-McGee],
makes, agrees to make, or proposes to make any material changes in the scope of conduct of any
existing response, removal, remediation or other correct action plan or project that (1) is with
respect to a site associated with a Former Operation listed on Schedule 2.5(a), (ii) results in an
increase in any Reserve Amount by $3,500,000 or more, or (iii) related to any site associated
with a Former Operation for which no reserve has previously been established and for which
substantial planning, cooperation and consultation between Parent and Tronox would be
reasonably expected.").

the Master Separation Agreement was illusory; and (3) because the control allegations are based

on the Adversary Complaint.  KMG Br. at 24 n.34.  These arguments fail.  First, as demonstrated

above, Plaintiffs do in fact allege that, through the explicit terms of the Master Separation

Agreement, KMG had the ability, and in fact did, dictate Tronox's environmental reserves.  ¶15.

Second, the fact that KMG had intentionally stripped Tronox of sufficient cash (¶87), does not

make the terms of the Master Separation Agreement "illusory."  To the contrary, the fact that

KMG denuded Tronox of its necessary cash, but then forced it to enter into a wholly-one sided

separation agreement to further protect itself, demonstrates the complete control it had over

Tronox.[59]  Finally, the allegations related to the Master Separation Agreement are not only based

on the Adversary Complaint (which, as discussed in Section I.G., *infra*, is appropriate), but also

on the terms of the agreement as filed with the SEC.[60]

### 3.    Defendants KMG And Anadarko Were Culpable Participants In The Fraud

While it remains unclear whether Plaintiffs in the Second Circuit are required to plead

culpable participation as an element of Section 20(a), as discussed above, Plaintiffs have

nonetheless adequately alleged Defendant KMG and Anadarko's culpable participation in the

fraud.  KMG Br. at 23-24.  Specifically, the Complaint alleges that KMG and its senior

executives were aware that the method established to reserve for KMG (and thereby, Tronox's)

environmental remediation obligations, as well as the actual reserved amount, was wholly

improper and misleading.  ¶¶10-14, 62-102.  Indeed, these Defendants knew of millions of

---

[59]    In fact, KMG forced Tronox to indemnify KMG for any material misstatements in what was effectively a KMG offering.  ¶15.

[60]    Notably, the Adversary Complaint relies both on the actual terms of the Master Separation Agreement, and on the first-hand account of a former Tronox senior manager.  ¶90.

dollars in environmental liabilities that not only were "probable" and "reasonably estimable," but assured. *Id.*

Moreover, facts sufficient to establish motive and opportunity suffice to establish culpable participation.  In particular, "a controlling person's receipt of financial benefits can demonstrate culpable participation."  *Gabriel Capital*, *L.P. v. NatWest Fin., Inc*., 122 F.Supp.2d 407, 428 (S.D.N.Y. 2000) (Scheindlin, J.); *see also In re Oxford Health Plans, Inc*., 187 F.R.D. 133, 143 (S.D.N.Y. 1999) (sustaining §20(a) allegations where plaintiffs alleged that defendants "participated in the fraud at least by reaping benefits of insider trading"); *In re Blech Sec. Litig*., No. 94 Civ. 7696 (RWS), 2002 U.S. Dist. LEXIS 19835, at *59 (S.D.N.Y. Oct. 22, 2002).  Here, KMG and its senior officers received enormous financial benefits as a result of the fraud.  The Complaint alleges that as a result of their fraud: (1) KMG was able to garner more than $800 million, including more than $500 million in cash, in the IPO; (2) KMG was able to sell itself to Anadarko for $18 billion; and (3) Corbett, Pilcher, and Wohleber personally received more than $270 million.  ¶¶14, 146-147.

Accordingly, because of its position of control and its motive and opportunity to commit the alleged fraud, Defendant KMG (and Anadarko as its successor) were able to, and did, control the conduct of Tronox's business, the establishment of its environmental remediation reserves, the information contained in its filings with the SEC, and public statements about its business, and are therefore liable under Section 20(a) for all Class Period statements.

