USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/28/10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
:
:
:
**IN RE TRONOX, INC. SECURITIES**　　:　　**OPINION AND ORDER**
**LITIGATION**　　　　　　　　　　　　　:
:　　　**09 Civ. 6220 (SAS)**
:
:
-------------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.　INTRODUCTION

This action arises from alleged false and misleading statements made

by Tronox, Inc. ("Tronox") during and following its initial public offering in 2005

(the "IPO" or "Tronox IPO").  LaGrange Capital Partners, LP and LaGrange

Captial Partners Offshore Fund, Ltd. (together, the "Lead Plaintiffs"), on behalf of

themselves and those similarly situated, assert claims under Section 10(b) and

Section 20(a) of the Securities Exchange Act against Tronox's parent company

prior to the IPO, Kerr-McGee Corporation ("KMG"), the company that purchased

KMG following the IPO, Anadarko Petroleum Corporation ("Anadarko"), several

senior Tronox officers, Thomas Adams, Mary Mikkelson and Marty Rowland

(collectively, the "Tronox Officers"), two Tronox directors, J. Michael Rauh and

Robert Wohleber (together, the "Tronox Directors"), and two KMG officers, Luke

Corbett and Gregory Pilcher (together, the "KMG Officers").  Lead Plaintiffs also

bring Section 10(b) claims against Tronox's auditor, Ernst and Young, LLP

("Ernst & Young"). Tronox is not named as a defendant due to its filing for

bankruptcy. Defendants now move to dismiss the Complaint.

## II.   BACKGROUND[1]

### A.   Plaintiffs

Lead Plaintiffs are affiliated hedge funds that purchased Class A and

Class B Tronox common stock ("Tronox Common Stock") between November 21,

2005 and January 12, 2009 (the "Class Period").[2] The Complaint also names two

other plaintiffs. The Fire and Police Pension Association of Colorado purchased

Tronox's nine and a half percent Senior Notes due 2012 ("Tronox Bonds") during

the Class Period.[3] The San Antonio Fire and Police Pension Fund purchased

Tronox Bonds and "received Class B common stock" as a dividend during the

Class Period.[4]

### B.   Defendants

#### 1.   Unnamed Defendant: Tronox

---

[1]     This factual background reflects the allegations in the Consolidated
Class Action Complaint ("Complaint" or "Compl.").

[2]     *See* Compl. ¶ 23.

[3]     *See id.* ¶¶ 23-24.

[4]     *Id.* ¶ 24.

Tronox is a Delaware Corporation formed on May 17, 2005 as a wholly-owned subsidiary of KMG.[5]  Tronox went public on November 21, 2005 and filed for Chapter 11 bankruptcy protection on January 12, 2009.[6]  Due to the automatic stay provisions of Section 362(a) of Title 11 of the United States Code, Tronox is not named as a defendant in this action.[7]

### 2.   KMG and Anadarko

KMG was the corporate parent of Tronox from the time of Tronox's incorporation in May 2005 until the Tronox IPO in November 2005.[8]  Immediately after the IPO, KMG retained 56.7 percent of Tronox's Class B common stock,[9] giving it 88.7 percent of the total voting power of all classes of Tronox Common Stock.[10]  It completed the spin-off of Tronox by distributing its remaining Tronox shares to KMG shareholders on March 31, 2006.[11]  Thereafter, on August 10,

---

[5]   *See id.* ¶ 27.

[6]   *See id.*

[7]   *See id.*

[8]   *See id.* ¶ 28.

[9]   *See id.*

[10]   *See id.* ¶ 15.

[11]   *See id.* ¶ 28.

-3-

2006, KMG was purchased by Anadarko for eighteen billion dollars and became its wholly-owned subsidiary.[12]

### 3.    Ernst & Young

Ernst & Young served as both KMG's and Tronox's principal accountant and auditor during the Class Period[13] and had a "close relationship" with KMG "dat[ing] back to 2002."[14]  "As a result of its relationship with [KMG] and Tronox and the audit and tax services it rendered to both companies, [Ernst & Young's] personnel were regularly present at [KMG's] and [Tronox's] corporate headquarters,"[15] and "had knowledge of KMG's and Tronox's confidential corporate financial and business information . . . ."[16]  Ernst & Young signed and issued audit reports of Tronox for fiscal years 2005, 2006, and 2007[17] and consented to the use of its unqualified opinion letters in Tronox's 10-Ks for those

---

[12]    *See id.* ¶ 29.

[13]    *See id.* ¶¶ 30, 300.

[14]    *Id.* ¶ 300.

[15]    *Id.*

[16]    *Id.*

[17]    *See id.* ¶ 302.

same years.[18]

### 4.    Tronox Officers

Adams was the Chief Executive Officer ("CEO") of Tronox from

September 2005 until September 2008, and a director of Tronox during the Class

Period.[19]  Rowland was the Chief Operating Officer of Tronox and a director

during the Class Period.[20]  Mikkelson was the Senior Vice President and Chief

Financial Officer of Tronox during the Class Period.[21]  All three defendants

previously held positions within various divisions of KMG.[22]

### 5.    Tronox Directors

Wohleber and Rauh were KMG officers that served on Tronox's

board of directors (the "Tronox Board") until March 31, 2006.[23]  Wohleber and

Rauh each signed two Tronox securities filings while serving as Tronox

---

[18]    *See id.* ¶ 30.

[19]    *See id.* ¶ 31.

[20]    *See id.* ¶ 32.

[21]    *See id.* ¶ 33.

[22]    *See id.* ¶¶ 31-33.

[23]    *See id.* ¶¶ 34-35.

directors.[24]

### 6.    KMG Officers

Corbett was the Chairman and CEO of KMG during the Class Period.

Pilcher was the Senior Vice President, Secretary and General Counsel of KMG

during the Class Period.[25]  Neither defendant signed any Tronox securities filing or

made any other statement that is the subject of this Complaint.[26]

### C.    The Tronox IPO

Although founded as an oil and gas exploration company in 1929,[27]

KMG subsequently expanded its operations into other industries including

forestry, coal mining, uranium, fertilizers, ammonium perchlorate, and aspects of

the nuclear energy industry.[28]  By 2000, KMG left many of these business

operations to focus on oil and gas exploration and chemical production.[29]

Nevertheless, KMG remained responsible for a plethora of legal liabilities

---

[24]    *See id.*

[25]    *See id.* ¶ 37.

[26]    *See id.* ¶ 38.

[27]    *See id.* ¶ 55.

[28]    *See id.* ¶¶ 56-59.

[29]    *See id.* ¶ 60.

associated with these businesses (the "Legacy Liabilities") – which included environmental remediation costs and environmental tort liabilities.[30]

In 2001, KMG developed a strategy, known internally as "Project Focus," to create a corporate structure designed to isolate and separate the Legacy Liabilities from KMG's oil and gas operations.[31]  KMG created two separate subsidiaries to divide its oil and gas assets from its chemical assets.[32]  The Legacy Liabilities were primarily isolated in KMG's chemical business – which would later become Tronox.[33]  Thereafter, in March of 2005, KMG's board of directors authorized management to explore a sale or spin-off of KMG's chemical business.[34]  After attempting to sell the chemical business to a variety of purchasers, KMG concluded that it should proceed with an initial public offering.[35]

---

[30]   See id.

[31]   Id. ¶ 69.

[32]   See id. ¶¶ 68-70.

[33]   See id. ¶¶ 71-73.

[34]   See id. ¶¶ 74-75.

[35]   See id. ¶ 81.

KMG Chemical Business was incorporated as Tronox in May 2005[36] and on November 21, 2005 Tronox filed a registration statement ("Registration Statement") with the Securities and Exchange Commission ("SEC") in connection with the IPO.[37]  Tronox subsequently sold approximately forty-three percent of Tronox Common Stock at fourteen dollars per share.[38]  It also issued three hundred and fifty million dollars in Tronox Bonds.[39]  The remainder of the Tronox Common Stock, the net proceeds from the IPO and debt offerings, and forty million dollars in cash were transferred to KMG as consideration for the chemical business.[40]  On April 1, 2006, after KMG distributed its remaining Tronox shares to its investors, Tronox became an independent company.[41]

### D.    Alleged False and Misleading Statements

Tronox's securities filings during the Class Period contained financial

---

[36]    *See id.* ¶ 28.

[37]    *See id.* ¶ 103; Tronox Inc. Registration Statement ("Registration Statement"), Ex. D. to Declaration of Jay B. Kasner ("Kasner Dec."), counsel for defendants Anadarko and KMG.

[38]    *See* Compl. ¶ 14.

[39]    *See id.*

[40]    *See id.*

[41]    *See id.* ¶ 103.

statements that violated various Generally Accepted Accounting Principles

("GAAP").[42]  Most significantly, Tronox failed to record reserves for

environmental remediation costs and tort claim liabilities that were both probable

and reasonably estimable.[43]  Tronox has subsequently "admitted that it repeatedly

and materially misstated its financial results throughout the Class Period based on

its improper reserving methodology."[44]  "In doing so, the Defendants misled the

market as to the true financial condition of Tronox and deprived investors of

material information that was necessary to understand [Tronox's] financial

condition."[45]

Ernst & Young also issued audit reports during the Class Period that

"falsely represented that Tronox's financial statements for the reported periods

were presented in conformity with GAAP when such statements violated GAAP

---

[42]      *See id.* ¶¶ 166-295.

