**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------**X**
             **:**
             **:**
**IN RE TRONOX, INC. SECURITIES**  **:**  <u>**OPINION AND ORDER**</u>
**LITIGATION**           **:**
             **:**  **09 Civ. 6220 (SAS)**
             **:**
------------------------------------------------------------**X**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

    This action arises from alleged false and misleading statements made

by Tronox, Inc. ("Tronox") during and following its initial public offering in 2005

(the "IPO" or "Tronox IPO").  On June 28, 2010, I issued an Opinion and Order

("*Tronox I*")[1] ruling on defendants' motions to dismiss various claims asserted in

plaintiffs' Consolidated Amended Complaint ("CAC") and granting plaintiffs leave

to replead certain claims.  On July 30, 2010, plaintiffs filed their First Amended

Consolidated Complaint ("FAC" or "Amended Complaint").  Count IV of that

complaint alleges that Kerr-McGee Corporation ("KMG"); Anadarko Petroleum

Corporation ("Anadarko") (as successor-in-interest to KMG and pursuant to

*respondeat superior*); and Luke Corbett, Robert Wohleber (through the August 10,

---

[1]  *See In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220, 2010 WL
2835545 (S.D.N.Y. June 28, 2010).  This opinion assumes familiarity with the
factual background and legal analysis contained in that decision.

2006 "Merger"), and Gregory Pilcher (through August 10, 2006) (collectively, the "KMG Officers") are liable as controlling persons both of Tronox and of the Tronox Officers.[2]  KMG and Wohleber now move to dismiss Count IV for the period after the March 31, 2006 "Spin-Off"[3]; Corbett and Pilcher move to dismiss Count IV in full; and Anadarko moves to dismiss Count IV and to strike those allegations pertaining to *respondeat superior* liability.  For the following reasons, KMG's motion to dismiss is denied; Anadarko's motion to dismiss is denied in part and granted in part; and the KMG Officers' motion to dismiss is denied in part and granted in part.

## II.   APPLICABLE LAW

### A.   Control Person Liability Under Section 20(a) of the Exchange Act

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[4]

---

[2]      "Tronox Officers" refers collectively to defendants Thomas Adams, Marty Rowland, Mary Mikkelson, and J. Michael Rauh.

[3]      "Spin-Off" refers to KMG's distribution of its remaining Tronox shares to KMG shareholders on March 31, 2006.  *See* FAC ¶ 15.

[4]      *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

"[C]ontrol over a primary violator may be established by showing that [the controller] possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[5]  "Actual control is essential to control person liability."[6]  Moreover, "the Section 20(a) defendant must . . . have actual control over the *transaction* in question."[7]  However, "[f]or purposes of Section 20(a) liability, actual control requires only the *ability* to direct the actions of the

---

[5]     *First Jersey Sec.*, 101 F.3d at 1472-43 (quoting 17 C.F.R. § 240.12b-2).  Section 20(a) of the Securities Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[6]     *In re Blech Sec. Litig.*, 961 F.Supp. 569, 586-87 (S.D.N.Y. 1997).

[7]     *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (quotation marks omitted) (emphasis added).  *Accord Anwar v. Fairfield Greenwich Ltd.*, --- F. Supp. 2d ----, No. 09 Civ. 0118, 2010 WL 3341636, at *38 (S.D.N.Y. Aug. 18, 2010); *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001).

controlled person, and not the *active exercise thereof*."[8]  "Allegations of influence
are not the same as the power to direct the management and policies of the primary
violator."[9]  "Status of defendants as directors, 'standing alone, is insufficient to
establish their control.'"[10]

"Allegations of control are not averments of fraud and therefore need
not be pleaded with particularity."[11]  Thus, "'[a]t the pleading stage, the extent to
which the control must be alleged will be governed by Rule 8's pleading
standard.'"[12]  "In the Second Circuit, 'the control person provisions are broadly

---

[8]    *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y.
2006) (emphasis added and quotation marks omitted).

[9]    *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618, 645
(S.D.N.Y. 2004).

[10]    *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
No. 05 Civ. 1898, 2005 WL 2148919, at *7 (S.D.N.Y. Sept. 6, 2005) (quoting *In re
Philip Serv. Corp. Sec. Litig.*, No. 98 Civ. 0835, 2004 WL 1152501, at *19
(S.D.N.Y. May 24, 2004)) (citations omitted).  *Accord Alstom*, 406 F. Supp. 2d at
494 (S.D.N.Y. 2005) ("status as officer or committee member is generally not
enough to constitute control"); *Food & Allied Serv. Trades Dep't, AFL-CIO v.
Millfield Trading Co.*, 841 F.Supp. 1386, 1391 (S.D.N.Y. 1994) ("While courts in
this circuit have not always agreed on just how much beyond status as a director
must be alleged to plead a Section 20(a) claim . . . they have agreed that a bare
allegation of director status, without more, is insufficient.").

[11]    *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[12]    *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 385
(S.D.N.Y. 2007) (quoting *Parmalat*, 414 F. Supp. 2d at 440).  *Accord In re
Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14
(S.D.N.Y. Dec. 28, 2006); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392,

construed as they were meant to expand the scope of liability under the securities laws.'"[13]  "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."[14]

    **B.**    *Respondeat Superior* **Liability**[15]

        "*Respondeat superior* imposes liability upon a principal for the torts of [its] agent committed within the scope of their agency relationship."[16]  A principal-agent relationship "is created when [1] one party consents to have

---

415-16 (S.D.N.Y. 2003).

      [13]    *CompuDyne*, 453 F. Supp. 2d at 829 (quoting *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) (internal quotation marks omitted)).

      [14]    *Id.  Accord In re Scottish Re*, 524 F. Supp. 2d at 401.

      [15]    "Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quotation marks omitted).  *See, e.g.*, *Gabriel Capital L.P. v. Natwest Fin., Inc.*, 122 F. Supp. 2d 407, 432 (S.D.N.Y. 2000).  Because Delaware is the state of Anadarko's incorporation, I apply Delaware law to determine whether it may be held liable for the acts of its subsidiary.

      [16]    *Khanna v. McMinn*, No. Civ.A. 20545-NC, 2006 WL 1388744, at *28 (Del. Ch. May 9, 2006) (quotation marks omitted).  *Accord General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 392 (1982) ("The doctrine of respondeat superior . . . enables the imposition of liability on a principal for the tortious acts of his agent . . . ."); *Gratsy v. Michail*, No. Civ.A. 02C-05-89, 2004 WL 396388, at *2 (Del. Super. Ct. Feb. 24, 2004) ("In Delaware, a parent corporation can be held liable for its subsidiary's actions when the subsidiary is acting as the agent for the principal parent corporation, even when there is no fraud or inequity.").

another act on its behalf, [2] with the principal controlling and directing the acts of the agent."[17]  "Under the rubric of agency liability, there are two main theories – actual authority and apparent authority. . . .  Actual authority is that authority which a principal expressly or implicitly grants to an agent. . . .  Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing."[18]

"Under the agency theory, the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary. . . .  The parent corporation will be held liable for the activities of the subsidiary only if the

---

[17]     *Cochran v. Stifel Fin. Corp.*, No. Civ.A. 17350, 2000 WL 286722, at *17 (Del. Ch. Mar. 8, 2000) (quotation marks and citation omitted), *aff'd in part, rev'd in part on other grounds*, 805 A.2d 555 (Del. 2002).  This comports with the standard under federal common law.  *See In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 272 (S.D.N.Y. 2009) ("Under federal common law, the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.") (quotation marks and citation omitted).

