**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TRONOX, INC.<br>SECURITIES LITIGATION | ) Civil Action No. 09-CV-06220-SAS<br>)<br>)<br>) Electronically Filed<br>)<br>) |
| THIS DOCUMENT RELATES TO<br>ALL CLASS ACTIONS | )<br>)<br>)<br>) |

**JOINT DECLARATION OF SOLOMON B. CERA AND HANNAH G. ROSS IN
SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION
AND APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND
REIMBURSEMENT OF LITIGATION EXPENSES**

#126349

We, Solomon B. Cera and Hannah G. Ross, declare as follows:

1.      I, Solomon B. Cera, have been admitted to practice in this Court *pro hac vice* for purposes of this litigation.  ECF No. 30.  I am a partner with the law firm of Gold Bennett Cera & Sidener LLP ("Gold Bennett"), counsel for Lead Plaintiffs LaGrange Capital Partners, LP and LaGrange Capital Partners Offshore Fund, Ltd ("Lead Plaintiffs"), and Class Counsel in the above-captioned action (the "Action").

2.      I, Hannah G. Ross, am a partner with the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), counsel for Named Plaintiffs The Fire and Police Pension Association of Colorado and The San Antonio Fire and Police Pension Fund ("Named Plaintiffs" and collectively with Lead Plaintiffs, "Plaintiffs").

3.      We have been personally involved in all aspects of this litigation (hereafter the "Action"), including negotiations resulting in the settlement of the Action.  We have also been kept fully informed of developments in the Action by attorneys working with us and under our direction.

4.      We respectfully submit this joint declaration (the "Joint Declaration") on behalf of our respective firms and our clients,[1] pursuant to Federal Rule of Civil Procedure 23(e), in support of: (i) final approval of the proposed settlement of this Action (the "Settlement") on the terms and conditions reflected in the Stipulation, which this Court preliminarily approved by its Order Preliminarily Approving Proposed Settlement and Providing for Notice, dated August 10, 2012 (the "Preliminary Approval Order") (ECF No. 188); (ii) final approval of the plan for

---

[1]     The term "Plaintiffs' Counsel" refers collectively to Class Counsel and Bernstein Litowitz, together with Court-appointed Liaison Counsel, Cohen Milstein Sellers & Toll, PLLC ("Cohen Milstein").  Unless otherwise noted, capitalized terms used herein shall have the same meanings as reflected in the Stipulation and Agreement of Settlement dated August 3, 2012 (the "Stipulation") (ECF No. 186-1).

allocating the settlement proceeds to the Class (the "Plan of Allocation"); and (iii) Class

Counsel's application for an award of attorneys' fees and expenses.

5.      The Settlement now before the Court for final approval is the culmination of over

three years of hard-fought litigation, followed by months of arms'-length settlement negotiations

including two formal mediation sessions, the last of which was presided over by the Honorable

Daniel Weinstein (Ret.).  As discussed herein, we believe the Settlement represents an excellent

recovery for the Class both in absolute terms and when viewed in light of the risks of continued

litigation.  The Settlement provides the Class with a substantial and immediate monetary benefit

in the form of cash payments totaling $37 million.  This significant benefit to the Class must be

considered in the context of the serious risks that further protracted and contested litigation might

lead to no recovery, or to a smaller recovery, from Defendants in this Action.  Specifically, the

Settlement avoids uncertainties Plaintiffs faced in establishing loss causation as well as the

hurdles Plaintiffs faced establishing Defendants' liability and the full amount of the Class's

damages at trial.  We believe the Settlement represents a realistic assessment by both sides of the

strengths and weaknesses of their respective claims and defenses as well as the risks of further

litigation and is a fair, reasonable and adequate settlement.

## I.      TERMS OF SETTLEMENT AND NOTICE

6.      The Settlement provides for the payment of $37,000,000 in cash (the "Settlement

Amount") on behalf of defendants Thomas W. Adams, Marty J. Rowland, and Mary Mikkelson,

(the "Tronox Individual Defendants"); Robert M. Wohleber, J. Michael Rauh, Luke R. Corbett,

and Gregory F. Pilcher (the "Kerr-McGee Individual Defendants"); Kerr-McGee Corporation

("Kerr-McGee"); Anadarko Petroleum Corporation ("Anadarko"); and Ernst & Young LLP

("E&Y").[2]  Pursuant to the Stipulation, the Settlement Amount has been deposited into an

interest-bearing escrow account on behalf of the Class.[3]

7.      The terms of the Settlement are set forth in the Stipulation.  The Notice of

Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing, and Motion for

Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"), which, pursuant to

the Preliminary Approval Order was mailed to potential Class Members, sets out a summary of

the terms of the Settlement.  In compliance with the Preliminary Approval Order, on September

10, 2012, 17,442 copies of the Notice and Proof of Claim and Release form (the "Proof of

Claim" and, together with the Notice, the "Claim Packet") were mailed to potential Class

Members and nominees.  *See* ¶3 of the Declaration of Carole Sylvester of Gilardi & Co. LLC

("Gilardi"), the Court-authorized claims administrator for the Settlement (the "Sylvester Decl."),

filed herewith.  In addition, the Summary Notice was published in *Investor's Business Daily* and

transmitted over the *PR Newswire* on September 12, 2012.  *See* Sylvester Decl. ¶13.  Pursuant to

broker and nominee requests following the initial mailing, a total of more than 70,000 Claim

Packets have been mailed.  *Id.* ¶¶3, 6-9.  Gilardi also posted important information and deadlines

regarding the Settlement, as well as downloadable copies of the Notice, Proof of Claim and

---

[2]     The term "Defendants" refers collectively to the Tronox Individual Defendants, the Kerr-McGee Individual Defendants, Kerr-McGee, Anadarko, and E&Y.

[3]     By the Preliminary Approval Order, and pursuant to Rule 23(a) and (b)(3) of the Federal Rule of Civil Procedure, the Court certified, solely for the purpose of effectuating the proposed Settlement, a Class consisting of all persons or entities who purchased or otherwise acquired shares of Tronox Class A or Class B common stock ("Tronox Common Stock") or 9 ½ % senior notes due 2012 ("Tronox Bonds") (collectively "Tronox Securities") during the period from November 21, 2005 through and including January 12, 2009 (the "Class Period") and who were damaged thereby.  By the same order, and for the purposes of the Settlement only, the Court concluded that Plaintiffs are adequate class representatives and certified them as such, and appointed Lead Counsel as Class Counsel.

Stipulation, on the website created for the Settlement, www.gilardi.com/tronox, and established a toll-free number to accommodate potential claimant inquiries. *Id.* at ¶¶11-12.