### G.     Use Of Allegations Made By Tronox In Its Bankruptcy Court Adversary Complaint Is Proper

Defendants have attacked Plaintiffs' reference to factual allegations made in *Tronox Inc., et al*. *v. Anadarko Petroleum Corporation, et al*., No. 09-01198 (ALG) (Bankr. S.D.N.Y. May

12, 2009), going so far as purporting to moving to strike such references.  This position is baseless.

Plaintiffs have conducted an independent and extensive investigation into Defendants' wrongdoing.  Each factual allegation in the Complaint is premised on a reliable source.  Plaintiffs were careful to identify the sources of their allegations, including instances where they relied on materials in the Adversary Complaint.  The Adversary Complaint itself is corroborated by the independent investigation conducted by Tronox's restructuring consultant, Gary Barton, Senior Director at Alvarez & Marsal, North America LLC (the "Barton Declaration"), and which is described in detail in a sworn Declaration filed in the Bankruptcy Court.  *See* Ex. F to the Cera Decl..[61]

Disregarding Plaintiffs' extensive investigatory efforts and the reliability of the Adversary Complaint and Barton Declaration, Defendants KMG and Anadarko do not – and cannot – establish the predicate requirements for striking allegations pursuant to Rule 12(f), Fed.R.Civ.P.  *Feitshans v. Kahn*, 2007 U.S. Dist. LEXIS 24693, at *3 (S.D.N.Y. Apr. 2, 2007) (Scheindlin, J.) ("Motions to strike are generally disfavored and will be denied unless it is clear that under no circumstances could the demand succeed.  Courts are very reluctant to determine disputed or substantial issues of law on a motion to strike.  To prevail on a motion to strike, the movant must show that he will be prejudiced by inclusion of the [information].").  It is clear that in pleading a case of securities fraud, a plaintiff may rely upon any reliable source of information.  As this Court has held, the operative question is not whether the plaintiff has personally verified a fact alleged but, rather, whether the plaintiff is relying upon a source in a

---

[61]   Thus, the allegations of the Adversary Complaint are clearly an appropriate source.  Indeed, were Plaintiffs to have ignored this important source of information, they would not be fulfilling their obligations to the Class.

position likely to have had access to the information attributed to the source.  *See, e.g., Children's Place*, 580 F.Supp.2d at 233 (Scheindlin, J.); *In re Scottish Re*, 524 F.Supp.2d at 392 (Scheindlin, J.) (same).

There can be no doubt that Tronox, an entity whose officers, directors, and employees have first hand knowledge, and its restructuring consultant – who conducted an extensive and well documented investigation – are in a position to know the facts that Tronox publicly set forth in its own Adversary Complaint and in the signed Barton Declaration.  The 48-page Adversary Complaint and 59-page Barton Declaration are based on a review of Tronox's "day-to-day operation, businesses, financial affairs, and books and records," including information supplied to Barton "**by members of [Tronox's] management and [Tronox's] financial advisors**."  Barton Declaration at ¶¶1, 4.  There can be no question that the Company and the restructuring consultant were in a position to possess the information alleged.  *In re New Century*, 588 F.Supp.2d 1206, 1220-21 (C.D. Cal. 2008) (allowing Plaintiffs who did not "independently investigate[]" a bankruptcy examiner's report, to rely on the statements from that report "because the allegations [we]re derived from documentary evidence that qualifies as a reliable source for pleading purposes."); *In re Spiegel, Inc. Sec. Litig.*, 382 F.Supp.2d 989, 1013 (N.D. Ill. 2004); *In re Enron Corp. Secs. Litig.*, 2005 U.S. Dist. LEXIS 41240, at *23 n.11 (S.D. Tex. 2005) (same).[62]

Furthermore, the Adversary Complaint and the Barton Declaration are consistent with, and corroborated by, numerous former employees KMG and Tronox that Plaintiffs' counsel

---

[62]    Indeed, due to the inherent reliability of bankruptcy documents, courts regularly permit pleadings based on documents like the Adversary Complaint and Barton Declaration at issue here.  *See, e.g.*, *Fleet Nat'l Bank v. Boyle*, No. 04 CV 1277 LDD, 2005 WL 2455673, at *2 (E.D. Pa. Sept. 12, 2005); *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 1999 WL 178749, at *13 (S.D.N.Y. Mar. 29, 1999).

interviewed as part of their investigation and quoted in the Complaint, as well as other publicly

available documents also referenced in the Complaint.  These factors further support the

conclusion that the Adversary Complaint and Barton Declaration have a sufficient basis in fact.