[43]      *See id.* ¶ 155; Accounting for Contingencies, Statement of Fin.
Accounting Standards No. 5, ¶ 8 (Fin. Accounting Standards Bd. 1975) ("An
estimated loss from a loss contingency . . . shall be accrued by a charge to income
if . . . [i]nformation available prior to issuance of the financial statements indicates
that it is *probable* that . . . a liability has been incurred . . . [and] [t]he amount of
loss can be *reasonably estimated.*" (emphasis added)).

[44]      Compl. ¶ 6.

[45]      *Id.* ¶ 165.

with regard to the appropriate environmental remediation reserve."[46]  These audits, moreover, were not conducted in accordance with Generally Accepted Accounting Standards ("GAAS").[47]  Specifically, Ernst & Young: (1) knew, or recklessly disregarded, that "Tronox exhibited significant internal control weaknesses, including the lack of appropriate policies and procedures to measure and record environmental remediation reserves;"[48] (2) failed "to devise an audit plan that would appropriately address areas of audit risk" —[49] including Tronox's "use of unusually aggressive accounting policies with regard to . . . [the] environmental remediation and tort liability reserves;"[50] and (3) "did not obtain sufficient, competent, evidential matter to support Tronox's assertions regarding its environmental remediation reserve for the periods ending December 31, 2005, 2006, and 2007 and/or was reckless in ignoring audit evidence."[51]

## E.    The Master Separation Agreement

---

[46]    *Id.* ¶ 302.

[47]    *See id.* ¶ 308.

[48]    *Id.* ¶ 310.

[49]    *Id.* ¶ 316.

[50]    *Id.* ¶ 315.

[51]    *Id.* ¶ 320.

Attached to the Registration Statement was an agreement effectuating

the split between KMG and Tronox (the "Master Separation Agreement").[52]   That

agreement required KMG to reimburse Tronox for a portion of Tronox's

environmental remediation costs if certain conditions were met.  Several of those

conditions are relevant to defendants' motions to dismiss.  *First*, Tronox had to

obtain KMG's approval before it increased any of its reserve estimates by two and

a half million dollars or more.[53]   *Second*, Tronox was required to "manage all

remediation activities . . . in a manner consistent with [KMG's] past practice."[54]

*Third*, KMG only had to reimburse Tronox after Tronox's costs exceeded its

recorded reserve estimates.[55]   This final condition rendered the indemnification

---

[52]     *See id.* ¶ 15;  The Master Separation Agreement Between KMG and
Tronox ("Master Separation Agreement"), Ex. E to the Declaration of Solomon B.
Cera, attorney for Lead Plaintiffs.

[53]     *See* Master Separation Agreement § 2.5(e) ("Notwithstanding the
foregoing, [KMG] will not be required to reimburse any member of the Tronox
Group with respect to any individual sites . . . if any member of the Tronox Group,
without the prior written consent of [KMG], makes, agrees to make, or proposes to
make any material change in the scope or conduct of any existing response,
removal, remediation, or other corrective action plan or project that . . . results in
an increase in any Reserve Amount by $2,500,000 or more.").

[54]     *Id.* § 2.5(f).

[55]     *See id.* § 2.5(a) ("[KMG] shall not be obligated to reimburse Tronox
for any Net Reimbursable Costs until the Environmental Remediation Costs with
respect to an individual site associated with any Former Operation exceed the
Reserve Amount . . . by more than $200,000 . . . .");  Compl. ¶ 87.

-11-

illusory as Tronox did "not have sufficient cash flow to spend the reserved amounts and thus qualify for indemnification."[56]

### F.     Tronox's Collapse

During the Class Period, Tronox Class A common stock traded as high as nineteen dollars per share, Tronox Class B common stock traded as high as $19.37 per share and Tronox Bonds traded as high as $107.75 per bond.[57] When the first partial disclosures regarding Tronox's true financial condition were made on July 12, 2007, the Class A stock was trading at $14.73 per share, the Class B stock at $14.47 per share, and the bonds at $104 per bond.[58] "Over the next 18 months, in response to additional partial disclosures that revealed more about the Company's true financial condition, the market reacted, and Tronox's securities declined in value."[59] By the end of the Class Period, when Tronox filed for bankruptcy on January 12, 2009,[60] both classes of Tronox Common Stock had fallen to three cents per share, and the Tronox Bonds had fallen to sixteen dollars

---

[56]    Compl. ¶ 87.

[57]    *See id.* ¶ 327.

[58]    *See id.*

[59]    *Id.*

[60]    *See id.* ¶ 366.

per bond.[61]  When it filed for bankruptcy, Tronox revealed that it had "spent more than $118 million to satisfy the Legacy Liability obligations and still faced hundreds of millions of dollars worth of additional claims."[62]

## III.  APPLICABLE LAW

### A.    Motion to Strike

Federal Rule of Civil Procedure 12(f) permits a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "Typically, to prevail on a Rule 12(f) motion, the defendant must demonstrate . . . that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant."[63]  "Motions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so."[64]

### B.    Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept as true all of the factual allegations

---

[61]    *See id.* ¶ 367.

[62]    *Id.* ¶ 366.

[63]    *Iliano v. Mineola Union Free School Dist.*, 585 F. Supp. 2d 341, 357 (E.D.N.Y. 2008) (quotation marks and citation omitted).

[64]    *Id.* (quotation marks and citation omitted).

contained in the complaint"[65] and "draw all reasonable inferences in [the]

plaintiff[s'] favor."[66]  However, the court need not accord "[l]egal conclusions,

deductions or opinions couched as factual allegations . . . a presumption of

truthfulness."[67]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in

the complaint must meet a standard of "plausibility."[68]  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."[69]

Plausibility "is not akin to a probability requirement," rather plausibility requires

"more than a sheer possibility that a defendant has acted unlawfully."[70]

When determining the sufficiency of a claim under Rule 12(b)(6), the

court is normally required to consider only the allegations in the complaint.

---

[65]      *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[66]      *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[67]      *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[68]      *Twombly*, 550 U.S. at 564.

[69]      *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[70]      *Id.* (quotation marks omitted).

However, the court is allowed to consider documents outside the pleading if the documents are integral to the pleading or subject to judicial notice.[71]

## C.  Section 10(b) and Rule 10b-5 of the Securities Exchange Act

### 1.  Prima Facie Case

"To prevail in a Rule 10b-5 action based on subsection [10](b), a plaintiff must prove that 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff's] injury.'"[72]

### 2.  Scienter

"'The requisite state of mind, or scienter, in an action under [S]ection 10(b) and Rule 10b-5, that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'"[73]  In addition, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), plaintiffs in securities fraud actions must "'state

---

[71]    *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[72]    *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999)).

[73]    *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000)) (quotation marks omitted).

with particularity facts giving rise to a strong inference that the defendant acted
with the required state of mind.'"[74]

A plaintiff may satisfy this requirement "by alleging facts (1) showing
that the defendants had both motive and opportunity to commit the fraud or (2)
constituting strong circumstantial evidence of conscious misbehavior or
recklessness."[75] Under the first prong, "[t]o show motive and opportunity,
plaintiffs must allege a likelihood that defendants could realize 'concrete benefits'
through the deception."[76] Under the second prong, plaintiffs must allege facts
providing strong circumstantial evidence that defendants' conduct was "'highly
unreasonable'" and represented "'an extreme departure from the standards of
ordinary care . . . to the extent that the danger was either known to the defendant
or so obvious that the defendant must have been aware of it.'"[77] "Where motive is
not apparent, it is still possible to plead scienter by identifying circumstances

---

[74]    *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

[75]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.
2007) (citing *Ganino*, 228 F.3d at 168-69).

[76]    *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87,
100 (2d Cir. 2001) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124,
1130 (2d Cir. 1994)).

[77]    *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)
(quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

-16-

indicating conscious misbehavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[78]

"For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'"[79] Thus, a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."[80]

### 3. Causation

To state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."[81] Transaction causation "refer[s] to whether the particular plaintiff or plaintiff class relied upon – or is refutably presumed to have relied upon – the misrepresentation"[82] in its decision to purchase the securities. "Under the fraud-on-the-market doctrine,

---

[78]     *Kalnit*, 264 F.3d at 142 (quotation marks and citation omitted).

[79]     *ATSI*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original)).

[80]     *Tellabs*, 551 U.S. at 314.

[81]     *ATSI*, 493 F.3d at 106.

[82]     *In re Omnicom Group., Inc. Secs. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (citation omitted).

reliance is presumed when the statements at issue become public. The public

information is reflected in the market price of the security. Then it can be assumed

that an investor who buys or sells stock at the market price relies upon the

statement."[83]  To take advantage of this presumption a plaintiff must ultimately

prove that the market for the security at issue was efficient – *i.e.*, that the price of

the security rapidly reflected all available information.[84]  However, "'the question

on a motion to dismiss is not whether plaintiff has proved an efficient market, but

whether he has pleaded one.'"[85]  Accordingly, "plaintiffs are not required to plead

with exquisite specificity all of the information that ultimately will bear on the

factual determination of whether the markets for the relevant securities were

efficient."[86]

      Loss causation is "the proximate causal link between the alleged

---

[83]    *Stoneridge Inv. Partners, LLC v. Scientific Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (citation omitted).

[84]    *See In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).

[85]    *In re Parmalat Secs. Litig.*, 376 F. Supp. 2d 472, 509 (S.D.N.Y. 2005) (quoting *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir. 1992)).