[18]     *Albert v. Alex. Brown Mgmt. Servs., Inc.*, Nos. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *10 (Del. Ch. Aug. 26, 2005).

parent dominates those activities."[19]  "[W]hile one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation – completely independent of a second corporation – may assume the role of the second corporation's agent in the course of one or more specific transactions."[20]  "Circumstantial evidence of a principal-agent relationship includes the exclusive dedication of a subsidiary to assisting the parent company, payment of the subsidiary's expenses by the parent company, and requests for approval of the parent company for important decisions by the subsidiary."[21]  "The level of control necessary to form a principal-agent relationship between a parent company and subsidiary defies resolution by mechanical formula[e], for the inquiry is inherently fact-specific."[22]

---

[19]     *Gratsy*, 2004 WL 396388, at *2 (quotation marks and citation omitted).

[20]     *Alex. Brown*, 2005 WL 2130607, at *9.  *Accord Apartheid*, 617 F. Supp. 2d at 272 ("'[A] parent corporation is not liable for acts of its subsidiaries simply because it owns the subsidiary's stock.'") (quoting Restatement (Third) of Agency § 1.01 cmt. f(2)).

[21]     *Apartheid*, 617 F. Supp. 2d at 272-73.  *Compare Fletcher*, 68 F.3d at 1461-62 ("The presence of a parent's logo on documents created and distributed by a subsidiary, standing alone, does not confer authority upon the subsidiary to act as an agent.").

[22]     *Apartheid*, 617 F. Supp. 2d at 272 (quotation marks omitted).  *Accord Cochran*, 2000 WL 286722, at *17 ("Under Delaware law, [t]he determination of whether an agency relationship exists is normally a question of fact.") (quotation

### C.    Successor-in-Interest Liability

"[A] corporation acquiring the assets of another does not succeed to the liabilities of the successor corporation except where (1) the successor expressly or impliedly assumed the liability; (2) there was a de facto merger of the successor and predecessor; (3) the successor was a mere continuation of the predecessor; or (4) the transaction was fraudulent."[23]  The fraud exception applies only where "the transaction is fraudulent and intended to provide an escape from liability."[24] Federal Rule of Civil Procedure 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[25]

## III.    DISCUSSION

### A.    KMG: Control Person Liability After March 31, 2006

---

marks omitted).

[23]     *New York v. National Serv. Indus., Inc.*, 380 F. Supp. 2d 122, 128 (E.D.N.Y. 2005) (quotation marks and citations omitted).  *Accord Great Am. Ins. Co. of N.Y. v. TA Operating Corp.*, No. 06 Civ. 13230, 2008 WL 1848946, at *3 (S.D.N.Y. Apr. 24, 2008) (citing *Polius v. Clark Equip. Co.*, 802 F.2d 75, 78 (3d Cir. 1986)) (applying Delaware law); *United States v. Chrysler Corp.*, Nos. 88 Civ. 341, 88 Civ. 534, 1990 WL 127160, at *4 (D. Del. Aug. 28, 1990); *Rohn Indus. Inc. v. Platinum Equity LLC*, 887 A.2d 983, 996 (Del. Super. Ct. 2005), *rev'd on other grounds*, 911 A.2d 379 (Del. 2005)).

[24]     *Polius*, 802 F.2d at 78.

[25]     Fed. R. Civ. P. 9(b).

In *Tronox I*, I dismissed plaintiffs' claim that "KMG (and, by extension, KMG's officers) retained control of Tronox after March 31, 2006."[26] Plaintiffs had argued that, despite the fact that Tronox became an independent company on April 1, 2006, "KMG retained control after March 31, 2006 by virtue of the Master Separation Agreement ["MSA"]."[27]  This argument, I found, "fail[ed] as a result of plaintiffs' own allegations."[28]  In particular, plaintiffs had alleged that a condition in the MSA – under which KMG was only responsible for partially reimbursing Tronox for environmental costs after Tronox had already "paid above the amount reserved for specified sites"[29] – rendered the indemnification illusory because "the Chemical Business [did] not have sufficient cash flow to spend the reserved amounts and thus qualify for indemnification."[30]  Reasoning that "it is not plausible to think that Tronox was controlled by an indemnification it could not receive," I held that "this condition in the [MSA] cannot form the basis for plaintiffs' allegation of control."[31]  However, I granted plaintiffs leave to replead

---

[26]     2010 WL 2835545, at *14.

[27]     *Id.*

[28]     *Id.*

[29]     CAC ¶ 87.

[30]     *Id.*

[31]     *Tronox I*, 2010 WL 2835545, at *14.

their control claims based on misstatements made after Tronox's Spin-Off, "to the extent they are able to allege facts, other than the existence of the [MSA], that create a plausible inference that KMG controlled Tronox after March 31, 2006."[32]

Based on "newly discovered information gleaned from Tronox's bankruptcy case that Tronox had received some reimbursement [from KMG] pursuant to the MSA,"[33] plaintiffs have removed from their complaint the allegation that indemnification under the MSA was "illusory."  Therefore, the grounds on which I previously dismissed plaintiffs' control claims after March 31, 2006, no longer support their dismissal.  I now find that the FAC's more fulsome allegations, based on several additional provisions of the MSA and supporting confidential witness ("CW") information,[34] adequately plead that KMG had "actual control over the transaction in question"[35] – namely, Tronox's failure to record

---

[32]     *Id.*

[33]     Plaintiffs' Memorandum of Law in Opposition to KMG's and KMG Officers' Motion to Dismiss ("Pl. Opp. Mem. to KMG Mem.") at 3 n.6.  *See* FAC ¶ 49 n.5.

[34]     The confidential witnesses on whose reports plaintiffs base their allegations occupied positions providing them with personal knowledge as to the facts they reported.  *See, e.g.*, *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009).

[35]     *Alstom*, 406 F. Supp. 2d at 487 (S.D.N.Y. 2005) (quotation marks omitted).

reserves for environmental remediation costs and tort claim liabilities that were

both probable and reasonably estimable in violation of Generally Accepted

Accounting Principles ("GAAP") after March 31, 2006.[36]

      *First*, under the terms of the MSA, KMG had no reimbursement

obligation for environmental liabilities without KMG's prior written consent to any

material change made by Tronox which increased any reserve amount by $2.5

million or more, or if Tronox established any reserve for a site where none had

been previously recorded.[37]  "In other words, to the extent that KMG had itself

understated the environmental remediation reserves for the sites it transferred to

Tronox in connection with the Tronox IPO, KMG ensured that those reserves

would continue to be [publicly] understated by Tronox."[38]

      *Second*, the MSA *required* Tronox to adopt and use KMG's flawed

reserve methodologies for the same remediation sites that were transferred to

---

[36]    The MSA has a term of seven years, fully encompassing the Class Period.  *See* FAC ¶ 48.

[37]    *See* FAC ¶ 51; 10/24/05 Master Separation Agreement between Kerr-McGee Corporation and Tronox, Inc. ("MSA"), Exhibit A to 9/20/10 Declaration of Solomon B. Cera, counsel to plaintiffs, in Support of Pl. Opp. Mem. to KMG Mem., at 20.