8.      Along with providing information about the Settlement, the Notice advises recipients that Class Members who do not wish to participate in the Settlement may exclude themselves from the Class.  The Notice also advised recipients that Class Members have the right to object to any aspect of the Settlement, the Plan of Allocation, Class Counsel's fee request or the request for reimbursement of Litigation Expenses.  As of the filing of this Joint Declaration, no objections have been received to the Settlement, the Plan of Allocation or the fee and expense request.[4]

9.      If the Court approves the Settlement and it becomes Final as that term is defined in the Stipulation, the claims asserted in the Action against the Defendants shall be dismissed with prejudice, subject to the terms of the Stipulation and the Order and Final Judgment entered by the Court.  For the reasons set forth below and in the accompanying memoranda,[5] Class Counsel respectfully submits that: (i) the terms of the Settlement and Plan of Allocation are fair, reasonable and adequate in all respects and, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, should be approved by this Court; and (iii) Class Counsel's request for an award of attorneys' fees and reimbursement of Litigation Expenses is well justified and should be granted in full.

---

[4]    The deadline for submitting objections or requests for exclusion from the Class is October 29, 2012.  Preliminary Approval Order ¶¶ 13, 17.  If any objections are received after the date of this submission, Class Counsel will address them in a separate submission to be filed with the Court on or before November 12, 2012.

[5]    In conjunction with this Joint Declaration, Class Counsel is also submitting: (i) Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and (ii) Class Counsel's Memorandum of Law in Support of Application for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Class Representatives' Request for Reimbursement of Costs and Expenses (the "Fee Memorandum").

II.     **HISTORY OF THE ACTION**

     A.     <u>**Background of the Claims Asserted**</u>

    10.     This Action arises from alleged misrepresentations and omissions regarding Tronox's financial condition.  Specifically, the operative First Amended Consolidated Class Action Complaint, filed July 30, 2010 (ECF No. 93) (the "First Amended Complaint" or "Complaint") alleges that Defendants knowingly or recklessly (1) improperly recorded and also failed to record on Tronox's publicly issued financial statements material liabilities for environmental remediation obligations and related tort claims in violation of Generally Accepted Accounting Principals ("GAAP"); (2) failed to record appropriate reserves as required by GAAP; (3) failed to disclose a range of possible reserves for probable and reasonably estimable environmental remediation and tort liabilities as required by GAAP; and (4) failed to disclose that Tronox was effectively insolvent upon its IPO at the beginning of the Class Period. Complaint ¶¶2, 44.  The Complaint further alleges that, as a result of the foregoing misstatements and omissions, the prices of Tronox Securities were artificially inflated during the Class Period, causing damage to the Plaintiffs and other members of the Class.  *Id.* ¶8.

    11.     Plaintiffs have contended that when the truth about Tronox was slowly revealed to the market through partial disclosures from July 11, 2007 through January 12, 2009, the prices of Tronox Securities declined in response, as the artificial inflation caused by Tronox and the Defendants' material omissions and false and misleading statements were removed from the price of Tronox's Securities, causing substantial damage to Plaintiffs and the Class.  *Id.* ¶¶343-386.

    12.     On January 12, 2009, Tronox filed for bankruptcy and the Complaint alleges that in connection with that filing Tronox revealed that it had spent more than $118 million to satisfy

the environmental remediation obligations inherited from Kerr-McGee and that it continued to face very substantial additional claims. *Id*. ¶383.

13.     On May 4, 2009, Tronox filed a Form 8-K with the SEC stating that the financial statements it had published throughout the Class Period could no longer be relied upon and would require restatement.  As set forth in the Complaint, Tronox admitted that it had materially misstated its financial results throughout the Class Period based on application of an improper reserving methodology.  *Id*. ¶6.

### B.     The Pleadings Phase of the Litigation

14.     Beginning on July 10, 2009, three shareholder class actions were filed against the Defendants in this Court alleging violations of the federal securities laws.  By Order dated October 13, 2009 (ECF No. 50), the Court consolidated these actions under the docket number 09-cv-6220 and appointed LaGrange Capital Partners, LP and LaGrange Capital Partners Offshore Fund, Ltd. as Lead Plaintiffs.  By the same Order, the Court appointed Gold Bennett as Lead Counsel and Cohen Milstein as Liaison Counsel for the Class.  The Court's order noted that Lead Counsel and Bernstein Litowitz, who represented Named Plaintiffs bond purchasers, had agreed to work cooperatively on litigating the case.  *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 345 n.51 (S.D.N.Y. 2009).

15.     Before filing the complaint, Plaintiffs' Counsel undertook an extensive investigation which included, among other efforts: (i) review and analysis of the Plaintiffs' and, as to the Named Plaintiffs, their investment advisors' records concerning their transactions in Tronox Securities; (ii) review and analysis of voluminous public documents pertaining to Defendants, including Tronox, Kerr-McGee Corporation, and Anadarko Petroleum Corporation ("Anadarko") filings with the SEC, trading information regarding Tronox securities, press

releases, earnings releases and public statements published by Defendants; (iii) review and

analysis of materials published by numerous securities analysts who followed and reported on

Tronox, as well as transcripts of analyst conference calls, and the Company's website; (iv)

review and analysis of newspaper and magazine articles (and other media coverage) regarding

defendant Kerr-McGee (the parent of Tronox before it was spun-off in an IPO on November 21,

2005), and Tronox itself, information concerning Anadarko (which ultimately purchased Kerr-

McGee following the spin-off of Tronox), as well as publicly available information regarding the

Tronox Individual Defendants and the Kerr-McGee Individual Defendants' role with Kerr-

McGee, Anadarko, and/or Tronox; (v) interviews with no less than fifty-four (54) confidential

sources who were former employees of Kerr-McGee and/or Tronox; (vi) consultation with

multiple experts regarding market efficiency issues, loss causation, and accounting; (vii) review

and analysis of materials generated from the adversary proceeding captioned *Tronox, Inc. v.

Anadarko Petroleum Corporation et al.*, No. 09-1198 (ALG) (Bankr. S.D.N.Y.), (the "Adversary

Proceeding"); and (viii) research of the applicable law with respect to the multiple claims

asserted in the Action and the potential defenses thereto.