*See, e.g., Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987) (corroborating sources

strengthen reliability of evidence).

Defendants also contend that Plaintiffs cannot rely on the allegations and facts set forth in

the Adversary Complaint because "counsel has a 'non-delegable' responsibility' to

'personally . . . validate the truth and legal reasonableness of the papers filed.'"  KMG Br. at 15

n.18 (quoting *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989)); Tronox

Def. Br. at 4.  While it is true that an attorney has a non-delegable responsibility to investigate, it

is also true that an attorney's investigation can include contemporaneous and reliable facts

gleaned from a verified Adversary Complaint filed on behalf of the issuer whose conduct is at

the heart of the case.[63]  *See, e.g., In re New Century*, 588 F.Supp.2d at 1220-21; *Enron*, 2005

U.S. Dist. LEXIS 41240, at *22, n.11.  A securities fraud plaintiff may satisfy his obligation to

conduct a reasonable inquiry by relying upon an investigation performed by another, such as an

exposé published in a major newspaper.  *See, e.g., In re DaimlerChrysler AG Sec. Litig.*, 197

F.Supp.2d 42, 80 (D. Del. 2002) (noting "the Court has been unable to locate any cases

forbidding pleadings based on newspaper and media accounts" and holding "the Court concludes

---

[63]    The cases cited by KMG are inapposite.  In *In re Connetics Corp. Sec. Litig.*, 542 F.Supp.2d
996, 1005 (N.D. Cal. 2008) and *Karagianis v. Karagianis*, 2009 WL 4738188 (Bankr. D.N.H.
Dec. 4, 2009), the court stuck allegations taken from an SEC complaint and an "unrelated"
complaint, respectively, only because the plaintiffs had no other basis to support their allegations
and had not conducted any other independent investigation.  Here, in contrast, the Adversary
Complaint only supplements the independent and diligent investigation conducted by Plaintiffs.
In fact, in a later decision in *Connetics* the Court held that plaintiffs could rely on allegations in
an SEC complaint since they were corroborated to some extent by plaintiffs' own investigation.
*In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *4 (N.D. Cal. 2008).

that Class Plaintiffs' allegations derived from reputable media sources and clearly identified as such in the Amended Class Complaint are sufficient to meet the requirement of the PSLRA").[64] Accordingly, there is nothing improper in Plaintiffs' reliance on the Adversary Complaint as the factual underpinning for certain of the allegations made in the Complaint.

## II.    <u>CONCLUSION</u>

For all of the foregoing reasons, the motions to dismiss should be denied.

Dated:  February 26, 2010                    Respectfully submitted,

GOLD BENNETT CERA & SIDENER LLP


By: /s/Solomon B. Cera
Solomon B. Cera
Gwendolyn R. Giblin
Thomas C. Bright
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

Attorneys for Lead Plaintiffs

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
Salvatore J. Graziano
Hannah G. Ross
Laura H. Gundersheim
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Attorneys for Named Plaintiffs

---

[64]   *Morse v. Abbott Labs.*, No. 90C1982, 1991 WL 83148, at *1 (N.D. Ill. May 7, 1991); *Kamerman v. Steinberg*, 113 F.R.D. 511, 515 (S.D.N.Y. 1986) (same); *In re Ramada Inns Sec. Litig.*, 550 F.Supp. 1127, 1135 (D. Del. 1982) (same).  Defendant Tronox and Tronox's restructuring consultant, who detailed their sources and findings in a thorough complaint and declaration, are certainly equally – if not more – reliable than a media account.

COHEN MILSTEIN SELLERS & TOLL, PLLC
Christopher Lometti
150 East 52nd Street, 30th Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

COHEN MILSTEIN SELLERS & TOLL, PLLC
Steven J. Toll
1100 New York Ave, Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Liaison Counsel