[86]    *Id.* at 508.

misconduct and the plaintiff's economic harm."[87]  "A misrepresentation is 'the

proximate cause of an investment loss if the risk that caused the loss was within

the zone of risk *concealed* by the misrepresentations. . . .'"[88]  "To plead loss

causation," therefore, "the complaint[] must allege facts that support an inference

that [defendants'] misstatements and omissions concealed the circumstances that

bear upon the loss suffered such that plaintiffs would have been spared all or an

ascertainable portion of that loss absent the fraud."[89]

## D.   Control Person Liability Under Section 20(a) of the Exchange Act

"To establish a prima facie case of control person liability, a plaintiff

must show (1) a primary violation by the controlled person, (2) control of the

primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud."[90]

"Allegations of control are not averments of fraud and therefore need not be

---

[87]     *ATSI*, 493 F.3d at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544
U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d
Cir. 2005)). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343
F.3d 189, 197 (2d Cir. 2003).

[88]     *In re Omnicom Group*, 597 F.3d at 513 (quoting *Lentell*, 396 F.3d at
173) (emphasis in original).

[89]     *Lentell*, 396 F.3d at 175.

[90]     *ATSI*, 493 F.3d at 108 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d
1450, 1472 (2d Cir. 1996)).

-19-

pleaded with particularity."[91] Thus, "'[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.'"[92]

### E. Amendments to Pleadings

"Rule 15(a) provides that, other than amendments as a matter of course, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."[93] "[W]hether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion."[94] However, the Supreme Court has explained that

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

---

[91]    *In re Parmalat Secs. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[92]    *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007). *Accord In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003)).

[93]    *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quotation marks omitted).

[94]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quotation marks omitted).

-20-

> prejudice to the opposing party by virtue of allowance of the
> amendment, futility of amendment, etc. — the leave sought
> should, as the rules require, be "freely given."[95]

Accordingly, "'[i]t is the usual practice upon granting a motion to dismiss

to allow leave to replead.'"[96]

## IV.   DISCUSSION

Defendants' arguments for dismissal can be divided into seven

categories – each of which will be addressed in turn. *First*, KMG and Anadarko

move to strike certain allegations from the Complaint. *Second*, KMG and the

KMG Officers seek dismissal of plaintiffs' Section 10(b) claims on the ground that

no misleading statements have been attributed to them, and thus, that the element

of reliance has not been adequately pled. *Third*, the Tronox Officers and Tronox

Directors seek dismissal of plaintiffs' Section 10(b) claims on the ground that

plaintiffs' scienter allegations are insufficient.[97] *Fourth*, Ernst & Young also seeks

---

[95]   *Foman v. Davis*, 371 U.S. 178, 182 (1962). *Accord Jin v.
Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

[96]   *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2002 WL 193157, at *6
(S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949
F.2d 42, 48 (2d Cir. 1991)). *Accord Hayden v. County of Nassau*, 180 F.3d 42, 53
(2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant
leave to amend the complaint.").

[97]   KMG and the KMG Officers also argue that the Section 10(b) claims
should be dismissed on scienter grounds. Because plaintiffs' Section 10(b) claims

-21-

dismissal of plaintiffs' Section 10(b) claims on scienter grounds. *Fifth*, all

defendants seek dismissal of the Section 10(b) claims on the ground that plaintiffs

have failed to allege adequately both transaction and loss causation. *Sixth*, all

defendants seek dismissal of plaintiffs' Section 20(a) claims. *Seventh*, and finally,

Anadarko seeks dismissal of plaintiffs' claims on the ground that it is not a

successor-in-interest to KMG – the only theory under which plaintiffs assert

Anadarko is liable.

### A.    Motion to Strike Certain Allegations

KMG and Anadarko move to strike the prologue and paragraphs 12,

74-81, 83, 90, 92, 95-101, 167 and 316 from the Complaint "because they are

improperly based on" the adversary complaint filed by Tronox in bankruptcy court

("Adversary Complaint").[98] Federal Rule of Civil Procedure 11(b)(3) requires

counsel to ensure that a complaint's "factual contentions have evidentiary support

or, if specifically so identified, will likely have evidentiary support after a

reasonable opportunity for further investigation or discovery." Accordingly,

---

are dismissed for failure to meet the attribution requirement, I do not reach those
arguments.

[98]    Memorandum of Law in Support of Defendants Anadarko Petroleum
Corporation's and Kerr-McGee Corporation's Motion to (A) Dismiss the
Consolidated Amended Complaint and (B) Strike Certain Allegations ("KMG
Mem.") at 15 n.18.

courts routinely dismiss complaints filed in "tag-along" securities actions that are

based entirely on allegations taken from complaints filed by plaintiffs in other

actions.[99] This does not mean, however, that counsel must conduct a personal

investigation into every factual contention in the complaint. Even under the

PSLRA's more particularized pleading requirements, plaintiffs may rely "on

documentary evidence that qualifies as a reliable source for pleading purposes."[100]

When viewed in tandem with the other sources of information relied

upon by plaintiffs,[101] the Adversary Complaint is sufficiently reliable to meet this

standard. Unlike the complaints relied upon in the "tag-along" securities actions,

the Adversary Complaint was filed by Tronox – the issuer of the securities that

---

[99]     *See Geinko v. Padda*, No. 00 Civ. 5070, 2002 WL 276236, at *5-*6 (N.D. Ill. Feb. 27, 2002).

[100]    *In re New Century*, 588 F. Supp. 2d 1206, 1221 (C.D. Cal. 2008). *Accord Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (discussing the permissibility of relying on confidential witnesses in pleading securities actions).

[101]    *See* Compl. Prologue (stating that plaintiffs' investigation "included a review of (1) [Tronox's] public filings with the [SEC]; (2) [KMG's] public filings with the SEC; (3) [Anadarko's] public filings with the SEC; (4) the pleadings and papers on file in [Tronox's] pending Chapter 11 bankruptcy case . . . (5) securities analyst reports regarding Tronox and [KMG]; (6) transcripts and quarterly earning conference calls with Tronox management; (7) publicly available trading information regarding Tronox securities; (8) articles in the general financial press; (8) interviews with confidential witnesses; (9) consultation with experts.").

-23-

form the basis of this case.  Moreover, the Adversary Complaint's allegations are

corroborated by a sworn declaration filed in the bankruptcy court by Tronox's

restructuring consultant after conducting a "review of relevant documents, and/or

information supplied . . . by members of [Tronox's] management and [Tronox's]

financial advisors."[102]  These factors are sufficient to establish the Adversary

Complaint's reliability for pleading purposes.[103]  Accordingly, the motion to strike

is denied.

## B.      Section 10(b) Claims Against KMG: The Attribution Requirement

KMG and the KMG Officers move to dismiss plaintiffs' Section

10(b) claims on the ground that none of the allegedly fraudulent statements in the

Complaint are attributed to KMG.  Although I have previously held that a

statement need not be attributed to a defendant so long as the defendant

substantially participated in the creation of the statement and investors were aware

of such participation, a recent Second Circuit decision – *Pacific Investment*

---

[102]      Declaration of Gary Barton in Support of First Day Motions Filed in the Tronox Adversary Proceeding, Ex. F to Declaration of Solomon B. Cera, counsel for Lead Plaintiffs, ¶ 4.

[103]      *Cf. In re New Century*, 588 F. Supp. 2d at 1220-21 (refusing to strike "allegations drawn from [a bankruptcy examiner's report]" on the ground that "the allegations [were] derived from documentary evidence that qualifies as a reliable source for pleading purposes").

-24-

*Management Company LLC v. Mayer Brown LLP* (*"PIMCO"*)[104] – has curtailed

the applicability of that rule. Accordingly, under the Second Circuit's bright-line

attribution rule, plaintiffs' Section 10(b) claims against KMG and the KMG

Officers must be dismissed.

### 1. The Attribution Requirement

In *Central Bank of Denver v. First Interstate Bank of Denver*,[105] the

Supreme Court determined that Section 10(b) liability does not extend to aiders

and abettors.[106] Accordingly, for secondary actors to be held liable under Section

10(b), the conduct of the actor "must satisfy each of the elements or preconditions

for liability."[107] In response to *Central Bank*, the Second Circuit adopted a bright-

line rule – intended to ensure a plaintiff has proven reliance (a necessary element

of any Section 10(b) claim) – that a defendant "cannot incur primary liability . . .

---

[104]     603 F.3d 144 (2d Cir. 2010).

[105]     511 U.S. 164 (1994).

[106]     *See id.* at 177.  Congress subsequently passed a statute permitting the
SEC to bring enforcement actions predicated on aiding and abetting liability.  *See*
15 U.S.C. § 78t(e).  However, despite "calls for Congress to create an express
cause of action for aiding and abetting [in private actions], . . . Congress did not
follow this course." *Stoneridge*, 552 U.S. at 157.

[107]     *Stoneridge*, 552 U.S. at 157.

-25-

for a statement not attributed to that actor at the time of its dissemination."[108]  I

have previously held, based on Second Circuit decisions subsequent to *Central

Bank*,[109] that so long as a defendant substantially participated in the creation of the

alleged misstatements, and investors were aware of such participation, then that

defendant could be held liable even though the relevant misstatements were not

specifically attributed to that defendant.[110]

However, *PIMCO* has clarified that *In re Scholastic Corporate

Securities Litigation* did not relax the attribution requirement and forecloses the

application of this broad standard to secondary actors.[111]  In *PIMCO*, the Second

---

[108]     *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

[109]     *See In re Scholastic Corp.*, 252 F.3d at 63.