[38]    Pl. Opp. Mem. to KMG Mem. at 3.  *See also* FAC ¶ 133 ("The terms of the [MSA] effectively precluded Tronox from changing reserving methodologies by placing at risk [KMG's] indemnity if it did so.").

Tronox[39] – the same improper reserving methodologies that formed the basis for this Court's finding that plaintiffs' primary securities fraud claims against Tronox could proceed.  According to plaintiffs, "one Tronox senior manager believed that he could not change the method by which Tronox would [determine] environmental reserves – which was the practice used by [KMG] and approved by [Ernst & Young, LLP] – or the company risked losing whatever indemnity it had."[40] Plaintiffs' theory that KMG controlled Tronox through the MSA is bolstered by the allegation that KMG "imposed" the MSA on Tronox and "unilaterally determined" its content – including "a highly unusual provision" that required *Tronox* to indemnify *KMG* for any material misstatements in the Tronox IPO

---

[39]     *See* FAC ¶ 52; MSA at 46 ("All information provided by any Tronox Group member . . . filed with the [SEC] . . . will be consistent in terms of detail and otherwise with Parent's [KMG's] policies with respect to the application of GAAP and practices in effect on the Effective Date [of the MSA] . . . ."); FAC ¶ 133 (showing that Tronox's environmental remediation reserve balances from December 31, 2004, through September 30, 2008 (1) fluctuated little and (2) were consistent with the reserve balances of KMG's "Chemicals Segment" in years 2002-2004 (i.e., prior to the Spin-Off).

[40]     FAC ¶ 109.  "One can plausibly infer that the reason KMG imposed this provision on Tronox was to ensure that there would be no disclosure by Tronox of KMG's historically improper reserving practices.  Any such disclosure would have unraveled the entire Tronox transaction and revealed it to be, as alleged, a fraud on the public investors in Tronox."  Pl. Opp. Mem. to KMG Mem. at 3 n.5.

Registration Statement.[41]

*Third*, no later than eight business days following the end of each quarter, but prior to the public announcement of Tronox's financial results in an SEC filing or press release, Tronox was required to provide KMG with reserve estimates and any changes in reserve estimates, for the purposes of obtaining KMG's comments and approval prior to filing.[42]  The MSA also required Tronox to deliver to KMG – no later than ten business days prior to filing a 10-Q and twelve business days prior to filing a 10-K – drafts of any discussion or analysis of contingent obligations to pay environmental recovery costs (as defined in the MSA) in order to obtain KMG's comments and approval.[43]  KMG "made extensive revisions" to drafts of certain "notification letters" provided by Tronox pertaining to environmental reserve issues, was "constantly concerned with limiting assumable liabilities," and "made changes to the drafts that were ultimately incorporated."[44]  Tronox employees who interacted with KMG were "constantly frustrated with the numerous changes made to the drafts but were powerless to

---

[41]     FAC ¶ 421.

[42]     *See id.* ¶¶ 48, 54; MSA at 18-19.

[43]     *See* FAC ¶ 54; MSA at 22.  Final versions of such filings were to be delivered to KMG "in form and substance satisfactory to Parent."  *Id.* at 42-43, 44.

[44]     FAC ¶ 56.

avoid them."[45]

*Fourth*, KMG and Tronox were "in regular communication."[46]  They conducted "Quarterly Meetings" to "discuss remediation activities with respect to Former Operations, *reserve estimates* and matters giving rise to changes in reserves."[47]  These meetings were to be conducted prior to Tronox's delivering reserve estimates and any changes thereto to KMG.[48]  According to plaintiffs, a Vice-President of Governmental Affairs for Tronox "recalled having numerous conversations while at Tronox with [KMG] and Anadarko personnel in 2006, 2007, and 2008 regarding [KMG's] and then Anadarko's continuous attempts to influence the reserving process."[49]

These allegations support the plausible inference that  KMG "controlled the dissemination of the statements in the [SEC filings] that plaintiff[s]

---

[45]    *Id.*

[46]    FAC ¶ 50.

[47]    MSA at 19 (emphasis added).

[48]    *See* FAC ¶ 49.

[49]    *Id.* ¶ 57.  *See also id.* (alleging that Tronox "took direction from [KMG] on what legal positions it would take in response to claims made by citizens alleging injury from environmental pollution" and "was required by [KMG] to adopt these positions as its own and did so").

allege[] were materially false or misleading."[50]  For example, it is plausible that

through the Quarterly Meetings, KMG ensured that Tronox was responding as

intended to the MSA's strong incentives to understate reserves,[51] and that it had the

power not only to "influence" Tronox, but to "direct [its] management and

policies."[52]  Defendants argue that any interaction between KMG and Tronox

pursuant to the MSA related solely to whether Tronox would receive any

reimbursement from KMG, and reflected no involvement in the amount of reserves

Tronox would publicly report.[53]  Discovery may prove them right, but plaintiffs'

---

[50]     *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 468-69 (S.D.N.Y. 2005) (suggesting such allegations would state a claim under Section 20(a)).  *Accord Anwar*, 2010 WL 3341636, at *40 (plaintiffs stated a claim under Section 20(a) where plaintiffs alleged that "Citco Group controlled the 'content and dissemination of the statements that were false and misleading' and 'is presumed to have had the power to control or influence the false statements giving rise to the securities violations' committed by the Citco Administrators") (quoting pleadings) (citations omitted).

[51]     See *Tronox I*, 2010 WL 2835545, at *10, *11, *14 n.198.

[52]     *Fezzani*, 384 F. Supp. 2d at 645.  The fact that Tronox was also required to obtain KMG's advance written consent for testing, investigation, and sampling at, or any change to, any remediation site – "necessary and fundamental steps to properly establishing reserves" – and that KMG personnel were to be *physically present* only bolsters this inference.  Pl. Opp. Mem. to KMG Mem. at 3. *See also* FAC ¶ 53.

[53]     *See* KMG's and KMG Officers' Reply to Plaintiffs' Memorandum in Opposition to KMG's and KMG Officers' Motion to Dismiss ("KMG Reply Mem.") at 3 ("Plaintiffs' argument amounts, at most, to an assertion that KMG had an opportunity to discuss Tronox's reserves before they were finalized."); *id.* at 2;

allegations now support the plausible inference that such interactions facilitated and enabled KMG's control of Tronox's reserve reporting.  As plaintiffs explain, the reimbursement provisions of the MSA "directly implicate reserves, regardless of whether they also relate to reimbursement calculations."[54]  The fact that the MSA did not "give KMG the right to determine what the reserve estimates would be"[55] does not undermine plaintiffs' argument that the MSA was written and implemented in such a way that KMG had the power to effectively control Tronox's reserve estimates without explicitly doing so.  That section 2.5(i) of the MSA "self-servingly recites that KMG's role in receiving notice, monitoring, overseeing, and providing consent, relate to whether KMG is obligated to provide reimbursement"[56] is entirely consistent with the "gravaman" of plaintiffs' complaint: "that KMG and others engaged in a deliberate fraud whereby KMG ridded itself of the Legacy Liabilities by transferring them to Tronox and in turn controlled Tronox's management and reporting of these obligations through the

---

KMG's and KMG Officers' Memorandum of Law in Support of Motion to Dismiss ("KMG Mem.") at 4.

[54]     Pl. Opp. Mem. to KMG Mem. at 7-8.  *See also id.* at 9 n.11 ("One cannot reasonably separate the issue of reimbursement obligations from involvement in setting the reserves.  The two are inextricably linked.").