      16.     Following this extensive investigation, Lead Plaintiffs filed the Consolidated

Class Action Complaint on November 24, 2009 (ECF No. 56) (the "Consolidated Complaint"),

which alleged that Defendants issued materially false and misleading statements regarding the

financial condition of Tronox, including its environmental liabilities, in violation of Sections

10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act"), and Rule 10b-5

promulgated thereunder.  The Consolidated Complaint asserted claims under Section 10(b)

against all Defendants, and asserted "control person" claims under Section 20(a) against all

Defendants except E&Y.  The claims asserted in the Consolidated Complaint were based on

allegations that Tronox was essentially insolvent at the time of its IPO and throughout the Class Period, based on its materially understated reserves for environmental liabilities and that such liabilities were not fully and adequately disclosed until Tronox filed for Chapter 11 bankruptcy protection on January 12, 2009.  The Consolidated Complaint further alleged that certain of the Defendants controlled Tronox as of its IPO on November 21, 2005 and, through such control, dictated during the Class Period the recording of materially deficient reserves for environmental liabilities and Tronox's disclosures about reserves and, therefore, faced liability for the securities law violations alleged.  The Consolidated Complaint further alleged that the prices of Tronox Securities were artificially inflated as a result of Defendants' allegedly false and misleading statements and omissions, and declined when the truth about the extent of Tronox's environmental remediation obligations and related tort claims was revealed.

### C.      **Defendants' Motions to Dismiss the Consolidated Complaint**

17.      On January 11, 2010, Kerr-McGee and Anadarko moved to dismiss the claims asserted against them arguing, among other things, that Plaintiffs had failed to adequately allege reliance and scienter, that none of the alleged misstatements were attributed to Kerr-McGee or Anadarko, and that the Consolidated Complaint failed to plead facts demonstrating that they were "culpable participants" in a Section 10(b) violation by Tronox or the other Defendants for purposes of the "control person" claim.  *See generally* ECF No. 62.

18.      The Tronox and Kerr-McGee Individual Defendants moved to dismiss the Consolidated Complaint on January 19, 2010, arguing, among other things, that the complaint failed to allege facts supporting a strong inference of scienter and that Plaintiffs failed to sufficiently allege misstatements by Defendants Corbett and Pilcher.  *See generally* ECF Nos. 71 and 69.

19.      E&Y moved to dismiss the claims against it on February 8, 2010 arguing, among other things, that the Consolidated Complaint failed to allege facts permitting a strong inference of scienter, or to adequately allege reliance or loss causation.  *See generally* ECF No. 75.

20.      On February 26, 2012, Plaintiffs filed their opposition to the (1) Anadarko and Kerr-McGee motion to dismiss; (2) the Tronox Individual Defendants' motion to dismiss; and (3) the Kerr-McGee Individual Defendants' motion to dismiss (ECF No. 78).  Plaintiffs filed their opposition to E&Y's motion to dismiss (ECF No. 81) on March 15, 2010.  Anadarko and Kerr-McGee filed a reply on March 22, 2010 (ECF No. 83); the Kerr-McGee Individual Defendants and the Tronox Individual Defendants' replied on March 29, 2010 (ECF Nos. 85 and 86, respectively); and E&Y replied on April 16, 2010 (ECF No. 88).

21.      In June 2010, while the motions to dismiss were pending, the Parties voluntarily engaged in a mediation session over two days with a professional mediator in an effort to explore a potential resolution of the Action.  However, the Parties were unable to reach an agreement at that time and the litigation continued to be aggressively prosecuted by the Plaintiffs.

22.      By Opinion and Order dated June 28, 2010 (ECF No. 89), the Court granted in part and denied in part Defendants' motions to dismiss.  The Court denied the motions to dismiss filed by the Tronox Individual Defendants and E&Y in their entirety.  Additionally, the Court ruled, among other things, that: Plaintiffs' claims against Kerr-McGee, Anadarko and the Kerr-McGee Individual Defendants for violations of Section 20(a) relating to misstatements after March 31, 2006 were dismissed without prejudice; Plaintiffs were granted leave to replead their claims that Kerr-McGee and/or the Kerr-McGee Individual Defendants controlled Tronox after March 31, 2006 (when Tronox was spun off from Kerr-McGee) and that Anadarko was a successor-in-interest to Kerr-McGee; and Plaintiffs' claims against defendants Corbett, Pilcher

and Rauh, Kerr-McGee and Anadarko for violations of Section 10(b) were dismissed with prejudice based on the finding that these defendants made no actionable misstatements to the market regarding Tronox.  On July 28, 2010, the Tronox Individual Defendants and E&Y filed their Answers to the Consolidated Complaint (ECF Nos. 91 and 92), and shortly thereafter Lead Plaintiffs, the Tronox Individual Defendants and E&Y exchanged initial disclosures and embarked on the discovery described below.

23.     On July 30, 2010, Lead Plaintiffs filed their First Amended Consolidated Class Action Complaint (ECF No. 93).  Like the Consolidated Complaint, the First Amended Complaint asserted claims against the Defendants under Section 10(b) of the Exchange Act and Rule 10b-5, and under Section 20(a) of the Exchange Act.  The First Amended Complaint alleged claims similar to those in the Consolidated Complaint but added substantial factual detail in support of the claims asserted for violations of Sections 10(b) and 20(a) during the Class Period which had been dismissed without prejudice in the Court's June 28, 2010 Order.  The First Amended Complaint asserted the same Class Period as set forth in the Consoldiated Complaint.

24.     On August 27, 2010, Kerr-McGee and Wohleber moved to dismiss Plaintiffs' Section 20(a) claim for the period after March 31, 2006; Corbett and Pilcher moved to dismiss the claims against them in their entirety; and Anadarko again moved to dismiss the claim against it.  *See generally* ECF Nos. 98 and 95.

25.     The Lead Plaintiffs opposed these motions on September 20, 2010 (ECF Nos. 100 and 102).  Anadarko and certain Kerr-McGee Individual Defendants filed their replies on October 4, 2010 (ECF Nos. 106-107).

26.     By Opinion and Order dated January 5, 2011 (ECF No. 115), the Court denied

Messrs. Wohleber, Corbett and Pilcher's motion to dismiss with respect to the period that pre-

dated August 10, 2006; denied Anadarko's motion to dismiss Plaintiffs' Section 20(a) claim that

was predicated on control person liability and *respondeat superior* liability; and denied Kerr-

McGee's motion to dismiss.  The Court granted Anadarko's motion to dismiss Plaintiffs' Section

20(a) claim that was predicated on successor-in-interest liability and granted Mr. Corbett's

motion to dismiss Plaintiffs' Section 20(a) claim with respect to the period that post-dates

August 10, 2006.  On February 4, 2011, Andarko, Kerr-McGee, and certain Kerr-McGee

Individual Defendants answered the First Amended Complaint. (ECF Nos. 119-122,

respectively).