[110]     *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of
Am. Secs., LLC*, 592 F. Supp. 2d 608, 622 (S.D.N.Y. 2009) ("The prevailing rule
in this Circuit is that a statement need not be publicly attributed to the defendant,
[if] the defendant's participation is substantial enough that s/he may be deemed to
have made the statement, and [if] investors are sufficiently aware of defendant's
participation that they may be found to have relied on it as if the statement had
been attributed to the defendant." (quotation marks and citations omitted). *See
also In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 330-32
(S.D.N.Y.2004).

[111]     *See PIMCO*, 603 F.3d at 158 n.6 ("[A]t least with respect to
secondary actor liability, *Scholastic* did not relax *Wright*'s attribution
requirement."). The Second Circuit was noncommital about the role that
*Scholastic* would play in the future. The court suggested the possibility that the
claims permitted in *Scholastic* (*i.e.*, claims against corporate insiders) could be
distinguished from claims against secondary actors on the ground "that investors

-26-

Circuit, in upholding dismissal, determined that *the creation* of actionable

statements was an insufficient basis for holding secondary actors liable.[112]

> [S]econdary actors can be liable in a private action under Rule
> 10b-5 for only those statements that are explicitly attributed to
> them. The mere identification of a secondary actor as being
> involved in a transaction, or the public's understanding that a
> secondary actor is at work behind the scenes are alone
> insufficient. To be cognizable, a plaintiff's claim against a
> secondary actor must be based on that actor's own articulated
> statement, or on statements made by another that have been
> *explicitly* adopted by the secondary actor.[113]

Moreover, *PIMCO* provided a broad definition of the term secondary actor –

stating that it includes "any part[y] who [is] not employed by the issuing firm

whose securities are the subject of allegations of fraud."[114]

## 2. The Attribution Requirement Applied to KMG

Under the broad definition propounded in *PIMCO*, KMG is a

---

rely on the role corporate executives play in issuing public statements even in the
absence of explicit attribution." *Id.* However, the court did not intimate a view on
whether this distinction was ultimately tenable. *See id.* In any event, to the extent
*Scholastic* can be distinguished, and thus, survives *PIMCO*, its application appears
limited to claims against corporate insiders at the firm which issued the securities
that are the subject of the litigation.

   [112]   *See id.* at 154-55.

   [113]   *Id.* at 155 (quotation marks and citations omitted) (emphasis in
original).

   [114]   *Id.* at 148 n.1.

secondary actor. Tronox, and not KMG, is the issuing firm whose securities are

the subject of this litigation. The Registration Statement was filed by Tronox and

signed by its officers.[115] Accordingly, because KMG is "not employed by the

issuing firm whose securities are the subject of allegations of fraud,"[116] it is a

secondary actor that can only be held liable if the attribution requirement is met.[117]

Lead Plaintiffs argue that KMG was in actual fact the issuing firm

because Tronox was under KMG's control at the time of the stock offering.[118]

Permitting control over an issuing firm to transform a secondary actor into a

primary actor, however, would undermine the clear distinction between primary

and secondary liability that the Supreme Court and the Second Circuit have sought

to establish.[119] Moreover, it would conflate analysis under Section 10(b) with

---

[115]    *See* Registration Statement.

[116]    *PIMCO*, 603 F.3d at 148 n.1.

[117]    *In re Converium Holding*, 2006 WL 3804619, at *11-12 (holding that
a corporate parent was not liable as a primary actor under section 10(b) for the
statements of a wholly-owned subsidiary made during the course of an IPO).

[118]    *See* 5/6/10 Letter from Solomon B. Cera ("Cera Letter"), counsel for
Lead Plaintiffs, at 2; Lead Plaintiffs' Memorandum of Law in Opposition to the
Motions to Dismiss of Defendants Kerr-McGee Corporation; Anadarko Petroleum
Corporation; and the Individually Named Defendants ("Pl. Opp.") at 12-15.

[119]    *See PIMCO*, 603 F.3d at 157 (explaining that the use of a bright-line
rule increases predictability for both investors and secondary actors, simplifies
litigation, and ensures that the reliance requirement is satisfied).

-28-

analysis under Section 20(a) – which establishes *control person* liability.[120]

Because KMG is a secondary actor, it can only be held liable for statements explicitly attributed to it. The Complaint does not contain allegations of any such statements. Plaintiffs argue that attributable statements exist because the public was aware that "all data regarding Tronox which was included in the offering documents was in fact KMG data."[121] This is inaccurate. While the Registration Statement informs potential investors that its "combined financial statements . . . have been *derived from* the accounting records of [KMG]," it emphasizes that it was Tronox which, on the basis of KMG data, "prepare[d] the

---

[120]   *See Central Bank*, 511 U.S. at 184 ("In addition, Congress did not overlook secondary liability when it created the private rights of action in the 1934 Act. Section 20 of the 1934 Act imposes liability on "controlling person[s]' – persons who 'contro[l] any person liable under any provision of this chapter or of any rule or regulation thereunder.' . . . The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere." (quoting 15 U.S.C. § 78t(a))). Plaintiffs have not asserted claims against KMG under any other theory of vicarious liability (*e.g.*, *respondeat superior*) – which may, or may not, survive *PIMCO* and related cases. *See In re Parmalat Secs. Litig.*, 594 F. Supp. 2d 444, 449-51 (S.D.N.Y. 2009) (a pre-*PIMCO* case holding that vicarious liability survives *Central Bank*).

[121]   *See* Cera Letter at 2. *See also* Pl. Opp. at 9 ("Plaintiffs specifically alleged in the Complaint that certain of Tronox's SEC filings during Class Period identified KMG as the source of the information concerning the environmental remediation reserve balances that are directly at issue here." (citing Compl. ¶¶ 112, 185, 297)).

-29-

combined financial statements."[122]  The financial statements were Tronox's, not

KMG's.  And, as *PIMCO* makes clear, "the public's understanding that a

secondary actor is at work behind the scenes [is] alone insufficient."[123]

Accordingly, plaintiffs' Section 10(b) claims against KMG must be dismissed.

### 3.    The Attribution Requirement Applied to the KMG Officers

There are no allegedly fraudulent statements attributed to either

Corbett or Pilcher – the two KMG Officers that were not on the Tronox Board.[124]

Accordingly, for the same reasons that KMG cannot be held liable as a primary

violator, plaintiffs' Section 10(b) claims against Corbett and Pilcher must also be

dismissed.[125]

---

[122]    Registration Statement at 46 (emphasis added).

[123]    *PIMCO*, 603 F.3d at 155.

[124]    *See* Compl. ¶¶ 37-38.

[125]    Plaintiffs have also alleged that KMG, Corbett and Pilcher are liable
under Rules 10b-5(a) and (c) as participants in a "scheme . . . to defraud which
involved the transfer of the Legacy Liabilities . . . to Tronox and effectuating the
Tronox IPO without making disclosure of the true magnitude of these liabilities
and thereafter falsely reporting Tronox's financial results."  Compl. ¶ 375.
However, plaintiffs can only make out a claim for scheme liability if the alleged
"deceptive conduct" is "communicated to the public."  *PIMCO*, 603 F.3d at 159.
The only deceptive conduct communicated to the public in this case were the
alleged misstatements relating to the Legacy Liabilities, which as discussed, were
not attributed to KMG, Corbett, or Pilcher.  Accordingly, plaintiffs' scheme
liability claims against these defendants are also dismissed.

C.    **Section 10(b) Claims Against the Tronox Officers and the Tronox Directors: Scienter**

Tronox has admitted that the reserve estimates in its securities filings

contained misstatements in violation of GAAP.[126]  However, the existence of

"GAAP violations or accounting irregularities, standing alone, are insufficient to

state a securities fraud claim."[127]  The Tronox Officers and Directors had to know,

or be reckless in disregarding, "that the reserves were inappropriate at the time

they were established."[128]  On a motion to dismiss, plaintiffs may create a strong

inference of such knowledge or reckless disregard by alleging, with particularity,

that these defendants were "[aware] of facts or [had] access to information

contradicting their public statements."[129]

---

[126]    *See* Compl. ¶ 118.

[127]    *Novak*, 216 F.3d at 309.

[128]    *In re Bristol-Meyers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 569 (S.D.N.Y. 2004).

[129]    *Novak*, 216 F.3d at 308.  Plaintiffs must rely on the 'strong circumstantial evidence of recklessness' prong to show scienter because the alleged facts do not establish that the Tronox Officers and Directors had a motive adequate to show scienter.  This is not to say that the Tronox Officers and Tronox Directors did not benefit from the alleged fraud.  Four of these five defendants received substantial increases in compensation for either successfully executing the Tronox IPO or completing the sale of KMG to Anadarko (which most likely could not have been completed without the Tronox IPO). *See* Compl. ¶¶ 141-147. However, because a corporate officer who did not seek to increase his or her compensation would be an anomaly bordering on the fictitious, an allegation that

-31-

## 1.    The Contradictory Information

The following three pieces of information contradict, or otherwise

cast doubt upon the accuracy of, the public statements attributed to the Tronox

Officers and Directors. *First*, prior to the IPO, KMG was unable to sell its

chemical business in large part because several potential buyers believed "the

recorded reserves for the [legal] liabilities were materially deficient."[130]  *Second*,

although Tronox was a spin-off of KMG's chemical business, many of the legal

liabilities which it became responsible for after the IPO were related to KMG's

other businesses.[131]  *Third*, in response to a significant demand from the

Environmental Protection Agency at one of its wood-treatment sites in Manville,

New Jersey, KMG conducted a review of all of its wood-treatment sites.[132]  The

---

an officer was motivated by increased compensation is generally insufficient to
establish motive.  *See ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP
Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("If scienter could be
pleaded solely on the basis that defendants were motivated because an inflated
stock price or improved corporate performance would increase their
compensation, virtually every company in the United States that experiences a
downturn in stock price could be forced to defend securities fraud actions.
Incentive compensation can hardly be the basis on which an allegation of fraud is
predicated." (quotation marks and citations omitted)).