[55]     KMG Mem. at 4.

[56]     Pl. Opp. Mem. to KMG Mem. at 9 n.11.

MSA and otherwise."[57]

## B.      Anadarko

### 1.      Control Person Liability After March 31, 2006

Anadarko argues that "Plaintiffs' Section 20(a) claim against

Anadarko runs afoul of the undisputed fact that Anadarko is not even a party to the

MSA, the document Plaintiffs contend provided KMG with the ability to exercise

control over Tronox after the Spin-Off."[58]  However,  plaintiffs have alleged that

not only KMG, but also Anadarko, were "deeply involved in the process of

determining Tronox's remediation obligations and reserves, the core of the fraud

alleged in the FAC."[59]  Indeed, plaintiffs allege virtually identical involvement of

KMG and Anadarko in the implementation of the MSA.[60]  Moreover, Anadarko

represented in its 2006 and 2007 Annual Reports that "'[a]s a result of the merger,

we will be responsible to provide reimbursements to Tronox pursuant to the

[MSA], and we may be subject to potential joint and several liability, as the

---

[57]      *Id.* at 10.

[58]      Anadarko's Reply to Plaintiffs' Memorandum in Opposition to
Anadarko's Motion to Dismiss ("Anadarko Reply Mem.") at 5.

[59]      Plaintiffs' Memorandum of Law in Opposition to Anadarko's Motion
to Dismiss ("Pl. Opp. Mem. to Anadarko Mem.") at 9.

[60]      *See* FAC ¶¶ 48-59.

successor to [KMG], if Tronox is unable to perform certain remediation obligations.'"[61]  According to plaintiffs, as of June 29, 2010, and "pursuant to the [MSA]," Anadarko had paid Tronox approximately $4.1 million in environmental response costs, and it has reserved approximately $96 million in remaining reimbursement obligations.[62]  Moreover, during a conference call on February 3, 2008, defendant Adams – then-CEO of Tronox – stated that, "under the [MSA], we continually have dialogues with Anadarko concerning our ongoing programs and legacy environmental [sic] . . . [W]e work with [Anadarko] continuously."[63]  Together these allegations support an inference that Anadarko was deeply involved in Tronox's day-to-day operations[64] as they pertained to the transaction at issue –

---

[61]      *Id.* ¶ 127 (quoting Annual Reports).

[62]      *See id.* ¶ 49 n.5.  *See also id.* ¶ 270 (quoting defendant Adams' statement, during the third quarter of 2007, that Tronox pursued "Anadarko reimbursements").

[63]      *Id.* ¶ 58.

[64]      *See Anwar*, 2010 WL 3341636, at *40 (defendant's oversight of "day-to-day operations" made it "at least plausible that [defendant] exerted actual control over the fraudulent transaction at issue."); *Cornwell v. Credit Suisse Group*, 689 F. Supp. 2d 629, 639 (S.D.N.Y. 2010) (control sufficiently alleged "[b]y virtue of [defendants'] 'direct and supervisory involvement in the day-to-day operations of'" primary violator); *In re Refco, Inc. Sec. Lit.*, 503 F. Supp. 2d 611, 660-63 (S.D.N.Y. 2007) (plaintiffs stated a Section 20(a) claim where defendants were allegedly "'deeply involved in the day-to-day management'"); *In re Scottish Re*, 524 F. Supp. 2d at 401.

Tronox's reporting of reserves – and provide Anadarko with "fair notice"[65] of the

control claim against it.[66]

### 2. Respondeat Superior Liability

Plaintiffs also seek to establish Anadarko's liability on the basis of

*respondeat superior* for KMG's primary violation "in controlling the reporting of

Tronox's reserves."[67]  Plaintiffs articulate their theory of *respondeat superior*

liability in their Opposition brief:

> Anadarko is properly alleged to be responsible for the tortious acts
> of its agent, KMG, in controlling the reporting of Tronox's
> reserves.  The confidential witness allegations, and public
> statements of Tronox's CEO show that, following the merger,
> Anadarko allowed KMG to interact with Tronox in addressing the
> issues regarding Tronox's environmental reserves and remediation
> costs, including issues arising under the MSA.  Anadarko at all
> times maintained control over these activities, especially in light
> of its acknowledged responsibility, as KMG's successor, to pay

---

[65]     *In re Scottish Re*, 524 F. Supp. 2d at 386.

[66]     Plaintiffs' allegations also support the inference that KMG and
Anadarko consciously engaged in a cover-up so that the control they exercised
over Tronox could not be revealed.  *See* FAC ¶ 55.  For example, based on
information obtained from "CW 15," a Vice-President of Safety & Environmental
Affairs, KMG and Anadarko made it a point to refrain from generating any
documents that might appear to confirm their exercise of control.  *See id; see also
id.* ¶ 56 (alleging that senior KMG and Anadarko personnel issued a directive to
Tronox to avoid creating a record of revisions made to the notification letters so as
to limit any documentation that showed KMG's and Anadarko's control of
Tronox).

[67]     Pl. Opp. Mem. to Anadarko Mem. at 10.

any remediation obligations which Tronox could not satisfy.[68]

Anadarko argues that the paragraphs of the FAC on which this argument is based

"relate only to KMG's alleged 'ability to exercise control' over *Tronox* – not to

Anadarko's relationship to KMG."[69]  Instead, "the sole bases for Plaintiffs'

allegation of a principal-agent relationship between Anadarko and KMG [in the

FAC] are (i) Anadardo and KMG's 'parent-subsidiary relationship' and (ii) 'the

merger agreement dated as of June 22, 2006'"[70] – allegations insufficient to allege

the existence of a principal-agent relationship.[71]

---

[68]    *Id.*

[69]    Anadarko Reply Mem. at 5.

[70]    Anadarko's Memorandum of Law in Support of Motion to Dismiss ("Anadarko Mem.") at 10 (quoting FAC ¶ 424).

[71]    *See id.* at 9.  Anadarko also moves to strike the *respondeat superior* allegations as barred by my order in *Tronox I* granting plaintiffs leave to replead "their allegations relating to the claim that Anadarko is liable as a successor-in-interest to KMG."  *Tronox I*, 2010 WL 2835545, at *16.  *See* Anadarko Mem. at 8-9; Anadarko Reply Mem. at 4 n.6.  Although "successor-in-interest liability and the doctrine of *respondeat superior* are distinct theories of liability," Anadarko Mem. at 4 n.6, plaintiffs correctly note that their *respondeat superior* claims are "an adjunct to the successor-in-interest claim," Pl. Opp. Mem. to Anadarko Mem. at 9 n.10.  *See Tronox I*, 2010 WL 2835545, at *8 n.120 (categorizing *respondeat superior* as one "theory of vicarious liability").  Therefore, I deny Anadarko's motion to strike these allegations.  *See Iliano v. Mineola Union Free School Dist.*, 585 F. Supp. 2d 341, 357 (E.D.N.Y. 2008) ("Motions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so.") (quotation marks and citation omitted).