### D.     Motion for Class Certification

27.     On August 9, 2011, Plaintiffs moved for class certification.  ECF No. 140.

Included with this submission was a detailed expert report of Dr. Tavy Ronen, Ph.D., a Professor

of Economics at Rutgers University who opined on market efficiency for both the Tronox

Common Stock and Tronox Bonds.  ECF No. 141.  In connection with this motion, the

Defendants propounded significant discovery from the Plaintiffs which Plaintiffs responded to.

28.     On September 16, 2011, Defendants filed a lengthy opposition to Lead Plaintiffs'

class certification motion on a number of grounds, including: (i) that Lead Plaintiffs' investment

strategy and trading decisions rendered the Lead Plaintiffs atypical of the Class and inadequate to

serve as class representatives; (ii) that each of the Named Plaintiffs was subject to unique

defenses that rendered them atypical of the Class; and (iii) that Plaintiffs were not entitled to a

fraud-on-the-market presumption of reliance because they failed to establish that the alleged

corrective disclosures impacted the price of Tronox Securities or that the market for Tronox

Bonds was efficient.  *See generally*, ECF Nos. 151 and 155, respectively.  Certain Defendants also alleged that Plaintiffs had failed to establish that the market for Tronox Common Stock was efficient during the entire Class Period.  ECF No. 151.

29.     On October 26, 2011, Lead Plaintiffs' motion was denied without prejudice, and with leave to renew, because the Court requested the Parties to re-submit their respective submissions in support of and in opposition to class certification pursuant to a revised Order governing page limitations and timing.  No decision on the merits of the motion was made at that time.  ECF No. 159.

30.     On November 11, 2011, Lead Plaintiffs filed their renewed motion for class certification (ECF No. 163), Defendants opposed it on November 23, 2011 (ECF No. 166), and on December 7, 2011, Lead Plaintiffs filed a reply memorandum in further support of class certification  (ECF No. 170).  With the Court's approval, further proceedings on class certification were held abeyance while the Parties prepared for and conducted the mediation with Judge Weinstein.

       E.     **Investigation and Discovery**

31.     The Parties engaged in extensive discovery during the course of this litigation. This included significant document productions by the Plaintiffs, as well as production of approximately 3.6 terabytes of data (roughly equivalent to ninety-three (93) million pages of documents) produced by Tronox, the Defendants, and third parties in response to discovery propounded by Plaintiffs.  These documents included, among others, internal and external audits, minutes and records of meetings of senior executives and directors, and analyses of Tronox's reserves for environmental remediation at a multitude of sites throughout the country, as well as multiple years of accounting workpapers.  In the case of defendant E&Y, it produced accounting

workpapers applicable to three years' worth of annual and interim audits, for the years 2005, 2006, and 2007.  These voluminous records were organized, reviewed, and analyzed.  Plaintiffs also sought access to records from the Adversary Proceeding and worked cooperatively with Tronox's bankruptcy counsel to obtain such materials, which also were voluminous. Additionally, Plaintiffs' Counsel made significant document productions on behalf of their respective clients, answered multiple sets of interrogatories, and defended their clients in depositions, and in the case of the Named Plaintiffs, attended depositions of their investment advisors.  There were a total of 5 non-expert depositions related to class certification.  With regard to class certification, Plaintiffs retained multiple experts and produced detailed expert reports on market efficiency.  The Parties deposed each other's expert witnesses.  Defendants' experts were Dr. Paul Gompers of Harvard University and Dr. Mukesh Bajaj of the University of California, Berkeley.  They opined that the market for Tronox Bonds was inefficient throughout the Class Period, that the market for Tronox Common Stock was inefficient during portions of the Class Period, and that Plaintiffs could not show loss causation.

32.    Plaintiffs' Counsel were in the midst of preparing for depositions of key percipient fact witnesses when the Settlement was reached.

33.    The discovery efforts described above were in addition to the thorough investigation of the claims conducted by Plaintiffs' Counsel before filing the Consolidated Complaint which are discussed in paragraph 15 above.  Plaintiffs' Counsel also worked extensively with bankruptcy specialists to pursue the Class's interests in Tronox's bankruptcy case, including preserving access to all relevant Tronox records, obtaining the cooperation of Tronox and certain important witnesses, and preserving Plaintiffs' ability to access applicable insurance to satisfy their claims.

### F.    <u>Settlement Negotiations</u>

34.     In June 2010, the Parties engaged in a full-day mediation session under the auspices of respected mediator Jonathan Marks in New York.  Prior to that mediation session, the Parties drafted and exchanged detailed mediation statements and engaged in telephonic calls with the mediator.  That mediation was ultimately unsuccessful.

35.     On March 2, 2012, the Parties entered into a stipulated agreement to extend certain discovery deadlines set forth in a Scheduling Order entered on January 13, 2012, pursuant to which and with the consent of the Court, Lead Plaintiffs agreed to withdraw their motion for class certification without prejudice to re-submit as previously filed, to allow the parties additional time to conduct discovery and explore the possibility of reaching a mediated settlement of the Action.

36.     In March 2012, the Parties participated in a mediation conducted by the Hon. Daniel Weinstein (Ret.) of JAMS.  The Parties submitted mediation statements to Judge Weinstein and conducted extensive, protracted negotiations through him, both in person and telephonically.  Plaintiffs engaged in these discussions with a view to exploring the possibility of resolution of the issues in dispute consistent with achieving the best relief possible in the interests of the Class.  Thereafter, the Parties (with the exception of E&Y) reached an agreement in principle to settle in March 2012 and signed a term sheet on May 31, 2012.

37.     The litigation remained ongoing against E&Y, the one defendant as to which an agreement in principle to settle had not been reached.  On May 17, 2012, Lead Plaintiffs filed their second renewed motion for class certification.  ECF No. 177.

38.     Thereafter, Plaintiffs and E&Y began discussing a possible resolution of the Action.  Plaintiffs and E&Y had multiple settlement discussions and arm's-length negotiations

with respect to a compromise and settlement of the claims against E&Y.  Again, Plaintiffs

engaged in these discussions with a view to exploring the possibility of resolution of the issues in

dispute consistent with achieving the best relief possible in the interests of the Class.  Plaintiffs

and E&Y reached an agreement in principle to settle in late May 2012.

39.     The Parties spent the next weeks negotiating the details of a formal settlement

agreement and drafting the relevant settlement papers.  The Parties executed the Stipulation on

August 3, 2012, and the Court preliminarily approved the Stipulation and the Settlement

embodied therein by Order dated August 10, 2012 (ECF No. 188) and modified forms of the

Settlement Notice and Proof of Claim were approved by the Court on August 29, 2012 (ECF No.