[130]    Pl. Opp. at 24 (citing Compl. ¶¶ 78, 81-83, 93, 101).

[131]    *See* Compl. ¶¶ 71, 131.

[132]    *See id.* ¶ 95.

review identified eleven additional sites facing the same type of liability as the Manville site.[133]   However, despite the fact that these site became the responsibility of Tronox, the securities filings signed by the Tronox Officers and Directors never disclosed, nor recorded reserves for, any of them.[134]

It is rare that a single piece of information – standing along – demonstrates recklessness.  Corporations are not required to adopt the liability estimates of negotiating counterparties.  There is nothing necessarily fraudulent about transferring unrelated liabilities to a spun-off company so long as those liabilities are disclosed.  And it may have been reasonable to assume, for various reasons, that the eleven sites would not incur probable and reasonably estimable liabilities that should have been recorded under GAAP.  Taken together, though, there existed (1) information that should have made the Tronox Officers and Directors highly vigilant of potential errors in Tronox's liability reserve estimates (*e.g.*, Tronox taking on responsibility for liabilities unrelated to its chemical business) and (2) information that should have cast doubt on the accuracy of Tronox's liability reserve estimates (*e.g.*, numerous companies providing

---

[133]    *See id.*

[134]    *See id.*

-33-

significantly higher estimates of the liabilities than Tronox).[135] These factors render the inference that the Tronox Officers and Directors, if they had access to this information, were reckless in disregarding the reserve estimate inaccuracies as plausible as the opposing inference that they were not reckless in doing so.[136]

### 2.    Awareness of the Contradictory Information

However, the mere existence of contradictory information is not sufficient. For a complaint to adequately plead conscious misbehavior or recklessness, it must also allege that each defendant was aware of or had access to the information contradicting his public statements.[137] Prior to discovery, plaintiffs cannot be expected to allege the time and place that each individual defendant received documents containing the alleged contradictory information. However, the complaint must do more than "make nonspecific allegations that a defendant's knowledge . . . can be inferred from his or her high position in a

---

[135]    *See Tellabs*, 551 U.S. at 322-23 ("The inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.").

[136]    *See id.* at 324 ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

[137]    *See Novak*, 216 F.3d at 308.

company."[138]

In this case, the Complaint contains allegations (supported by the statements of confidential witnesses) that Adams, Mikkelson, and Rowland were all involved in KMG's failed attempt to sell its chemical business prior to the Tronox IPO,[139] that Mikkelson was aware of the eleven undisclosed sites,[140] and that Wohleber was "heavily involved" in the plan to transfer the Legacy Liabilities from KMG's oil and gas business to its chemical business.[141] The Complaint, therefore, goes beyond making general allegations that these defendants would have known of the contradictory information by virtue of their senior positions. It alleges that these defendants played a role in a specific set of transactions that would have made them aware of, or given them access to, information contradicting their public statements.[142] This is sufficient to establish awareness

---

[138] *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *17 (S.D.N.Y. Aug. 22, 2005) (collecting cases).

[139] *See* Compl. ¶ 132.

[140] *See id.* ¶ 134

[141] *Id.* ¶ 126.

[142] *Cf. In re LaBranche Secs. Litig.*, 405 F. Supp. 2d 333, 361-62 (S.D.N.Y. 2005) (stating that it was "reasonable to infer that pursuant to their NYSE duties" the individual defendants would have had access to information contradicting their public statements); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (finding that plaintiffs had

for purposes of a motion to dismiss. Accordingly, defendants' motions to dismiss

plaintiffs' Section 10(b) claims against Adams, Mikkelson, Rowland and

Wohleber are denied.

However, there are no corresponding allegations regarding Rauh.

The Complaint does not establish Rauh's role in the scheme to transfer liabilities

to Tronox beyond noting his position on the Tronox Board.[143] This is exactly the

type of general allegation that seeks to establish knowledge by virtue of a

corporate title and is insufficient to survive a motion to dismiss. Accordingly,

Rauh's motion to dismiss plaintiffs' Section 10(b) claim against him is granted.

### D.    Section 10(b) Claims Against Ernst & Young: Scienter

"The standard for pleading auditor scienter is demanding."[144]

Plaintiffs must allege sufficient facts to show that "[t]he accounting practices were

---

adequately alleged that a defendant had access to information contradicting his
public statements by alleging that the defendant had collaborated with other
defendants who performed the pricing analysis containing the contradictory
information); *In re AOL Time Warner and "ERISA" Litig.*, 381 F. Supp. 2d 192,
220-21 (S.D.N.Y. 2004) (finding that the strong circumstantial evidence prong
was satisfied because a defendant would have had access to the contradictory
information due to his role as "Account Executive" on some of the company's
biggest accounts).

[143]    *See, e.g.*, Compl. ¶ 93.

[144]    *In re Marsh & McLennan Cos., Inc. Secs. Litig.*, 501 F. Supp. 2d 452,
488 (S.D.N.Y. 2006).

so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."[145] While allegations of accounting errors by themselves do not meet this standard, when coupled with sufficiently attention-grabbing "red-flags," pervasive "GAAP and GAAS violations . . . are sufficient to support a strong inference of scienter."[146]

Lead Plaintiffs highlight several red-flags of which Ernst & Young was allegedly aware.[147] *First*, by virtue of its role as both KMG's and Tronox's auditor prior to and during the Class Period, Ernst & Young would have known that many of the Legacy Liabilities that were transferred from KMG to Tronox "had no connection whatsoever to Tronox's core business."[148] In light of Tronox's

---

[145]    *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007).

[146]    *In re AOL Time Warner*, 381 F. Supp. 2d at 240. *Accord Lewin v. Lipper Convertibles, LLP*, No. 03 Civ. 1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (stating that "pervasive and repeated" accounting violations, if proven, "could provide strong circumstantial evidence of recklessness").

[147]    As with the Tronox Officers and Tronox Directors, plaintiffs' allegations of motive and opportunity are insufficient to establish scienter.

[148]    Lead Plaintiffs' Memorandum of Law in Opposition to Defendant Ernst and Young LLP's Motion to Dismiss the Consolidated Class Action

-37-

apparent undercapitalization,[149] this should have alerted Ernst & Young that

Tronox had an incentive to undervalue these liabilities to create the appearance

that it had a viable balance sheet.

Second, "by virtue of its longstanding relationship in providing audit,

tax, and consulting services to [KMG], [Ernst & Young] had in depth knowledge

as to the status of both the chemical and oil and gas businesses, and was

knowledgeable  about [KMG's] effort to sell the chemicals business and the fact

those efforts were unsuccessful due to potential purchasers' refusal to take on the

Legacy Liabilities."[150]  While, as stated, a corporation is not expected to adopt its

competitors' valuations of its assets and liabilities, awareness of these estimates

should have made Ernst & Young particularly sensitive to the possibility that

Tronox was undervaluing its liability estimates.

Third, the Master Separation Agreement incentivized Tronox to

deflate its reserve estimates.  Under the Agreement, KMG was required to

indemnify Tronox for a portion of Tronox's environmental remediation costs.

However, KMG was only required to do so after Tronox's remediation spending

Complaint at 18 (citing Compl. ¶ 317).

   149    See Compl. ¶ 5.

   150    Id. ¶ 318.

-38-

exceeded its reserve estimates.[151]  Thus, the lower Tronox kept its reserve

estimates, the less it needed to spend to trigger the indemnification clause.  While

there is nothing inherently impermissible about this contractual provision, the

incentive structure it created should have caused Ernst & Young to scrutinize the

accuracy of Tronox's reserve estimates with greater care than might otherwise

have been warranted.

        In tandem with the pervasive GAAP and GAAS violations alleged by

plaintiffs,[152] this series of attention-grabbing red flags is sufficient to establish a

strong inference of scienter.  Accordingly, Ernst & Young's motion to dismiss

---

[151]    *See* Master Separation Agreement § 2.5(a) ("[KMG] shall not be
obligated to reimburse Tronox for any Net Reimbursable Costs until the
Environmental Remediation Costs with respect to an individual site associated
with any Former Operation exceed the Reserve Amount . . . by more than
$200,000.").

[152]    Plaintiffs have alleged numerous GAAP and GAAS violations
occurring over an extended period. *See* Compl. ¶¶ 148-164 (alleging that Tronox
pervasively misstated its environmental remediation and tort liability reserves in
violation of GAAP over the course of four years); *id.* ¶¶ 307-325 (alleging that
Ernst & Young violated GAAS by recklessly disregarding that Tronox exhibited
significant internal control weaknesses, by failing to devise an audit plan that
would appropriately address areas of audit risk exhibited by Tronox, and by failing
to obtain sufficient evidentiary matter relating to Tronox's environmental
remediation and tort liabilities).

plaintiffs' Section 10(b) claims on scienter grounds is denied.[153]

## E.   Causation

### 1.   Transaction Causation

Plaintiffs rely on the fraud-on-the-market doctrine to establish

transaction causation with respect to both the Tronox Common Stock and the

Tronox Bonds.[154]

#### a.   Tronox Common Stock

Primary markets for IPOs (*i.e.*, stock sold by the issuer in the initial

allocation) are "'not efficient or developed under any definition of these terms.'"[155]

Accordingly, any claims based on purchases of Tronox Common Stock in the

primary market are barred.  Defendants assume that this prevents plaintiffs from

---

[153]     Because plaintiffs have alleged that Ernst & Young made false and
misleading statements that released or available to the public, *see* Compl. ¶ 302
("The audit reports issued and signed by defendant E & Y for the fiscal years
2005, 2006, and 2007 falsely represented that Tronox's financial statements were
presented in conformity with GAAP when such financial statements violated
GAAP with regard to the appropriate environmental remediation reserve."),
plaintiffs' Section 10(b) claims are not barred for failure to satisfy the attribution
requirement articulated in *PIMCO*.