Although plaintiffs' *argument for* liability based on *respondeat superior* may not be fully articulated in the FAC, they have "pl[ed] facts giving rise to a plausible inference that [KMG] possesses either actual or apparent authority to act on behalf of [Anadarko]."[72]  Specifically, plaintiffs' allegations regarding the MSA and its implementation render plausible (1) that Anadarko consented to KMG's acting on its behalf in implementing the terms of the MSA and (2) that Anadarko controlled and directed KMG's actions.[73]

*First*, plaintiffs' allegations support the inference that KMG was acting on Anadarko's behalf, with Anadarko's consent, in implementing the terms of the MSA.  Given – as defendant notes – that "Anadarko is not even a party to the MSA,"[74] Anadarko's assumption of responsibility for KMG's reimbursement obligations *pursuant to* the MSA[75] raises the plausible inference that Anadarko consented to KMG's *acting on its behalf* in implementing the MSA's terms.  Stated in terms of apparent authority, in light of Anadarko's "acknowledged responsibility, as KMG's successor, to pay any remediation obligations which

---

[72]   Anadarko Mem. at 9 (explaining what plaintiffs must plead to survive a motion to dismiss their claim for *respondeat superior* liability).

[73]   *See Cochran*, 2000 WL 286722, at *17.

[74]   Anadarko Reply Mem. at 5.

[75]   *See* FAC ¶¶ 49 n.5, 127, 128.  *See also* discussion *supra* Part III.B.1.

Tronox could not satisfy,"[76] KMG "[held] itself out as possessing"[77] the authority to act on Anadarko's behalf in implementing the terms of the MSA.

          *Second*, plaintiffs have adequately alleged that Anadarko controlled and directed KMG's actions in implementing the terms of the MSA.  Plaintiffs have alleged Anadarko's "deep involvement . . . in the reserving process following its acquisition of [KMG] in August 2006."[78]  That these allegations support the plausible inference that *KMG* controlled *Tronox* does not preclude a finding, at the motion to dismiss stage, that Anadarko also controlled and directed KMG.  Given that Anadarko is not even a party to the MSA, Anadarko's "continuous attempts to influence the reserving process"[79] would necessarily result from its control and direction of KMG, the party to whom Tronox was required to deliver quarterly and annual reports and other public filings "in form and substance satisfactory to [KMG]."[80]  Moreover, the statement by Adams during the February 2008

---

[76]     Pl. Opp. Mem. to Anadarko Mem. at 10.

[77]     *Alex. Brown*, 2005 WL 2130607, at *10.

[78]     FAC ¶ 58.  *See* discussion *supra* Part III.B.1.  *See, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *13 n. 14 (S.D.N.Y. 2002) ("By involving themselves directly in [the subsidiary's] activities, and by directing these activities, [the parent companies] made [their subsidiary] their agent with respect to the torts alleged in the complaint.").

[79]     FAC ¶ 57.

[80]     MSA at 42-43, 44.

conference call – that "*under the [MSA]*, we continually have dialogues with Anadarko concerning our ongoing programs and legacy environmental [sic] . . . . [W]e work with [Anadarko] continuously"[81] – it is plausible that Anadarko not only controlled Tronox, but also directed and controlled KMG in the implementation of the MSA.  For these reasons, Anadarko's motion to dismiss plaintiffs' *respondeat superior* claim is denied.

### 3.   Successor-in-Interest Liability

#### a.   Express or Implied Assumption of KMG's Liabilities

The FAC adds no material allegations on which to sustain plaintiffs' claim that Anadarko expressly or impliedly assumed KMG's liability for securities fraud actions relating to the Tronox IPO.  Instead, the claim remains entirely based on (1) Anadarko's acknowledgment of its potential liability as a successor-in-interest to KMG for environmental remediation costs[82] and (2) Anadarko's contractual agreement, together with KMG, to indemnify KMG's officers and directors for their acts or omissions occurring before the acquisition date.[83]  These allegations fail to state a claim for successor liability based on express or implied

---

[81]   FAC ¶ 58.

[82]   *See id.* ¶ 128.

[83]   *See id.* ¶ 66.

assumption of liabilities.[84]

### b.     Fraud

Plaintiffs now claim that

> Anadarko is liable as a successor-in-interest to KMG because its
> merger with that company constituted the culmination of the fraud
> alleged in the FAC whereby the Legacy Liabilities were excised
> out of KMG and transferred to Tronox, for the purpose of
> allowing Anadarko to acquire KMG free and clear of such
> obligations.  These transactions . . . were part of a deliberate plan,
> scheme, and artifice to defraud whereby the Legacy Liabilities
> were imposed on the public shareholders of Tronox without
> disclosure of their true magnitude and with the goal of KMG and
> Anadarko fraudulently escaping these liabilities.[85]

Anadarko moves to dismiss this claim on the grounds that plaintiffs

have "improperly conflated the merger with the IPO and Spin Off":[86] because the

Legacy Liabilities were allegedly transferred to Tronox prior to the merger,

Anadarko argues, the merger was not the "final step" in escaping the obligations

arising from the Legacy Liabilities.[87]  I agree.  Plaintiffs' allegations do not support

---

[84]     *See Tronox I*, 2010 WL 2835545, at *15-16; *Great Am. Ins. Co. of
N.Y.*, 2008 WL 1848946, at *4 ("[T]he fact that the defendants agreed to indemnify
each other does not lead to the conclusion that the [parent] agreed to assume any
additional liabilities.").

[85]     Pl. Opp. Mem. to Anadarko Mem. at 3-4.

[86]     Anadarko Mem. at 6.

[87]     *Id.* at 2.

an inference that *Anadarko's acquisition of* KMG – the "transaction" at issue in this claim – was "fraudulent and intended to provide an escape from liability."[88] The fact that "Anadarko . . . knew that KMG had gone from billions of dollars in environmental remediation liabilities to effectively zero in a very short timeframe"[89] or that "[a]bsent KMG's ability to represent it had no or limited exposure, the merger would not have occurred"[90] does not support a theory that the *merger* was fraudulent.[91]  This is because the "merger by which a so-called 'clean' KMG became a subsidiary of Anadarko could not possibly have 'provide[d] an escape from' the so-called 'Legacy Liabilities,' as the merger did not affect the ownership of those liabilities . . . in the first place."[92]  Therefore, Anadarko's motion to dismiss plaintiffs' claim for successor liability is granted.

## C.  KMG Officers: Control Person Liability

In Count IV of the FAC, plaintiffs allege that Corbett (for the entire

---

[88]   *Polius*, 802 F.2d at 78.

[89]   Pl. Opp. Mem. to Anadarko Mem. at 5.

[90]   *Id.* at 6.

[91]   *See Sunnyside Dev. Co. v. Opsys Ltd.*, No. C 05 0553, 2007 WL 2462142, at *2, *11 (N.D. Cal. Aug. 29, 2007) (fraud exception did not apply where acquiror "made it clear to [seller] that it had no interest in the California assets and business, and that any deal would require a clean separation of the U.S. operations from the UK operations" that the buyer purchased).

[92]   Anadarko Mem. at 6 (quoting *Polius*, 802 F.2d at 78).