189).  The modification was made to clarify in the Notice that Kerr-McGee holders who received

Tronox Class B common stock as a dividend upon the March 31, 2006 spin-off of Kerr-McGee's

remaining interest in Tronox, are not Class Members by virtue of such acquisition and are not

entitled to any portion of the Settlement Amount with respect to those shares.  *See In re Tronox,*

*Inc. Sec. Litig.*, No. 09-civ-6220 SAS, 2010 WL 2835545 at * 10 n. 160 (S.D.N.Y. June 28,

2010).

## III.     THE RISKS FACED BY PLAINTIFFS

40.     It is well recognized that actions for securities fraud are fraught with risks.  In this

Action, there were significant risks with respect to establishing both liability and damages.

### A.     The Risks of Establishing Liability

41.     The Plaintiffs recognize that they faced substantial risks of establishing liability if

the Action continued, and these potential risks were considered and analyzed by Plaintiffs and

Plaintiffs' Counsel in determining whether to enter into the Settlement.

42.     Tronox, the issuer of the securities involved in this case, filed for bankruptcy protection on the last day of the Class Period, January 12, 2009.  *In re Tronox Incorporated, et al.,* No. 09-10156 (Bankr. S.D.N.Y.).  As a result of the Tronox bankruptcy and the automatic stay provisions of 11 U.S.C. §362(a), Plaintiffs could not proceed against Tronox as a defendant and had to overcome obstacles created by the filing in order to obtain documents and access to witnesses.

43.     Kerr-McGee and Anadarko issued no statements to the market.  As a result, Plaintiffs were limited to claims against those entities for "control person" and/or *respondeat superior* liability.  Plaintiffs would have to establish a primary violation of Section 10(b) of the Exchange Act against Tronox or its officers in order to establish a Section 20(a) claim against Anadarko, Kerr-McGee, as well as certain of the Kerr-McGee Individual Defendants.  They would face a heavy burden of proving scienter as the claims are based on the adequacy of reserves for contingent liabilities that are inherently subjective, reflect the opinion and judgment of management, and vary depending on a variety of unpredictable circumstances such as whether a claim had been filed by a third party, and the relative strengths and weaknesses of any such claim.  Plaintiffs were also faced with the prospect of identifying the specific sites for which reserves were allegedly understated, facts to show that the contingent liabilities were both probable and reasonably estimable, and the amount by which the reserves were understated.  Even assuming Plaintiffs could establish a reserving fraud and thereby a primary violation, they would still be faced with the difficulty of showing as against Kerr-McGee, Anadarko, and several of the individually named defendants, the requisite control and culpable conduct to survive on their control person claims.

44.     Although Tronox announced in May 2009 the need for a restatement of prior year financial results, the restatement that was ultimately issued by the Company in its bankruptcy case in October 2011 was far smaller in magnitude than originally anticipated, and was unaccompanied by restated financials for the years in question, again due to the bankrupt condition of the Company and the expense and complexity of generating restated financial statements.  Thus, Plaintiffs did not significantly benefit in the prosecution of their case by the restatement.

45.     With respect to E&Y, Plaintiffs would have to prove either, that it had actual knowledge of the misrepresentations and omissions in its audit reports, or that the accounting work was so deficient that the audit amounted to no audit at all.  Obviously, this is a very demanding standard to meet.  The sheer quantity of documentation generated in connection with E&Y's audits would make this very difficult to prove.

46.     As noted, the risks of the litigation were increased because Tronox, the issuer of the securities involved in this litigation had filed for bankruptcy in January 2009 and, thus, could not be a potential source of recovery in the Action.

47.     Had the Settlement not been reached, the Plaintiffs would expect Defendants to build foundations for each of the defenses they asserted in their motions to dismiss and during the Parties' settlement negotiations, and to assert each of these defenses, and others, at summary judgment, trial and on appeal.

      **B.**     **The Risks of Establishing Loss Causation and Damages**

48.     Even if the Plaintiffs succeeded in overcoming each and every defense the Defendants could raise with respect to liability, they would still have to establish loss causation and prove that Class Members suffered damages.  Plaintiffs would be required to prove that the

alleged false and misleading statements artificially inflated the price of Tronox Common Stock as well as Tronox Bonds, the amount of the artificial inflation, and that the price declines on the alleged disclosure dates identified in the First Amended Complaint resulted from disclosure of the alleged fraud.

49.     Plaintiffs' damages expert estimated aggregate damages sustained by purchasers of Tronox Securities during the Class Period to be between $164 million and $215 million. According to this calculation, the present Settlement represents between 17% and 22.8% of the Class's potential damages recoverable at trial.  This damages figure, however, assumes that a jury would accept every element of the Class's damages theory as being correct and recoverable. Further, a damages analysis does not attribute relative fault – something a jury would be required to do under Section 10(b).

50.     Plaintiffs' estimated aggregate damages also assumes that Plaintiffs could establish the requisite causal connection between the alleged fraud and any price decline in numerous corrective disclosures.  This would require convincing the jury that the decline on the disclosure dates cited by Plaintiffs was caused by disclosures of the alleged fraud.  This would be especially challenging because in this Action, by the time the Class Period ended upon Tronox's bankruptcy filing, Tronox common stock had gradually declined over a two-year period to mere pennies on the dollar and the economy was in the midst of the economic crisis, which Defendants vigorously argued caused the price declines.  There was no sudden drop based on a single startling disclosure.  Defendants had argued that the alleged corrective disclosures in 2007 did not exhibit statistically significant price changes and that no new corrective information about environmental liabilities were disclosed on those days.  In addition, Defendants were

prepared to present expert testimony that the market for Tronox Bonds was not efficient and that the market for Tronox Common Stock was not efficient at all times throughout the Class Period.

51.     Presentation of evidence and the Parties' differing arguments on loss causation and damages would hinge upon extensive expert discovery and testimony.  Although Plaintiffs believe they would be able to present expert testimony to meet their burden on loss causation, and to rebut any arguments that Defendants would make, Defendants would be expected to assert that there were no damages or substantially smaller damages.  As a result, the crucial elements of loss causation and damages would likely be reduced at trial to a "battle of experts."  Plaintiffs' Counsel have sufficient experience to recognize that in such a battle there exists the real possibility that a trier of fact could be swayed by Defendants' experts, who would seek to minimize or eliminate the amount of Plaintiffs' losses by showing that any losses were attributable to factors other than the alleged misstatements and omissions.

52.     As the foregoing demonstrates, had the Action proceeded, there existed real uncertainties concerning causation and damages.  That Class Members will recover a substantial percentage of their reasonable estimated damages without undertaking the foregoing risks weighed heavily in our view in favor of the Settlement.