[154]     *See* Compl. ¶ 372.

[155]     *In re IPO*, 471 F.3d at 42 (quoting *Freeman v. Laventhol & Horwath*,
915 F.2d 193, 199 (6th Cir. 1990)).

pleading "reliance with respect to any statement made in the IPO."[156] That is

incorrect. The prices for Class A stock set in the secondary market – where the

shares were traded on the highly efficient New York Stock Exchange –[157] would

have incorporated information, including any false statements, made in the IPO

securities filings.[158] The inapplicability of the fraud-on-the-market presumption in

this context is based on the inefficiency of the stock price set in initial offerings,

not on the blanket irrelevance of statements made during the course of those

offerings.[159] Accordingly, while plaintiffs' claims based on purchases of Tronox

Common Stock in the primary market are barred, claims based on purchases in the

---

[156]     Reply Memorandum of Law in Further Support of Defendants
Anadarko Petroleum Corporation's and Kerr-McGee Corporation's Motion to (A)
Dismiss the Consolidated Amended Complaint and (B) Strike Certain Allegations
at 6.

[157]     *See* Compl. ¶ 372(a).

[158]     *See Freeman*, 915 F.2d at 199 ("[S]ecurities traded in national
secondary markets such as the New York Stock exchange . . . are well suited for
application of the fraud on the market theory.").

[159]     *See In re Initial Pub. Offerings Secs. Litig.*, 544 F. Supp. 2d 277, 298
(S.D.N.Y. 2008); *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 68 n.5
(S.D.N.Y. 2005) (holding that although the fraud-on-the-market presumption did
not apply to stock acquired through an IPO, it did apply to sales of that same
"stock acquired . . . on the open market").

secondary market are not.[160]

### b.    Tronox Bonds

Defendants argue that "[p]laintiffs also fail to allege that the market

for Tronox's [B]onds was efficient."[161] This reading of the Complaint is largely

built on the observation that the Complaint's market efficiency allegations often

refer to "Tronox securities" rather than specifically to the Tronox Bonds.[162] It is

clear from Lead Plaintiffs' briefing of this issue that the Complaint does intend to

allege that the market for the Tronox Bonds was efficient,[163] and that at least some

(if not all) of the factual allegations supporting plaintiffs' claims of market

---

[160]    KMG distributed Tronox Class B common stock to its investors as a
dividend. *See* Compl. ¶ 103. Because plaintiffs who receive stock as a dividend
do not "participate in any sort of investment decision," they do "not engage in a
'purchase' within the scope of Section 10(b)." *In re Adelphia Commc'ns Corp.
Sec. & Derv. Litig.*, 398 F. Supp. 2d 244, 260 (S.D.N.Y. 2005). Accordingly, as
Lead Plaintiffs concede, *see* Pl. Opp. at 5 n.6, claims based on the distribution of
Tronox Class B common stock are barred.

[161]    Pl. Opp. at 14.

[162]    *See, e.g.*, Compl. ¶ 372(e) and (h).

[163]    *See* Pl. Opp. at 44 ("As alleged in the Complaint, throughout the
Class Period, Tronox bonds actively traded in the PORTAL Market, a highly
developed and liquid securities market, which facilitates the quoting and trading of
unregistered [equity and debt securities] eligible to be resold pursuant to SEC Rule
144A." (quotation marks and citation omitted)).

-42-

efficiency also relate to the Tronox Bonds.[164] Plaintiffs should amend the

Complaint to clarify which allegations relate to which Tronox securities, and are

granted leave to do so.

That said, it is apparent from reading the Complaint in light of Lead

Plaintiffs' submissions that the allegations are sufficient to establish the

plausibility of the claim that the market for the Tronox Bonds was efficient.

Plaintiffs argue: (1) that PORTAL, the electronic market on which the bonds were

traded, is a highly developed and liquid securities market; (2) that Tronox filed

periodic public reports with the SEC; (3) that the Tronox Bonds were followed by

numerous securities analyst firms; and (4) that the Tronox Bonds were rated by

Moody's, Standard & Poor's and Fitch Ratings.[165] These allegations, if proven,

would show that there was a significant amount of information about the Tronox

Bonds available to investors and that the PORTAL market was sophisticated

---

[164]    *See id.* at 14 ("Plaintiffs also allege that the Tronox bond market was efficient due to the fact that Tronox filed periodic public reports with the SEC, that Tronox bonds were followed by numerous securities analyst firms, including fixed income analysts and brokerage firms, and that all of Tronox securities, including its debt securities, were rated by Moody's, Standard & Poor's and Fitch Ratings.").

[165]    *See id.* at 44.

-43-

enough to incorporate that information.[166]

Defendants have raised multiple questions regarding whether the

PORTAL Market is, in actuality, efficient. However, these fact intensive

questions (e.g., whether the Tronox Bonds were thinly traded) are premature and

cannot be properly analyzed in the absence of a more developed record.[167] For

---

[166]    See Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D. N.J. 1989)
(establishing a five-factor test for analyzing market efficiency: (1) whether the
security at issue had a large weekly trading volume; (2) the existence of a
significant number of analyst reports relating to the security; (3) the existence of
market makers and arbitrageurs in the security; (4) the eligibility of the company
to file an S-3 registration statement; and (5) a history of immediate movement of
the stock price caused by unexpected corporate events or financial releases.). The
Cammer test – which, although broadly cited, has not been adopted by the Second
Circuit, see Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
546 F.3d 196, 204 n.11 (2d Cir. 2008) – was developed to analyze the efficiency
of equity markets and it is not clear that it can be seamlessly transplanted to
analyze the efficiency of debt markets. However, in the absence of an established
alternative test, Cammer provides an acceptable basic framework for evaluating
whether a plaintiff's allegations of efficiency are plausible. See id. at 210 (stating
that is was permissible for a district court to use "the Cammer factors as an
'analytical tool'" to evaluate the efficient of debt markets on a motion for class
certification (quoting Unger v. Amedisys Inc., 401 F.3d 316, 325 (5th Cir. 2005))).
Moreover, on a motion to dismiss, plaintiffs do not have to allege facts sufficient
to satisfy the Cammer test. See Cammer, 711 F. Supp. at 1277-80 (applying the
market-efficiency factors only after converting defendants' motion to dismiss to a
motion for summary judgment). In this context, Cammer simply indicates the
types of factors that a court should weigh in analyzing whether claims of market
efficiency are plausible.

[167]    See In re IPO, 544 F. Supp. 2d at 297 ("Ultimately, whether the
relevant markets were efficient is a question of fact to be resolved at trial."
(collecting cases)).

-44-

now, plaintiffs' allegations of market efficiency are sufficient for the claims to survive.[168]

## 2.    Loss Causation

The most straightforward way to show loss causation is to prove that the price of the purchased security decreased in response to a single corrective disclosure – *i.e.*, a statement revealing that prior representations by a company were false. Tronox "has admitted that it repeatedly and materially misstated its financial results throughout the Class Period based on its improper reserving methodology."[169]  This disclosure, however, did not occur until May 4, 2009 – at which time Tronox had already filed for bankruptcy and its debt and equity securities were essentially worthless.[170]  Accordingly, this alleged corrective disclosure cannot establish loss causation.

Instead, the Complaint relies on a gradual disclosure hypothesis –[171] arguing that increasing environmental liabilities, which were revealed to the

---

[168]    *See In re Parmalat Secs. Litig.*, 376 F. Supp. 2d at 508-09.

[169]    Compl. ¶ 6.

[170]    *See id.* ¶ 27.

[171]    *See In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008) ("It is also clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events.").

public over time by Tronox, caused plaintiffs' losses. As stated, to establish loss causation, plaintiffs must allege that their loss was "caused by the materialization of the risk concealed by the fraudulent statement."[172] In this case, plaintiffs allege that Tronox's misstatements hid the true extent of Tronox's environmental liabilities, and thus, the risk that those liabilities would ultimately be greater than reported.[173] That risk materialized when Tronox began to incur increasing environmental costs – which, in turn, caused the price of Tronox's equity and debt securities to decrease when the costs were communicated to the public.

        For example, on February 12, 2008, Tronox's Class A stock had a market value of $7.55 per share, its Class B stock had a market value of $7.48 per share, and its bonds had a market value of $92.50 per bond.[174] On February 13, 2008, Tronox announced that it had spent thirty-three million dollars on environmental remediation in 2007, and that this number would increase to between forty to forty-five million dollars in 2008.[175] The following day, on February 13, 2008, the market value of Tronox's Class A stock, Class B stock, and

---

[172]    *ATSI*, 493 F.3d at 107 (citing *Lentell*, 396 F.3d at 173).

[173]    *See* Compl. ¶¶ 326-369.

[174]    *See id.* ¶ 342.