Class Period), Wohleber (through August 10, 2006), and Pilcher (through August 10, 2006) "were controlling persons of Tronox and the officers of Tronox . . . within the meaning of Section 20(a) of the Exchange Act."[93]  As support for that claim, they allege that Corbett, Wohleber, and Pilcher, along with KMG, "devised and effectuated the fraudulent scheme and course of conduct alleged herein"; "created the plan to remove the Legacy Liabilities from [KMG] and place them into Tronox without making full and adequate disclosure[s]"; "planned and effectuated [KMG's] extrication from further association with Tronox except through a modest indemnification obligation reflected in the [MSA], by completing the Spin-Off"; "unilaterally determined the content of all material agreements between [KMG] and Tronox and dictated the terms of the transactions described hereinabove"; and "imposed" the MSA on Tronox.[94]

Building on these allegations, plaintiffs argue that, as senior officers of (and/or general counsel for) KMG from March 31, 2006, to August 10, 2006 – when KMG controlled Tronox by virtue of the MSA[95] – Corbett, Wohleber, and

---

[93]     FAC ¶¶ 420-421.

[94]     *Id.* ¶ 421.

[95]     *See* discussion *supra* Part III.A.

Pilcher "continued to exercise control over Tronox."[96]  Plaintiffs assert that these

senior officers "can be presumed to have received reports regarding Tronox's

ongoing environmental remediation work, the setting of the reserves, and to have

directed KMG's positions vis-a-vis Tronox."[97]  Because they were "responsible for

and had knowledge of KMG's financial reporting, which included the

reimbursement obligations and related amount of Tronox reserves," they controlled

this aspect of Tronox's financial reporting "inasmuch as KMG" did.[98]

> Corbett and Pilcher now move to dismiss Count IV in full,[99] and

Wohleber moves to dismiss Count IV for the period after March 31, 2006.[100]  As an

initial matter, I note that although the KMG Officers' motion divides the Class

Period into three distinct periods of time for the purpose of analyzing plaintiffs'

---

[96]  Pl. Opp. Mem. to KMG Mem. at 9.

[97]  *Id.*

[98]  *Id.*

[99]  From November 21, 2005 through August 10, 2006, Corbett was the Chairman and CEO of KMG; Pilcher served as Senior Vice President, Secretary, and General Counsel of KMG.  *See id.* ¶¶ 37-38.

[100]  Wohleber served as Chariman of the Board and a Director of Tronox from November 21, 2005 through March 31, 2006, during which time he signed various Tronox SEC filings.  *See id.* ¶ 34.  Wohleber does not move to dismiss plaintiffs' control allegations against him from the IPO to the Spin-Off, focusing instead on the later time, when he served solely as an officer of KMG (Senior Vice President and Chief Financial Officer).  *See id.*

control allegations – the time periods (1) between the IPO and the Spin-Off, (2)

between the Spin-Off and the Merger, and (3) after the Merger – plaintiffs make

little distinction among these time periods.  Below, I address in turn (1) the period

of time from the IPO to the Merger and (2) the period of time after the Merger.

### 1. Control Person Liability from November 21, 2005 to March 31, 2006 (Corbett and Pilcher) and from April 1, 2006 to August 10, 2006 (Corbett, Pilcher, and Wohleber)[101]

Defendants argue that Corbett's and Pilcher's "role as officers of

KMG between the time of Tronox's IPO and Spin-Off" – a period of time during

which plaintiffs have alleged *KMG* controlled Tronox[102] – "does not amount to an

_____

[101]    Plaintiffs assert that "Wohleber, Corbett, and Pilcher have been
properly alleged to be control persons of Tronox through March 31, 2006," citing
*Tronox I*, 2010 WL 2835545, at *14.  However, "[t]he only 'control' issue raised
in the [last round of] motions to dismiss [was] whether KMG (and by extension,
KMG's officers) retained control of Tronox *after March 31, 2006*."  *Id.* (emphasis
added).  Moreover, the KMG Officers had relied on plaintiffs' purported failure to
allege a primary violation to argue, in their first motion to dismiss, that I should
dismiss plaintiffs' control allegations.  *See* 1/19/10 KMG Officers' Memorandum
of Law in Support of Motion to Dismiss (Docket No. 69) at 14.  Thus, because I
did not specifically address whether plaintiffs had adequately pled control of
Tronox by Wohleber, Corbett, and Pilcher before March 31, 2006, I now consider
Corbett's and Pilcher's argument as it pertains to that time period.

[102]    KMG does not now argue that plaintiffs have failed to state a claim
that KMG controlled Tronox from the IPO to the Spin-Off.  There is no question
that plaintiffs have made such allegations.  *See* 2/26/10 Plaintiffs' Memorandum in
Opposition to KMG's, Anadarko's, and the Individually Named Defendants'
Motion to Dismiss (Docket No. 78) at 48 n.57 ("KMG's control over Tronox prior
to March 31, 2006, is evidenced by the fact that, among other things, KMG: (1)
planned and effectuated the fraudulent IPO scheme alleged in the Complaint; (2)

allegation of control under Section 20"[103] because

> [t]here are no allegations that [from November 21, 2005, to March 31, 2006] either Corbett or Pilcher owned a controlling amount of Tronox voting shares, were officers or directors of Tronox, were involved in the day-to-day activities of Tronox, or signed any of Tronox's filings.  More specifically, there is no allegation that Corbett or Pilcher were involved in Tronox's reserve-setting process or the management of Tronox.[104]

Therefore, according to defendants, plaintiffs' control claims boil down to mere assertions of Corbett's and Pilcher's "status" as officers of KMG, which is "generally not enough to constitute control."[105]

Defendants similarly argue that plaintiffs' control argument for the period from March 31, 2006 to August 10, 2006, is a concession that their claim against Corbett, Pilcher, and Wohleber is based solely "'on [their] status as []

---

owned 88.7% of the total voting power of all classes of Tronox stock, including 56.7% of the outstanding Tronox Class B shares; (2) received $804 million of the $844 million in proceeds and secured credit facility monies raised through the IPO; (3) assigned two of its executives, Defendants Rauh and Wohleber, to Tronox's Board of Directors; and (4) had complete control over the [MSA].") (citations omitted); FAC ¶ 46 ("'Upon the closing of this [IPO], . . . [KMG] will be able to control, directly or indirectly . . . all matters affecting us . . . .'") (quoting Tronox's Registration Statement and Prospectus).

[103]   KMG Mem. at 10.

[104]   *Id.*

[105]   *Alstom*, 406 F. Supp. 2d at 494.  *See* cases cited *supra* note 10.

officer[s] of KMG.'"[106]  Defendants argue that, because plaintiffs never suggest

that unidentified KMG "personnel" or "employees" involved in the

implementation of the MSA "included any of the named individual defendants,"

plaintiffs "do not and cannot assert that [Corbett, Pilcher, or Wohleber] had any

hand in alleged exercises of control by KMG," rendering their control claims

"impermissibly tertiary."[107]

It is true that plaintiffs have not explicitly alleged the quintessential

markers of control against Corbett, Pilcher, and Wohleber.  For example, there is

no allegation that from November 21, 2005 through March 31, 2006, either Corbett

or Pilcher signed Tronox's allegedly fraudulent public filings,[108] or that any of the

KMG Officers were directly involved in Tronox's day-to-day operations.[109]

However, in light of plaintiffs' allegations (1) that Corbett, Pilcher, and Wohleber

---

[106]     KMG Reply Mem. at 4 (quoting Pl. Opp. Mem. to KMG Mem. at 9).

[107]     *Id.* at 5.