### C.     The Complexity, Expense and Likely Duration of the Litigation

53.     The complexity, expense and likely duration of the litigation was also an important factor in Plaintiffs' decision to settle the Action and weighs strongly in favor of the Settlement.  As described above, Plaintiffs faced, among others, risks to successfully establishing liability and damages.  Plaintiffs also faced the risks inherent in taking a case to trial, *i.e.* that it is impossible to predict how a trier of fact will weigh the opposing evidence and testimony presented by the Parties.

54.     Not only does this Action involve many legal and factual issues related to the federal securities laws, but the Action also involved the complexities associated with litigating the adequacy of reserves for environmental remediation obligations and the audit of such reserves.  This too would have necessitated a battle of the experts on something extremely complicated and subjective.  There was real risk that a jury would believe the Defendants' expert on setting reserves for environmental remediation and related tort claims.

55.     Moreover, if there were no settlement, the Parties would have to continue their significant trial preparation efforts.  These efforts include continuing to litigate class certification, as well as completing an extensive and time-consuming discovery process involving the depositions of numerous Tronox, Kerr-McGee, and Anadarko employees, E&Y auditors,  and various third parties, followed by significant expert discovery and related motions pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  There would follow the inevitable round of motions for summary judgment by all Defendants on complex issues, including loss causation.  Assuming that the Class's claims survived Defendants' summary judgment motions, the required trial preparation would require substantial additional effort and expense.  The trial of liability issues alone could run several weeks and involve numerous expert witnesses, the introduction of voluminous documentary and deposition evidence, vigorously contested *in limine* motions, and the expenditure of enormous amounts of judicial and financial resources.  Even a jury verdict in favor of the Class would not guarantee a recovery of damages for the Class.  Defendants would undoubtedly appeal any verdict favorable to the Class, and the appellate process could last several years.

### D.   The Reaction of the Class to the Settlement

56.     To date, the reaction of the Class to the Settlement has been positive.  In accordance with the procedures for mailing and publication established by the Preliminary Approval Order, the Claims Administrator, Gilardi, undertook efforts to ensure that Notice and the Proof of Claim were widely disseminated to potential Class Members.  To date, Gilardi has disseminated of over 70,000 copies of the Notice and Proof of Claim to potential Class Members and nominees, and there have been no objections.[6]

### E.   The Stage of the Proceedings and the Amount of Discovery Completed

57.     By the time the Parties reached the Settlement, Plaintiffs and Plaintiffs' Counsel had sufficient knowledge and understanding of the merits of the claims alleged in the Action and the defenses that would be asserted by Defendants to determine that the Settlement is fair, reasonable and adequate.  We had actively litigated this Action for almost three years when the Settlement was reached.  More specifically, and as detailed above, the Parties have litigated (i) the Defendants' multiple motions to dismiss the Consolidated Complaint and the First Amended Complaint; (ii) completed briefing on Plaintiffs' motion for class certification; (iii) conducted class related discovery and depositions of Plaintiffs and the Parties' market efficiency experts; and (iv) engaged in merits discovery, including the production of more that 3.6 terabytes of documents by the Defendants and third parties for Plaintiffs' Counsel's review.

58.     Massive document discovery had occurred, and the parties were preparing for depositions when the 2012 settlement negotiations began.  Plaintiffs' Counsel had reviewed and analyzed a very extensive amount of internal Tronox, Kerr-McGee, Anadarko, and E&Y

---

[6]   The deadline for objecting to the Settlement or requesting exclusion from the Class is October 29, 2012.  If any objections are received after the date of this submission, Plaintiffs' Counsel will address them in their reply papers to be filed with the Court on or before November 12, 2012.

documentation, as well as third-party records, before agreeing to the Settlement.  Many of these documents related to complex, and in some instances scientific evaluations of the status of a multitude of environmental remediation sites dispersed throughout the country, highlighting the difficult issues facing Plaintiffs in unraveling the data available and considerations applied to determining an appropriate environmental remediation reserve.  Through a careful review and analysis of documents, Plaintiffs' Counsel were able to identify the material environmental sites insofar as reserves were concerned and conduct a careful analysis of the determinations made as to the size of recorded reserves.  Plaintiffs' Counsel thus gained valuable insights into the key issues in the case regarding the recording of reserves and the accounting determinations made with regard thereto.  Adding to this understanding were the numerous communications between and among board members, executives, and employees responsible for managing the environmental remediation sites, as well as third parties reflected in other documents that Plaintiffs' Counsel reviewed and analyzed.

59.     The Plaintiffs and their investment advisors had all been thoroughly deposed, as had the Parties' experts on market efficiency issues, who also had prepared and exchanged detailed expert reports.  Plaintiffs retained and consulted with respected financial experts, including Dr. Tavy Ronen, Ph.D., Professor of Economics at Rutgers University who, supported by Stanford Consulting Group, submitted an expert report on market efficiency issues in support of Plaintiffs' motion for class certification.  ECF No. 172.

60.     Additionally, Plaintiffs' Counsel worked with bankruptcy specialists to assure Plaintiffs' access to Tronox records, obtain cooperation of Tronox witnesses, and preserve the ability to draw from insurance policies which Tronox had previously procured for itself and its officers and directors.

61.     Plaintiffs' Counsel used the information obtained from their litigation efforts to engage in hard-fought arms'-length settlement negotiations with Defendants including three full-days of formal mediation, the last of which was with Judge Weinstein.

**F.     The Risks of Maintaining the Class Through Trial**

62.     Although the issue of class certification had been fully briefed at the time of settlement, the Court had yet to rule on the appropriateness of class certification.

63.     Defendants vigorously contested that certification of the Class would be appropriate.  The Defendants asserted, among other things, that Lead Plaintiffs were subject to unique defenses making them atypical and inadequate representatives and they strenuously argued that Plaintiffs could not establish that Tronox Securities traded in an efficient market and therefore the fraud-on-the-market presumption could not be invoked.  In support of their challenge to the efficiency of the market, Defendants were prepared to present expert testimony.  Had they succeeded on this contention, that would have presented a very significant hurdle to class certification.  Plaintiffs' Counsel believed they could counter these arguments but recognized that this was an issue on which Defendants could have several bites at the apple.  Thus, even if Defendants' arguments were unsuccessful at the class certification stage, they could relitigate them on a Rule 23(f) appeal, at summary judgment and at trial.

**IV.     THE PLAN OF ALLOCATION**

64.     The proposed Plan of Allocation (the "Plan"), as set forth in the Notice, provides the manner in which the Settlement Amount, plus interest, less payment of any Taxes, Court-approved attorneys' fees and expenses and the costs of claims administration, including the costs of printing and mailing the Notice and the cost of publishing the Summary Notice (the "Net Settlement Fund"), shall be distributed to Authorized Claimants.  Distributions from the Net

Settlement Fund will be made to Authorized Claimants after all Proofs of Claim have been processed and after the Court has approved the final calculations and distributions to the Class.