[175]    *See id.* ¶ 338.

bonds decreased to $5.46, $5.43, and $86.75 respectively.[176] This is a statistically significant drop – in the range of between six and twenty-eight percent for each security.

Defendants argue that the factual allegations establishing this pattern are insufficient to demonstrate loss causation because they do not show that it was the increasing environmental liabilities – as opposed to other factors such as "the unprecedented downturn in the U.S. housing market" – that caused this loss in market value.[177] Nearly every motion to dismiss since the onset of the current financial crisis has sought shelter from Section 10(b) claims on the ground that the United States has experienced a significant decline in the market capitalization of its companies. While this crisis is severe, most companies did not suffer losses comparable to those experienced by Tronox.[178] They did not, by and large, lose essentially one hundred percent of their market value or fall into bankruptcy.

---

[176]     See id. ¶ 342.

[177]     See Reply Memorandum of Law in Further Support of Defendant Ernst & Young LLP's Motion to Dismiss the Consolidated Class Action Complaint at 10.

[178]     See Lentell, 396 F.3d at 174 (requiring a plaintiff to plead facts showing that its loss was caused by alleged misstatements as opposed to other events when the loss coincides "with a marketwide phenomenon causing comparable losses to other investors" (quotation marks and citation omitted) (emphasis added)).

-47-

Indeed, defendants have not pointed this Court to any source of information – let

alone any source of information of which judicial notice could be taken –

indicating that similarly situated investors (*e.g.*, investors in other *chemical

businesses*) incurred losses similar to those experienced by Tronox investors.[179]

       The Second Circuit does not require plaintiffs, at the motion to

dismiss phase, to hire expert witnesses to perform complex regression analysis.[180]

---

[179]    Defendants' argument is similar to another argument I recently
considered in *King County, Wash. v. IKB Deutsche Industriebank AG*, No. 09 Civ.
8387, No. 09 Civ. 8822, 2010 WL 1702196 (S.D.N.Y. Apr. 16, 2010). In that
case, which involved triple-A rated senior debt securities ("Notes"), defendant
rating agencies argued that a decrease in interest rates on three-month Treasury
Bills at the same time as interest rates on the Notes increased indicated that there
was a widespread movement from corporate debt securities to Treasury Bills (and
hence that plaintiffs' losses were actually caused by a marketwide decline in the
value of corporate debt securities). *See id.* at *5-*6. While noting that this
argument may ultimately prevent plaintiffs from showing loss causation at a later
stage, I denied the motion to dismiss. *First*, "[t]o hold that plaintiffs failed to
plead loss causation solely because the credit crisis occurred contemporaneously
with [the collapse of the Notes] would place too much wight on one single factor
and would permit [defendants] to blame the asset-backed securities industry when
their alleged conduct plausibly caused at least some proportion of plaintiffs' loss."
*Id.* at *5. *Second*, closer inspection of the financial data revealed that the increase
in Treasury Bill interest rates occurred several months before the Notes collapsed.
*See id.* at *6. Accordingly, "there [was] insufficient evidence at [the motion to
dismiss phase] to conclude that interest rates on [the Notes] substantially rose
during the [relevant] period." *Id.*

[180]    *See Lentell*, 396 F.3d at 174 ("[I]f the loss was caused by an
intervening event, like a general fall in the price of Internet stocks, the chain of
causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6)
motion to dismiss." (quotation marks and citation omitted)).

It is enough for plaintiffs to "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [the alleged] misstatements."[181] Plaintiffs have satisfied this burden. In particular, the Complaint alleges that several analyst reports during the Class Period opined that Tronox's financial troubles were due in part to increased environmental remediation costs[182] – with one report even stating that Tronox's "'*larger than-expected* environmental remediation costs and liabilities' were a risk."[183] At the motion to dismiss stage, this is enough to make the inference of loss causation plausible.[184]

### F.  Control Person Liability: Section 20(a)

---

[181]    *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

[182]    *See, e.g.*, Compl. ¶¶ 328, 345.

[183]    *Id.* ¶ 351 (quoting a Branch Banking and Trust Company analyst report) (emphasis added).

[184]    *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d at 166 ("Plaintiffs need only plead that Defendants' fraudulent behavior concealed facts or circumstances which, when revealed, contributed to the loss. The Court need not make a final determination as to what losses occurred and what actually caused them."); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) ("For the purposes of a motion to dismiss, plaintiff has adequately alleged that there was a marked decline in Openwave stock price on the date of a curative disclosure about the company's alleged backdating scheme. Likewise, whether the decline was attributable to some other cause [an informal SEC inquiry and two United States Attorneys' subpoenas], as defendants allege, is a matter for proof at trial.").

The Complaint asserts three separate counts premised on control

person liability. *First*, Count IV alleges that the Tronox Officers and Directors

(Adams, Mikkelson, Rowland, Wohleber and Rauh) exercised control over

Tronox.[185] *Second*, Count V alleges that KMG, Corbett, Pilcher, and Wohleber

controlled Tronox, the Tronox Officers (Adams, Rowland and Mikkelson), and

one of the Tronox Directors (Rauh).[186] *Third*, Count VI alleges that Corbett,

Wohleber, and Pilcher controlled KMG.[187]

### 1.    Primary Violation

To establish a Section 20(a) claim, a complaint must allege "a

primary violation by the controlled person."[188] Because plaintiffs have not

adequately alleged a primary violation by KMG, Count VI is dismissed. Likewise,

Count V is dismissed as to KMG's, Corbett's, Pilcher's, and Wohleber's alleged

control of Rauh.

### 2.    Control

The Complaint must also adequately allege "control of the primary

---

[185]    *See* Compl. ¶¶ 406-412.

[186]    *See id.* ¶¶ 413-419.

[187]    *See id.* ¶¶ 420-424.

[188]    *ATSI*, 493 F.3d at 108.

violator by the defendant."[189] The only "control" issue raised in the motions to

dismiss is whether KMG (and by extension, KMG's officers) retained control of

Tronox after March 31, 2006. Following the Tronox IPO in November of 2005,

KMG retained 88.7 percent of total voting power of all classes of the Tronox

Common Stock,[190] and two of its officers (Wohleber and Rauh) held positions on

the Tronox Board.[191] On March 31, 2006, however, KMG distributed the Tronox

Common Stock it had retained[192] and Wohleber and Rauh both resigned from the

Tronox Board.[193] Thus, as the Complaint itself alleges, "[o]n April 1, 2006,

Tronox became an independent company."[194]

    Nevertheless, plaintiffs argue that KMG retained control of Tronox

after March 31, 2006 by virtue of the Master Separation Agreement – which

conditioned KMG's agreement to indemnify Tronox for its environmental

remediation costs on Tronox obtaining KMG's permission before it raised its

---

[189]    *Id.*

[190]    *See* Compl. ¶ 15.

[191]    *See id.* ¶¶ 34-35.

[192]    *See id.* ¶ 15.

[193]    *See id.* ¶¶ 17, 34-35.

[194]    *Id.* ¶ 103.

-51-

liability reserve estimates.[195]  This argument, however, fails as a result of

plaintiffs' own allegations.  As discussed, KMG was only responsible for partially

reimbursing Tronox for environmental costs after Tronox had already "paid above

the amount reserved for specified sites."[196]  According to the Complaint, this

condition rendered the indemnification illusory because "the Chemical Business

[did] not have sufficient cash flow to spend the reserved amounts and thus qualify

for indemnification."[197]  As it is not plausible to think that Tronox was controlled

by an indemnification it could not receive, this condition in the Master Separation

Agreement cannot form the basis for plaintiffs' allegation of control.[198]

---

[195]     *See* Pl. Opp. 49-50.

[196]     Compl. ¶ 87.

[197]     *Id.*

[198]     *See In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2005 WL
1875445, at *3 (S.D.N.Y. Aug. 5, 2005) ("To be liable as a control person, the
defendant 'must actually possess, in fact, rather than in theory, the ability to direct
the actions of the controlled person.'") (quoting *Wallace v. Buttar*, 239 F. Supp.
2d 388, 396 (S.D.N.Y. 2003)).  Earlier in this Opinion, *see supra* Part IV.D, I held
that Ernst & Young should have been skeptical of the accuracy of Tronox's
reserve estimates because the Master Separation Agreement incentivized Tronox
to deflate these estimates.  This is consistent with the holding here that, given
Tronox's other allegations, the Agreement did not *in actual fact* give KMG the
ability to control Tronox.  Control person liability requires *actual control* by the
defendant over the primary violator.  *See In re Global Crossing, Ltd. Sec. Litig.*,
2005 WL 1875445, at *3.  The fact that the parties entered into an agreement that
gave Tronox the incentive to set artificially low reserves is unrelated to whether
KMG had the power to control or direct the amount of reserves set by Tronox.

Accordingly, Count V is dismissed against KMG to the extent it relates to misstatements made after March 31, 2006. Likewise, because plaintiffs' control person claims against Corbett and Pilcher are based on their roles as KMG officers, Count V is also dismissed against these defendants to the same extent. Finally, because plaintiffs' control person claims against Rauh and Wohleber are based on their roles as KMG Officers and/or on their roles as Tronox directors (positions which they resigned on March 31, 2006), Count IV is dismissed as to Wohleber and Count V as to both Wohleber and Rauh for all misstatements made after March 31, 2006. However, plaintiffs are granted leave to replead these claims to the extent they are able to allege facts, other than the existence of the Master Separation Agreement, that create a plausible inference that KMG controlled Tronox after March 31, 2006.