[108]     *See Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374, 1999
WL 101772, at *17 (S.D.N.Y. Mar. 1, 1999) (it "comport[s] with common sense to
presume that a person who signs his name to a report has some measure of control
over those who write the report").  *See also In re Scottish Re*, 524 F. Supp. 2d at
401-02; *Flag Telecom*, 352 F. Supp. 2d at 468-69; *In re CINAR Corp. Sec. Litig.*,
186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002); *In re Leslie Fay Cos., Inc. Sec. Litig.*,
918 F. Supp. 749, 763 (S.D.N.Y. 1996).

[109]     *See* cases cited *supra* note 64.

"devised and effectuated the fraudulent scheme"[110] and that (2) KMG controlled

Tronox from the IPO to the Spin-Off to the Merger, I find their allegations

sufficient to support the plausible inference that the KMG Officers had the "'*power*

to direct or cause the direction of the management and policies of [Tronox]'"[111]

during that time period.[112]   Corbett and Pilcher may not have signed Tronox's

filings during this time – because they were not Tronox officers – but they

allegedly "created the plan to remove the Legacy Liabilities from [KMG] and place

---

[110]     FAC ¶ 421.  *Accord* FAC ¶¶ 4 (Corbett, Wohleber, and Pilcher were "instrumental in planning and effectuating the transfer of the environmental remediation and tort liabilities to Tronox prior to the IPO"), 16 (Pilcher was a "moving force behind the fraudulent plan"), 37 (alleging Corbett's "involvement in developing the plan to create Tronox, dumping the Legacy Liabilities on Tronox, entering into the [MSA], and planning the Tronox IPO and subsequent Spin-Off"), 38 (same for Pilcher), 105 (alleging Corbett's and Wohleber's approval of the separation of KMG's Chemical Business), 125 (alleging Corbett was "a primary architect" and Wohleber and Pilcher "architects" of the fraud), 145 (Corbett and Wohleber were "'heavily involved'" in the decision to "'dump'" Legacy Liabilities) (quoting an Environmental Manager and Business Manager for the Health, Safety, and Environmental Group at both KMG and Tronox between 1984 and 2008).

[111]     *First Jersey Sec.*, 101 F.3d at 1472 (quoting 17 C.F.R. § 240.12b-2) (emphasis added).

[112]     I note that while courts in this Circuit have repeatedly addressed (a) the standards for alleging control against individuals who served as directors and officers of *primary violators*, few cases have squarely addressed (b) the standards for alleging individuals' control of entities that in turn controlled primary violators – e.g., Corbett's, Wohleber's, and Pilcher's liability based on their control of Tronox vis-a-vis KMG.

them into Tronox without making full and adequate disclosure[s]" and "dictated

the terms of the [IPO],"[113] rendering plausible the inference that they had the power

to control the content of Tronox's company press releases[114] and public filings.[115]

Similarly, plaintiffs' allegations against all three officers during the time that KMG

controlled Tronox via the MSA exceed mere "control person status."  All three

defendants allegedly "planned and effectuated [KMG's] extrication from further

association with Tronox except through a modest indemnification obligation

reflected in the [MSA], by completing the Spin-Off"; and "unilaterally determined

the content of [the MSA]" and "imposed" it on Tronox.[116]  When KMG was

ultimately sold to Anadarko – a transaction made possible by the allegedly

fraudulent Spin-Off of Tronox orchestrated by these officers – Corbett profited by

---

[113]    FAC ¶ 421.

[114]    *See, e.g.*, *id.* ¶ 94 (reciting Corbett's statement in a March 8, 2005 press release that "[f]or some time, the Board has been considering the separation of chemical [sic], current market conditions for this industry now make it an ideal time to unlock this value for our stockholders").

[115]    *See Teamsters*, 2005 WL 2148919, at *15 (because plaintiffs alleged that individual officers of the primary violators "control[led] the contents of the various SEC filings, press releases and other public statements" of the primary violator, the complaint did "not rely on status alone" and therefore adequately pled Section 20(a) claims against those individual defendants).  *Accord In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 289 (S.D.N.Y. 1999).

[116]    FAC ¶ 421.

over $270 million; Wohleber by roughly $26 million; and Pilcher by roughly $32

million.[117]  Based on these allegations, it is plausible that these defendants had the

power to, and in fact did, dictate Tronox's misleading environmental remediation

reserves.[118]

Such allegations place this case in stark contrast to those relied upon

by defendants for the proposition that plaintiffs cannot state a claim based on

"tertiary liability."[119]  In *Fezzani v. Bear, Stearns, & Co.*, plaintiffs sought to hold a

senior officer of Bear Stearns, which in turn allegedly controlled the primary

violator (Baron), "responsible based on tertiary liability – his control of Bear

---

[117]    *See id.* ¶¶ 16, 165.

[118]    I also note that although the attribution requirement of *Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144 (2d Cir. 2010), precludes plaintiffs from bringing a Section 10(b) claim against these officers, to hold that there is no theory on which plaintiffs may state a claim against them would undermine Congress's intent in creating control liability.  The "control person" provisions were included in the federal securities laws to "prevent people and entities from using 'dummies' to do the things that they were forbidden to do by the securities laws."  *Ross v. Bolton*, No. 83 Civ. 8244, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989) (citing *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975)).  While plaintiffs do not contend that Tronox or its officers were mere "dummies," *see* Pl. Opp. Mem. to KMG Mem. at 10, the FAC supports the plausible inference that the KMG officers had the power to direct, and actually did direct, the reserve-reporting policies of Tronox – to do the things that they were forbidden to do by the securities laws.

[119]    KMG Reply Mem. at 5.

Stearns, which in turn allegedly controlled Baron."[120]  The court held that plaintiffs

could not "stretch the concept of control liability so far."[121]  However, in that case,

the court had already *dismissed* plaintiffs' control claims against Bear Stearns as

time-barred.  If the court had reached the "merits" of plaintiffs' control allegations

against Bear Stearns – that it "took over Baron's offices and executed transactions,

as well as approved or disapproved of all of Baron's trading orders after November

1995" and subsequently "assumed control of all trading activities at Baron and sent

its employees to Baron's offices to enforce that control"[122] – it may well have

found that plaintiffs stated a claim against Bear Stearns, and seriously considered

whether the senior officer, too, could be found to control Baron vis-a-vis his

position at Bear Stearns.  Even if it had not, the control allegations here are

factually distinct from those at issue in *Fezzani*, because plaintiffs are alleging

more than "[p]articipation, even significant participation, in [the primary

violator's] scheme to defraud."[123]  They are alleging that Corbett, Pilcher, and

Wohleber *were* the masterminds behind a scheme to defraud that culminated in

---

[120]    384 F. Supp. 2d at 646 n.10.

[121]    *Id.*

[122]    *Id.* at 646.

[123]    *Id.*

Tronox's Spin-Off from KMG, saddled with liabilities that Tronox's public filings continually understated throughout the Class Period.[124]

Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.[125] is also distinguishable.  In that case, I held that an allegation that an individual defendant ("Beaudoin") was an officer and director of a parent corporation ("BI") of a primary violator ("BCM" and "BCI" (collectively "Bombardier")) was insufficient to plead a claim under Section 20(a).[126]  The complaint alleged that Beaudoin, as a signatory of BI's Annual Reports, had direct knowledge of the "Certificate Offerings" that were reflected in BI's financial statements and incorporated in BI's Annual Reports.[127]  I first rejected plaintiffs' primary securities fraud allegations against Beaudoin because "the Complaint does not allege that Beaudoin  knew of information contradicting [BCM's and BCI's] public statements . . . .  Nor does plaintiff allege that the Certificate Offerings were

---

[124]    See Pl. Opp. Mem. to KMG Mem. at 10; supra note 110.