65.     The Plan was drafted by an experienced damages expert consultant retained by Lead Plaintiffs in consultation with Plaintiffs' Counsel.  The Plan is set forth in the Notice that was mailed to over 70,000 potential Class Members and nominees.  As of the filing of this Joint Declaration, there are no objections to the Plan.

66.     The Plan is based on Plaintiffs' allegation that the price of Tronox Common Stock and Tronox Bonds was artificially inflated during the Class Period due to alleged misrepresentations and/or omissions by Defendants.  The Plan takes into account the impact of nine (9) alleged corrective disclosures identified in the Complaint which allegedly removed artificial inflation from the price of the Common Stock and four (4) which removed the artificial inflation from the price of the Tronox Bonds.

67.     Under the Plan, the Court-authorized claims administrator, Gilardi, will calculate each Authorized Claimant's "Recognized Claim" based on the information supplied with the Class Member's Proof of Claim.  Each claimant's *pro rata* share of the Net Settlement Fund shall be based upon the dates of their purchases and sale transactions as compared with the alleged disclosure dates.  Overall, if the total Recognized Claims for all Authorized Claimants exceeds the Net Settlement Fund, each Authorized Claimant's share of the Net Settlement Fund will be determined based upon the percentage that his, her or its Recognized Claim bears to the total Recognized Claims for all Authorized Claimants.  The Plan is similar in structure to numerous plans of allocation which have been utilized, and approved by courts, in other securities class action cases.  Accordingly, Plaintiffs' Counsel believe that this method of

allocation has a reasonable and rational basis and is fair and equitable and therefore warrants the Court's approval.

## V.     ATTORNEYS' FEES AND EXPENSES

68.     Plaintiffs' Counsel respectfully request an award of attorneys' fees in the amount of 25 percent of the Settlement Amount ($9,250,000) plus interest thereon at the same rate as earned by the Settlement Fund and expenses in the amount of $1,627,360.10.  A cross-check of the lodestar in this case supports the attorneys' fees requested.  Plaintiffs' Counsel have devoted a total of 17,127.50 hours to the Action from its inception through September 30, 2012 with a total lodestar value, based on their attorneys' and paraprofessionals' current hourly rates, of $ 8,477,447.50.[7]  Thus, the requested fee award represents an extremely modest multiplier of only 1.09 to the lodestar.

69.     District courts in the Second Circuit apply either the "percentage of the fund" method or the "lodestar" method when determining awards of attorneys' fees in common fund recoveries.  Therefore, Plaintiffs' Counsel are presenting the information necessary for the Court to use either method for its analysis.

70.     District courts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) when determining an award of attorneys' fees.  The six Goldberger factors are: (1) the time and labor expended by counsel, (2) the magnitude and complexities of the litigation, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy

---

[7]     The lodestar and expense submissions of Gold Bennett, Bernstein Litowitz and Cohen Milstein are attached hereto as Exhibits 1, 2 and 3, respectively.  These exhibits reflect the names of the attorneys and paraprofessionals who worked on the Action, the hourly rates currently chargeable by each such attorney and paraprofessional, the lodestar value of the time expended by such attorneys and paraprofessionals, and the expenses incurred by the firms.

considerations.  Plaintiffs' Counsel respectfully submit that an analysis of these criteria

demonstrates that the requested fee is fair and reasonable.

71.     Although the *Goldberger* factors do not specifically include the reaction of the

Class to the fee request, courts in the Second Circuit nevertheless consider the class's reaction

when deciding whether to award the requested fee.  The Notice advised Class Members that

Plaintiffs' Counsel would be requesting an award of attorneys' fees not to exceed 25 percent of

the Settlement Fund and reimbursement of out-of-pocket expenses not to exceed $1,985,000.00

(which may include the reasonable costs and expenses of Plaintiffs directly related to their

representation of the Class) to be paid from the Settlement Fund.  As of the filing of this Joint

Declaration, there have been no objections to the amount of attorneys' fees and expenses set

forth in the Notice.[8]

### A.     The Labor and Time Expended by Plaintiffs' Counsel

72.     An analysis of the labor and time expended by counsel clearly supports the fee

award requested. During the pendency of this litigation, Plaintiffs' Counsel marshaled

considerable resources and time in the research, investigation, prosecution and ultimate

resolution of this case.  Such efforts included an extensive investigation of all relevant facts,

including interviewing approximately 54 confidential witnesses.  Plaintiffs' Counsel's efforts

also included, *inter alia,* drafting a comprehensive consolidated complaint and an amended

consolidated complaint; consulting with market efficiency, loss causation and damages experts;

briefing arguments made in multiple motions to dismiss the complaints by the Defendants;

briefing the motion for class certification; and engaging in class and merits related discovery,

including the review and analysis of approximately 3.6 terabytes of documents produced by the

---

[8]     Should any objections be received after the date of this submission, they will be addressed by
Plaintiffs' Counsel in a reply brief to be filed with the Court on or before November 12, 2012.

Defendants and third parties.  Plaintiffs' Counsel also prepared for and engaged in hard-fought and protracted settlement negotiations with Defendants, including three days of formal, in-person mediations, the last of which was with Judge Weinstein, followed by weeks of negotiating the terms of the Stipulation and drafting the related settlement documentation.

73.     As set forth in Plaintiffs' Counsel's accompanying lodestar and expense submissions, Plaintiffs' Counsel devoted over 17,000 hours to this Action with an aggregate lodestar of $8,477,447.50.[9]  Thus, the requested fee award represents an extremely small multiplier of 1.09.  As Plaintiffs' Counsel litigated the matter and invested substantial resources without a guarantee of payment, Plaintiffs' Counsel respectfully submit that such a multiplier from the attendant lodestar cross-check, fully supports the requested attorneys' fees as fair and reasonable.

**B.      The Magnitude, Complexities and the Risk of the Litigation**

74.     An analysis of the magnitude, complexities and the risk of the litigation also weigh in favor of the Court's approval of the requested fees.  The legal challenges assumed by Plaintiffs' Counsel in bringing these claims to a successful conclusion are described in detail above.  These risks are also highly relevant to an award of attorneys' fees.

75.     Plaintiffs' Counsel undertook the risks of this Action on a contingent fee basis – including surviving dispositive motions, obtaining class certification, proving liability, causation and damages, prevailing in the "battle of the experts," and litigating the Action through trial and possible appeals.  From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that

---

[9]   These figures do not include time spent on Class Counsel's motion for attorneys' fees and reimbursement of expenses.

responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation for their efforts during the course of this Action.