### 3. Culpable Participation

KMG argues that "[p]laintiffs have failed to allege that KMG . . . acted with scienter . . . [and] therefore have failed to adequately allege culpable participation."[199] The Second Circuit has not defined what is meant by the requirement that a controlling entity be a culpable participant. While recognizing that other courts in this Circuit have held that proof of recklessness is a necessary

---

[199]     KMG Mem. at 24.

element of Section 20(a), and thus, must meet the PSLRA's pleading

requirements,[200] I continue to hold that "scienter is not an essential element of a

Section 20(a) claim."[201] As discussed elsewhere, "the statutory language places

the burden . . . on defendants . . . to exculpate themselves by proving either good

faith or due diligence,"[202] and "a plaintiff need only prove scienter if a defendant

presents the affirmative defense that it acted in good faith."[203] "Thus, although the

meaning of 'culpable participation' is unclear, there is strong reason to believe that

it is not the same as scienter,"[204] and thus "is governed by Rule 8's pleading

---

[200]    *See, e.g., Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008).

[201]    *In re Initial Pub. Offerings Secs. Litig.*, 241 F. Supp. 2d 281, 396 (S.D.N.Y. 2003). *Accord In re WorldCom*, 294 F. Supp. 2d at 415.

[202]    *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 190-91 (S.D.N.Y. 2006).

[203]    *In re IPO*, 241 F. Supp. 2d at 396.

[204]    *Id.* at 394. Judge Denise Cote has suggested that "[t]he concept of culpable participation describes that degree of control which is sufficient to render a person liable under Section 20(a)," *In re WorldCom*, 294 F. Supp. 2d at 415 and thus, that "a plaintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim under Section 20(a)." *Id. See also In re IPO*, 241 F. Supp. 2d at 395 (noting that in two Second Circuit cases, *First Jersey* and *Suez Equity*, "allegations of control coupled with an underlying violation sufficed to plead a Section 20(a) claim").

-54-

standard."[205]  I therefore reject KMG's argument that plaintiffs' control person

claims should be dismissed for failure to plead scienter adequately.

### G.    Anadarko: Successor-In-Interest Liability

Anadarko's acquisition of KMG was completed by means of a reverse

triangular merger.[206]  Triangular mergers permit an acquiring corporation to take

control of a target corporation without becoming a constituent corporation in the

merger.  In a "normal" triangular merger, the acquiring company (A) forms a new

subsidiary (S), into which the target company (T) merges, with S surviving as the

wholly-owned subsidiary of A.  In a reverse triangular merger, the same thing

happens, except S merges into T, with T surviving as the wholly-owned subsidiary

of A.  In this case, Anadarko formed a new subsidiary, APC Acquisition Sub, Inc.

("APC"), which merged into KMG.[207]  KMG's shareholders received monetary

---

[205]    *In re WorldCom*, 294 F. Supp. 2d at 415.

[206]    *See* Excerpts from the Agreement and Plan of Merger, Attached to
KMG's Form 8-K, Filed with the SEC on June 6, 2006, Ex. C to Kasner Decl., at
2.  KMG and Anadarko argue that Delaware law should apply to determine the
effect of this transaction because both Anadarko and KMG are Delaware
corporations.  *See* KMG Mem. at 9 n.9.  Lead Plaintiffs do not contest this
assertion.  In any event, the rules for successor liability at issue here are
substantially the same in New York and Delaware.  Accordingly, for purposes of
this motion to dismiss, I apply Delaware law to the issue of successor liability.

[207]    *See id.*

compensation in exchange for their stock and KMG became Anadarko's wholly-owned subsidiary.[208]

Because Anadarko was an acquiring company in this transaction, and not a constituent company in the merger, the traditional common law principle barring successor liability (with limited exceptions) applies to Anadarko.[209] "[A] corporation acquiring the assets of another does not succeed to the liabilities of the successor corporation except where (1) the successor expressly or impliedly assumed the liability; (2) there was a de facto merger of the successor and

---

[208]    *See id.* KMG and Anadarko cite Section 259(a) of Delaware General Corporation Law – which states that upon the completion of a merger "all debts, liabilities and duties of the respective constituent corporation shall thenceforth attach to [the] surviving or resulting corporation" – as support for their argument that Anadarko is not a sucessor-in-interest. According to defendants, Anadarko "cannot be liable as a successor-in-interest to KMG" because "Anadardko is not the surviving corporation." KMG Mem. at 9. However, Section 259(a) only settles the issue of liability as to the horizontal relationship between the merger's two constituent companies – KMG and APC. It does not settle the issue of liability as to the vertical relationship between the acquiring and target companies – Anadarko and KMG.

[209]    *See Baldwin Enters., Inc. v. Retail Ventures, Inc.*, No. 09 Civ. 0159, 2010 WL 624261, at *5 (S.D. Ill. Feb. 18, 2010) ("Although this maneuvering may appear improper at first blush, caselaw reveals that triangular mergers and reverse triangular mergers . . . are recognized, accepted, and fairly routine."); *Saginaw Prop., LLC v. Value City Dept. Stores, LLC*, No. 08 Civ. 13782, 2009 WL 3536616, at *8. (E.D. Mich. Oct. 30, 2009) ("The reverse triangular merger is popular precisely because it allows the acquiring company . . . to gain control of the target . . . without actually merging with the target or risking its own assets on the target's liabilities.").

-56-

predecessor; (3) the successor was a mere continuation of the predecessor; or (4) the transaction was fraudulent."[210]

The Complaint only alleges facts attempting to support the first exception – that Anadarko expressly or impliedly assumed KMG's liabilities flowing from securities actions relating to the Tronox IPO.[211]  Specifically, the Complaint alleges that Anadarko made statements in its securities filings that it might be required to reimburse Tronox for certain environmental remediation costs pursuant to the Master Separation Agreement between KMG and Tronox.[212]

These statements do not create a plausible inference of successor liability.  As an initial matter, a company does not take on successor liability by

---

[210]    *New York v. National Serv. Indus., Inc.*, 380 F. Supp. 2d 122, 128 (E.D.N.Y. 2005) (quotation marks and citations omitted).  *Accord Great Am. Ins. Co. of N.Y. v. TA Operating Corp.*, No. 06 Civ. 13230, 2008 WL 1848946, at *3 (S.D.N.Y. Apr. 24, 2008) (applying Delaware law) (citing *Polius v. Clark Equip. Co.*, 802 F.2d 75, 78 (3d Cir. 1986); *United States v. Chrysler Corp.*, No. 88 Civ. 341, No. 88 Civ. 534, 1990 WL 127160, at *4 (D. Del. Aug. 28, 1990); *Rohn Indus. Inc. v. Platinum Equity LLC*, 887 A.2d 983, 996 (Del. Super. Ct. 2005), *rev'd on other grounds*, 911 A.2d 379 (Del. 2005)).

[211]    *See* Compl. ¶¶ 104-109.

[212]    *See id.* ¶ 109.  The Complaint also alleges that "Anadarko agreed to indemnify [KMG's] officers and directors for acts and omissions occurring before the acquisition date." *Id.* ¶ 107.  This general statement of successor-in-interest liability, however, is wholly conclusory and hence insufficient to survive a motion to dismiss.

-57-

informing its investors that a court may one day hold that it is liable as a

successor-in-interest. By doing so, it is simply fulfilling its duty to fully disclose

potential liabilities – the same duty that plaintiffs claim Tronox neglected. In

addition, assuming liability for *environmental remediation costs* is not equivalent

to assuming liability for *securities class actions* flowing from a failure to report

adequate estimates of those costs. Accordingly, plaintiffs' successor-in-interest

claims against Anadarko are dismissed. However, plaintiffs are granted leave to

replead successor liability in accordance with this Opinion – including by alleging

that one of the other three successor liability exceptions applies.

## V.    CONCLUSION

For the reasons discussed, defendants' motions to dismiss are granted

in part and denied in part. Plaintiffs are granted leave to replead: (1) their

allegations relating to the efficiency of the market for the Tronox Bonds; (2) their

allegations relating to the claim that KMG controlled Tronox after May 31, 2006;

and (3) their allegations relating to the claim that Anadarko is liable as a

successor-in-interest to KMG. An Amended Complaint must be filed within thirty

days of the date of this Opinion and Order. The Clerk of the Court is directed to

close these motions (Docket Nos. 61, 68, 70, 74). A conference is scheduled for

July 12, 2010 at 5:00 p.m.

-58-

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              June 28, 2010

## - Appearances -

**For Lead Plaintiffs:**

Solomon B. Cera, Esq.
Gwendolyn R. Giblin, Esq.
Thomas C. Bright, Esq.
Gold Bennett Cera & Sidener LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
(415) 777-2230

**For Defendants Anadarko Petroleum Corporation and Kerr-McGee Corporation:**

Jay B. Kasner, Esq.
Susan Saltzstein, Esq.
Joseph A. Matteo, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
(212) 735-3000

**For Defendants Luke Corbett, Gregory Pilcher, J. Michael Rauh and Robert Wohleber:**

Gandolfo V. DiBlasi, Esq.
Penny Shane, Esq.
Jessica M. Klein, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

**For Defendants Thomas Adams, Mary Mikkeslon and Marty Rowland:**

Mathew D. Parrott, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
(212) 940-8800

David H. Kistenbroker, Esq.
Joni S. Jacobsen, Esq.
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200

**For Defendant Ernst & Young LLP:**

Robert A. Atkins, Esq.
Brad S. Karp, Esq.
Claudia Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000