[125]    2005 WL 2148919.

[126]    Id. at *15.  The alleged fraud in that case concerned certain Certificates offered by Bombardier.  "The gravamen of plaintiff's allegations [was] that defendants engaged in a scheme to defraud investors through misrepresentations and omissions regarding the integrity of [Bombardier's] underwriting standards for loan origination . . . ."  Id. at *1.

[127]    Id. at *15.

a core operation of BI."[128]  By contrast, plaintiffs here have alleged that Corbett,

Pilcher, and Wohleber – who allegedly orchestrated the plan by which the Legacy

Liabilities were excised from KMG and who "unilaterally determined the content

of" the MSA which they "imposed" on KMG[129] – knew of information

contradicting the reserves reported by Tronox.[130]  Moreover, unlike the KMG

Officers in this case, Beaudoin was not alleged to have "controlled [BCM and

BCI], nor [did plaintiffs] make any specific allegation of control against him other

than his status as an officer and director."[131]  Instead, the complaint merely

---

[128]   *Id.* at *14-*15.  *See also Alstom*, 406 F. Supp. 2d at 496 (rejecting control allegations against the CEO of a company whose wholly-owned subsidiary allegedly committed fraud because "the Complaint contain[ed] no allegations supporting any reasonable inference that [the CEO] knew or should have known about the [subsidiary's fraud]").

[129]   FAC ¶ 421.

[130]   *See id.* ¶¶ 39 (Corbett, Pilcher, and Wohleber "had access to the material adverse undisclosed information about the true extent of the Legacy Liabilities and the material deficiency in reserves recorded by Tronox" and "had access to internal Tronox and [KMG] corporate documents, including drafts and final copies of Tronox's press releases and its Forms 10-K and Forms 10-Q, as well as the operating plans, budgets, forecasts and reports of operations prepared by Defendants . . . ."), 102 (KMG's senior officers "knew that the Chemical Business did not have sufficient assets as a stand-alone entity to support the ongoing maintenance of [the] Legacy Liabilities"), 423 (Wohleber in particular "was fully knowledgeable as to the scope of the Legacy Liabilities and the fact that both [KMG] and Tronox had failed to record adequate reserves.").

[131]   *Teamsters*, 2005 WL 2148919, at *15.

"contain[ed] a number of allegations that the 'Individual Defendants' [including Beaudoin] had control over the 'the Company'"[132] – which included BI, BCI, and BCM.  Plaintiffs' allegations here go beyond such broad, conclusory assertions.[133] A company acts through its officers, and plaintiffs have alleged sufficient facts to support the inference that, as the perpetrators of the fraud and as senior officers of KMG, Corbett, Pilcher, and Wohleber effectuated the control injected into the relationship between KMG and Tronox (1) from the IPO to the Spin-Off (via stock ownership) and (2) from the Spin-Off to the Merger (via the MSA).[134]

### 2. Corbett: Control Person Liability from August 11, 2006 to January 12, 2009

Plaintiffs do not explain their theory for how Corbett was a

---

[132]   *Id.*

[133]   Defendants' reliance on *In re Alstom SA Sec. Litig.* is also misplaced. Although the *Alstom* court dismissed plaintiffs' claim that Alstom's CEO controlled Alstom's wholly-owned subsidiary, ATI, by virtue of his status as Alstom's CEO, it suggested that plaintiffs might have stated a claim had they explicitly "state[d] that ATI was controlled [by Alstom] through stock ownership" and pled that the CEO was a "culpable participant" in ATI's fraud.  406 F. Supp. 2d at 495-96.  Here, plaintiffs have adequately pled that KMG controlled Tronox from the IPO to the Spin-Off (through stock ownership) and from the Spin-Off to the Merger (through the MSA and its implementation), and have alleged that Corbett, Pilcher, and Wohleber not only knew about, but were responsible for, the alleged fraud.  *See supra* note 130.

[134]   This is especially true in light of plaintiffs' allegations that KMG consciously engaged in a cover-up so that the control it exercised over Tronox could not be revealed.  *See supra* note 66.

"controlling person" of Tronox after the August 10, 2006 merger.[135]

> Although Plaintiffs' basis for asserting control for this time period is entirely unstated, it can be inferred that it is based solely on the fact that Corbett became an outside director of Anadarko, whereas Pilcher and Wohleber had no role at Anadarko.  Plaintiffs are apparently alleging that – after Anadarko's acquisition of KMG – Corbett, as an outside director, controlled Anadarko, which in turn is allegedly liable (as a successor-in-interest or on a theory of *respondeat superior*) for KMG's alleged control over Tronox.[136]

This theory is "yet another step removed from 'control person' liability."[137]

Plaintiffs have failed to articulate how Corbett continued to control Tronox – vis-a-vis Anadarko vis-a-vis KMG – beyond asserting his status as an outside director of Anadarko.  In the absence of additional allegations, plaintiffs' Section 20(a) claim is too attenuated to state a claim against Corbett for control liability after the Merger.

## IV.   CONCLUSION

---

[135]     *See*, *e.g.*, FAC ¶ 37 ("Corbett was a control person of Tronox based on his involvement in developing the plan to create Tronox, dumping the Legacy Liabilities on Tronox, entering into the [MSA], and planning the Tronox IPO and subsequent Spin-Off.").

[136]     *See* KMG Mem. at 9.

[137]     *Id.  See In re Alstom*, 406 F. Supp. 2d at 495 ("[M]ere status as a board member is not enough to demonstrate actual control over the company and the transaction in question and the Complaint does not contain any allegations from which it can be inferred that [the individual defendant] exercised actual control over Alstom after he stepped down as CEO.") (citations omitted).

For the aforementioned reasons, KMG's motion to dismiss is denied; Anadarko's motion to dismiss plaintiffs' *respondeat superior* and Section 20(a) claims is denied; Anadarko's motion to dismiss plaintiffs' successor liability claim is granted; the KMG Officers' motion to dismiss is denied for the period before August 10, 2006; and Corbett's motion to dismiss for the period after August 10, 2006 is granted.  The Clerk of the Court is directed to close these motions (Docket Nos. 94 and 97).  A conference is scheduled for Thursday, January 20, 2011 at 5:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 5, 2011

-39-

**- Appearances -**

**For Lead Plaintiffs:**

Solomon B. Cera, Esq.
Gwendolyn R. Giblin, Esq.
Thomas C. Bright, Esq.
Gold Bennett Cera & Sidener LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
(415) 777-2230


**For Defendants Anadarko Petroleum Corporation and Kerr-McGee Corporation:**

Jay B. Kasner, Esq.
Susan Saltzstein, Esq.
Joseph A. Matteo, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
(212) 735-3000


**For Defendants Luke Corbett, Gregory Pilcher, J. Michael Rauh and Robert Wohleber:**

Gandolfo V. DiBlasi, Esq.
Penny Shane, Esq.
Jessica M. Klein, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

**For Defendants Thomas Adams, Mary Mikkeslon and Marty Rowland:**

Mathew D. Parrott, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022
(212) 940-8800

David H. Kistenbroker, Esq.
Joni S. Jacobsen, Esq.
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200

**For Defendant Ernst & Young LLP:**

Robert A. Atkins, Esq.
Brad S. Karp, Esq.
Claudia Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000