76.     Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  In fact, there have been many hard-fought lawsuits where, because of (i) the discovery of facts unknown when the case was commenced: (ii) changes in the law while the case was pending; or (iii) decisions on summary judgment or following a trial on the merits, that excellent professional efforts produced no fee for counsel.  Thus, there existed a real risk that Plaintiffs' Counsel would invest substantial resources and efforts and receive nothing.

### C.     Quality of Representation

77.     An analysis of the quality of representation involved in the Action further supports the requested fee award.  Plaintiffs' Counsel are experienced in prosecuting securities class actions, and worked diligently and efficiently in prosecuting the Action as well as in bringing the Action to a successful conclusion for the Class.  Class Counsel, Gold Bennett, and counsel for Named Plaintiffs, Bernstein Litowitz, as previously recognized by the Court, have successfully litigated these types of actions in courts throughout the country, and both firms have a successful track record in such cases.[10]

---

[10]   The Court recognized this experience in the Order appointing Lead Counsel.  *See In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338 (S.D.N.Y. 2009).

78.    The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  The Defendants were represented by the prominent law firms of Weil, Gotshal & Manges LLP, Bingham McCutchen LLP (counsel for defendants Andarko and Kerr-McGee), Sullivan and Cromwell LLP (counsel for the Kerr-McGee Individual Defendants); Dechert LLP (counsel for the Tronox Individual Defendants), and Baker Botts LLP (counsel for E&Y).  The ability of Plaintiffs' Counsel to obtain this favorable Settlement for the Class in the face of such formidable legal opposition further reflects the superior quality of their work.[11]

**D.    The Requested Fee in Relation to the Settlement**

79.    An analysis of the requested fee in relation to the Settlement also favors approval of Plaintiffs' Counsel's fee request.  While the percentage of fees awarded in securities actions have varied substantially, the percentage fee requested by Plaintiffs' Counsel here falls well within the range of fees regularly awarded by courts in the Second Circuit.  *See* Fee Memorandum at III.C.4,

**E.    Public Policy Considerations**

80.    An analysis of public policy considerations also supports the requested fee award. Plaintiffs' Counsel committed substantial resources to the litigation of this Action, notwithstanding significant uncertainty as to whether the Action would ultimately succeed. Here, this Settlement is providing the only monetary recovery for the Class based on purchases of Tronox Securities.  Therefore, it is important to encourage plaintiffs' counsel to bring securities actions and help deter future wrongdoing.  In order to attract well-qualified plaintiffs'

---

[11]    Skadden, Arps, Slate Meagher & Flom LLP (on behalf of Kerr-McGee and Anadarko) and Paul, Weiss, Rifkind, Wharton & Garrison LLP (on behalf of E&Y) also served as defense counsel at the beginning of the case.  The attorneys from Dechert LLP were with Katten Muchin Rosenman LLP at the onset of the Action.

counsel the courts should award fees that will adequately compensate plaintiffs counsel, taking into account the risks undertaken with a realistic view of the economics of the situation.  Further, courts recognize that in contingent fee class action litigation, where counsel expend sizable resources to obtain a recovery for an aggrieved class, and few individual class members have sufficient motivation to pursue litigation independently, public policy dictates sufficient payment to counsel to ensure the continued pursuit of recoveries for the benefit of such individuals.

### F.   Plaintiffs' Counsel's Request for Expenses

81.   Plaintiffs' Counsel also request expenses in the amount of $1,627,360.10, incurred by Plaintiffs' Counsel to date in connection with the prosecution and resolution of the Action on behalf of the Class.  It is well-settled that attorneys who have created a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and directly related to the prosecution of the Action.

82.   A large portion of Plaintiffs' Counsel's expenses was used to pay the experts retained in the areas of market efficiency, loss causation and damages, and auditing standards, and to pay for the costs of formal mediations including the final one with Judge Weinstein. Another significant expense was incurred because of the need to retain bankruptcy counsel to assist Plaintiffs in representing the Class's interests in Tronox's bankruptcy proceedings.  All of these expenses were critical to Plaintiffs' Counsel's success in achieving the proposed Settlement.  Plaintiffs' Counsel's remaining expenses include the costs of electronic discovery,[12] photocopying of documents, computerized research, messenger services, postage, express mail

---

[12]   Plaintiffs' Counsel retained HLP Integration to develop and maintain an electronic database to house the documents produced by the Defendants and certain third parties during discovery. During the course of their review of these documents, Plaintiffs' Counsel consulted regularly with HLP Integration to develop effective word searches and review strategies.

and next day delivery, filing fees, transportation, meals, travel and other incidental expenses directly related to the prosecution of this Action.  *See* lodestar and expense submissions of Plaintiffs' Counsel submitted herewith as Exhibits 1-3.  To date, no objections have been received regarding the expense figure set forth in the Notice.

83.     Additionally, Plaintiffs seek reimbursement of the reasonable costs and expenses that they incurred directly in connection with their representation of the Class.  Declarations in support of their requests have been submitted by Frank LaGrange Johnson on behalf of the Lead Plaintiffs requesting $129,804.23; by Frank Burney on behalf of The San Antonio Fire and Police Pension Fund requesting $49,030.00; and by Kevin Landahl on behalf of The Fire and Police Pension Association of Colorado requesting $15,626.76, and are attached hereto as Exhibits 4, 5 and 6, respectively.

84.     The Notice apprised potential Class Members that Class Counsel would be seeking reimbursement of expenses in an amount not to exceed $1,985,000 and that the costs and expenses of Plaintiffs could be sought as part of the request for reimbursement of Litigation Expenses.  The total amount sought by Plaintiffs (*i.e.*, $194,460.98), when added to the request of Plaintiffs' Counsel (*i.e.*, $1,627,360.10), is below the $1,985,000 that Class Members were advised could be sought.  As noted above, to date, no objections have been raised as to the request for reimbursement of Litigation Expenses.

85.     In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class.  Accordingly, we respectfully submit that the expenses incurred by Plaintiffs' Counsel and Plaintiffs should be reimbursed in full from the Settlement Fund.

I declare that the foregoing is true and correct.  Executed in San Francisco, California this 15th day of October, 2012.

/s/Solomon B. Cera
Solomon B. Cera

I declare that the foregoing is true and correct.  Executed in New York, New York, this 15th day of October, 2012.

/s/Hannah G. Ross
Hannah G. Ross

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

_____/s/Solomon B. Cera_____
Solomon B. Cera
